**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| RALPH SIMON, | Case No. 4:14-cv-1136 (JAR) |
| Plaintiff, | |
| v. | **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO EXCLUDE THE TESTIMONY OF PATSY DUNCAN** |
| SELECT COMFORT RETAIL CORP., | |
| and | |
| SELECT COMFORT CORPORATION, | |
| Defendants. | |

## INTRODUCTION

Plaintiff Ralph Simon claims a design defect caused mold to grow in his fourteen year-old Sleep Number® bed, causing various personal injuries.  To prevail on his claims, part of what Plaintiff must prove is that his bed contained mold at the time he was sleeping on it and that the mold became airborne such that he was exposed to it through inhalation.  To prove these facts, Plaintiff proposes to offer the expert testimony of Patsy Duncan, sole owner and operator of an at-home business called Fungus-A-Mungus.  But Duncan has no degree or higher education in microbiology or in any science.  Duncan does not have a laboratory.  She is not qualified to test for the presence of mold through any accepted methods.  She has no knowledge of the person at the laboratory who actually performed the mold analysis upon which she relies, has never talked to that person, and has no idea if that person was qualified to perform a microscopic test or if the test was actually performed.  Highlighting the extent of Duncan's lack of qualifications and expertise, she does not even know the basic taxonomy of mold.  Finally,

1

Duncan's opinion does not relate to whether mold was present in Plaintiff's bed when he used it. Indeed, Duncan did not do the tape-lift sample until almost five months after Plaintiff had taken the foam from his bed, in a damp condition, onto his driveway, exposing it to substantial mold from outside air, then placed it in a plastic bag, creating an ideal environment for mold to grow. Duncan's opinion is particularly significant because Dr. Bruce Hemming, a Ph.D. in microbiology, also tested the foam and found no evidence of mold. Simply put, Duncan is not qualified to opine on any mold issue relating to Plaintiff's bed and, even if she were, her opinion is irrelevant to causation and should therefore be excluded.

## FACTS

Plaintiff purchased his Sleep Number bed in 1999. In 2006, he claims that he disassembled and moved it to a new house but did not see any mold. (Ex. 1 (Simon Tr.) 24:4–27:3.)[1] At no time during his use of the bed did Plaintiff notice any mold related odor. (Ex. 18 (Lickfield Rbtl.) ¶ 34.)

Plaintiff claims that on March 1 or 2, 2013, he lifted up the foam pad of his bed and discovered a "massive accumulation of toxic mold," at which point he stopped sleeping on the bed. (Am. Compl. ¶ 7; Ex. 1 (Simon Tr.) 30:6–10.) He rolled up the foam pad, carried it out to his garage, and put it in a black plastic trash bag. (Ex. 1 (Simon Tr.) 80:5–11.) Plaintiff then took the foam pad out of the plastic bag, unrolled it on his driveway, took a picture of it, and put the foam back in the plastic bag in his garage. (*Id*. 90:2–7.) At some point later, Plaintiff gave the foam pad to his counsel, who kept it in a storeroom in his office. (*Id*. 90:10–11; Ex. 11 (Duncan Tr.) 72:20–73:6.)

---

[1] All exhibits cited in support of Defendants' (collectively "Select Comfort") motion are attached to the Declaration of Andrew S. Hansen and cited hereafter as "Ex.___."

2

Five months later, on July 24, 2013, Plaintiff's counsel asked Duncan to look at Plaintiff's foam pad. (Ex. 11 (Duncan Tr.) 73:3–6.) On July 26, 2013, Duncan was directed to Plaintiff's counsel's storage closet containing Plaintiff's foam pad in a plastic bag. (*Id*. 73:8–14.) Duncan proceeded to take a small single tape lift sample the size of one-square-centimeter from the queen-sized foam pad. (*Id*. 78:14–16, 79:19–80:1; Ex. 12 (Duncan Rpt.) at 2.) She took no samples of the indoor air on the storage room or closet or the air outside counsel's office building. She took no samples of the air or the inside or outside of Plaintiff's home, or of any other furniture, pillow or surface in Plaintiff's home. (Ex. 11 (Duncan Tr.) 85:17–23.) She put the single tape-lift sample in a standard FedEx package and mailed it via FedEx to a remote lab called EMLab. (*Id.* 80:20–81:7; Ex. 12 (Duncan Rpt.) at 2.) She claims the lab received the package three days later on July 29, 2013, and sent her a report on July 30, 2013. (Ex. 12 (Duncan Rpt.) at 2–3.) Duncan's reports do not reveal who did the microscopic examination or any evidence that the examination was performed. (*See* Ex. 12 (Duncan Rpt.).) No one from EMLab was identified by Plaintiff as a potential fact or expert witness in this case. Duncan had no further involvement with the sample or with the foam pad. (Ex. 11 (Duncan Tr.) 86:7–87:1.)

In her report, Duncan opines, despite not performing any analysis or revealing the identity of the person who purportedly did the analysis, that her single tape-lift sample showed evidence of *Cladosporium* mold growth "with a 3+ density with a general impression stating mold growth." (Ex. (Duncan Report) at 5, ¶ 1.) She includes in her report several statements regarding the health effects of mold and other allergens. (*Id*. at 3, 7.) She also opines that the model of Sleep Number® bed used by Plaintiff "could promote mold growth." (*Id*. at 5, ¶ 2.)

Duncan has a bachelor's degree in Economics from the University of Missouri-Columbia. (*Id*. at 1.) She is not a microbiologist, aerobiologist, physician, or engineer. (Ex. 11 (Duncan

3

Tr.) 12:12–21, 38:24–39:6.)  In fact, apart from Psychology 101, Duncan has taken no university science courses.  (*Id*. at 21:24–22:21.)  Rather, Duncan purports to hold certifications from the Indoor Air Quality Association and American Council for Accredited Certification in mold remediation and indoor environmental consultation.  (Ex. 12 (Duncan Rpt.) at 1; Ex. 11 (Duncan Tr.) 13:6–7, 16:5–7.)  These organizations essentially require nothing more than a fee and passing a single test administered by the organization.  (Ex. 11 (Duncan Tr.) 18:11–20:1.)  Duncan also touts her membership in Indoor Air Quality Association, which only requires that a person have "an interest in the subject of indoor air quality" and pay an annual fee.  (Ex. 11 (Duncan Tr.) 29:23–30:3.)  Duncan solely owns and operates a business out of her home called Fungus-A-Mungus.  (Ex. 12 (Duncan Rpt.) at 1; Ex. 11 (Duncan Tr.) 24:22–25.)  Based on her experience and education, she is qualified only to conduct visual inspections of indoor spaces for signs of substances with a mold-like appearance and to take samples of such substances for someone else to test for the presence or absence of mold.  (Ex. 11 (Duncan Tr.) 34:5–35:2.)  In addition, Duncan has no education, training, or experience in the fields of engineering, product design, or manufacturing.  Specifically, she has no knowledge, scientific or otherwise, of how the Sleep Number® bed is designed or manufactured.  (*Id*. at 38:19–25, 40:9–41:12, 88:10–17, 90:13–16.)

**ARGUMENT**

**I.  STANDARD OF ADMISSIBILLITY OF EXPERT TESTIMONY.**

Federal Rule of Evidence 702,[2] as interpreted by the United States Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993), dictates the circumstances in which expert testimony is admissible:

---

[2]  In a diversity case, the issue of whether expert testimony may be admissible is a matter governed by federal law.  *Clark v. Heidrick*, 150 F.3d 912, 914 (8th Cir. 1998).

4

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The Supreme Court's decision in *Daubert* and its progeny require that the trial court act as a "gatekeeper" to ensure that an expert's testimony is not only relevant, but "rests on reliable foundation." *Wells v. Fedex Ground Package Sys., Inc.*, No. 4:10-CV-2080-JAR, 2013 WL 5436608, at *4 (E.D. Mo. Sept. 27, 2013) (Ross, J.) (citing *Russell v. Whirlpool Corp.*, 702 F.3d 450, 456 (8th Cir. 2012)).  The Plaintiff has the burden of proving that Duncan's testimony is admissible pursuant to Rule 702 and the *Daubert* standard.  *See Daubert*, 509 U.S. at 592.

## II.     DUNCAN IS NOT QUALIFIED TO OFFER THE OPINIONS CONTAINED IN HER REPORT.

Federal Rule of Evidence 702 allows "a witness qualified as an expert by knowledge, skill, experience, training or education" to render opinions on scientific, technical or other specialized topics if her knowledge will assist the jury to understand the evidence or determine a fact issue.  The first step in analyzing proffered expert testimony is determining whether the expert is qualified under Federal Rule of Evidence 702.  It is not enough to prove general knowledge of a certain field; rather, the witness must possess expertise in the specific matters at issue. *See Mathis v. Exxon Corp.*, 302 F.3d 448, 460 (5th Cir. 2002).

Therefore, a court must look beyond general qualifications and decide if the expert possesses the special knowledge or expertise to express an opinion given the facts of the case. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 153–58 (1999).  Allowing an expert to go beyond her qualifications and to offer subjective beliefs as if they were opinions is improper. *See Gen.*

5

*Elec. Co. v. Joiner*, 522 U.S. 136, 136 (1997). Here, a lack of experience, training and education underlying the opinions she proffers renders her testimony inadmissible.

### A. Duncan Is Not Qualified to Opine On The Existence, Type, And Quantity Of Mold Allegedly Found In Plaintiff's Bed.

Duncan opines of the existence, type, and quantity of mold allegedly found in Plaintiff's bed. However, Duncan lacks qualifications to render such opinions. Duncan does not own or operate a lab and has never even worked in a lab. (Ex. 11 (Duncan Tr.) 24:20–21, 140:10–22, 142:2–4.) She is not qualified to scientifically analyze samples, a step essential to determining the existence of suspected mold. (*Id.* 35:14–15.) Duncan is not qualified to biologically identify mold or other microbes or to speciate or quantify mold. She is not qualified to opine on the shared or unique characteristics of types of mold. (*Id.* 35:14–15, 37:5–7, 38:2–10, 64:5–23, 119:3–120:8.) Duncan's knowledge of mold is so limited that she was not able to even partially discuss the taxonomy of mold. (*Id.* 119:3–120:20.) Further illustrating Duncan's lack of education and credentials, when she was asked why she used "mold" and "microbial" interchangeably she testified that the words meant the same thing. (*Id.* 21:10–23.) Of course, this is not the case as microbials include viruses, bacteria, and numerous other small organisms that are not fungi. Microbial, *The Oxford English Dictionary* 722 (2nd ed. 1989). Accordingly, Duncan lacks the qualifications to rebut the reports of Dr. Bruce Hemming and Neil Carlson, which would require scientific knowledge, training, and education with respect to the attributes and characteristics of viable and non-viable mold, as well as the potential allergenic effects of mold. (*See* Ex. 13 (Duncan Rbtl.).)

Duncan is not qualified to examine test tape for mold (Ex. 11 (Duncan Tr.) 35:14–15, 37:5–9), nor did she do so. Therefore, Duncan is not qualified to testify about the results of the analysis of the test sample purportedly conducted by third party EMLab or what those results

indicate.  Plaintiff has failed to provide any evidence through which the EMLab test can be verified or provide any information through which Select Comfort could challenge the test results in discovery.  Specifically, Duncan has no knowledge of the person who conducted the analysis of the test sample.  The person is not identified in Duncan's report.  She has never talked to this person. (Ex. 11 (Duncan Tr.) 40:1–4, 106:22–15).  She does not know if the examiner is competent or qualified.  (*See id.*)  EMLab did not send any photomicrographs of their purported analysis.  As a result, Select Comfort never had the opportunity to depose the laboratory worker or test the results in discovery.  Therefore, Select Comfort, the Court, and potential jury will know nothing of the laboratory technician's qualifications or practices.  Indeed, we do not even know if the technician was fired for incompetence the day after reviewing the test tape.  Basic due process prevents Plaintiff from shielding, through Duncan, all evidence and information regarding this purported analysis.

In attempting to argue that EMLab is trustworthy, Duncan clearly exceeded her scope of knowledge, resulting in plainly false testimony.  Specifically, Duncan testified that American Industrial Hygiene Association ("AIHA") accredits EMLab which involves someone from AIHA constantly being present in the lab and overseeing all testing and analysis, including the analysis of Duncan's tape sample.  (Ex. 11 (Duncan Tr.) 131:4–133:15).  Duncan even testified that "[e]very exam, [at EMLab] is audited by AIHA." (Ex. 11 (Duncan Tr.)  132:7.)  This is simply not true.  AIHA's own website notes that site assessments of laboratories only takes place "[o]nce every two years." (Ex. 26 (EMLAP website).)  Again, Duncan is out of her knowledge and experience but, in this instance, instead of admitting a lack of knowledge, unfortunately elected to testify falsely.

7

### B. Duncan Is Not Qualified To Opine On Whether The Sleep Number Bed Is Defective.

Duncan opines that Plaintiff's bed could promote mold growth because of the creation of a "moisture barrier with no ventilation." (Ex. 12 (Duncan Rpt.) at 5, ¶ 2.) Duncan lacks any qualification to offer this opinion. She has no education, training, or experience in engineering, design, or manufacturing of any kind, let alone of air beds like the Sleep Number® bed. She has absolutely no knowledge of how the Sleep Number® bed is designed or manufactured, including whether the bed provides for ventilation. (Ex. 11 (Duncan Tr.) 38:19–25, 40:9–41:12, 73:24–74:6, 88:10–17, 90:13–16.) Other than looking at Plaintiff's assembled bed in his garage, she did not inspect Plaintiff's bed and has never inspected any Sleep Number® bed. (*Id*. 110:3–111:5.) Further, Duncan's claim about lack of ventilation wholly contradicts Plaintiff's theory that ventilating air pushes mold spores out of the mattress and into the air.

The Court should therefore exclude Duncan from offering any testimony on whether the Plaintiff's bed is defective.

### C. Duncan Is Not Qualified To Opine On The Health Effects Of Mold Exposure.

Duncan submitted with her report a series of paragraphs regarding the potential health effects and reactions to mold in addition to other statements throughout her report. (Ex. 12 (Duncan Rpt.) at 3, 7.) Duncan has no scientific or technical expertise in microbiology, aerobiology, or environmental science and does not have a medical degree that would qualify her to testify regarding any alleged health effects related to mold. Duncan even testified that those paragraphs in her report are not her own words, but were cut-and-pasted from other sources. (Ex. 11 (Duncan Tr.) 120:9–122:21.)

### III.  DUNCAN'S SAMPLING METHODOLOGY IS UNRELIABLE.

Under *Daubert*, "[t]he adjective 'scientific' implies a grounding in the methods and procedures of science. Similarly, the word 'knowledge' connotes more than subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590. The Court's obligation under Rule 702 and *Daubert* is to determine evidentiary reliability, that is, trustworthiness.  509 U.S. at 590 n.9.  "In a case involving scientific evidence, evidentiary reliability will be based on scientific validity." *Id.* "[I]n order to qualify as 'scientific knowledge,' an inference or assertion must be derived by the scientific method. Proposed testimony must be supported by appropriate validation—i.e., 'good grounds,' based on what is known. *Id.* In short, the requirement that an expert's testimony pertain to 'scientific knowledge' establishes a standard of evidentiary reliability." *Id.* at 590. *Daubert* sets forth several non-exhaustive factors to assist trial courts in determining whether a theory or technique constitutes "scientific knowledge" within the meaning of Rule 702, including whether the methodology, principles and reasoning underlying the proposed experts' opinions: (1) can be and have been empirically tested; (2) have been subjected to peer review and publication; (3) have a known or potential rate of error; and (4) have gained general acceptance in the relevant scientific community. 509 U.S. at 593–94.

As explained in the rebuttal expert report of Dr. Lickfield, Duncan's methodology is not reliable under *Daubert*. (Ex. 18 (Lickfield Rbtl.) ¶¶ 36–38.) Dr. Lickfield has a Ph.D. in Textile and Polymer Science with a minor in microbiology and also has a Master's Degree in microbiology. (Ex. 18 (Lickfield Rbtl.) ¶¶ 6–7.) She explains that Duncan failed to take more than a one-square-centimeter tape-lift sample from an area on Plaintiff's bed. She did not take multiple surface samples, she did not perform any air sampling of Plaintiff's residence, surroundings, or other frequented locations, she did not take control samples, nor did she repeat her sampling on multiple days.  A single tape-lift sample "from a single area of suspected

9

biological contamination provides insufficient information to confirm the identity of a microbial species." (Ex. 18 (Lickfield Rbtl.) ¶ 36.) "[G]ood laboratory methodology requires that multiple samples be taken and evaluated in order to both mitigate the effect of potential procedural errors and to improve the confidence the investigator will have in the test results obtained." (*Id*.)

Dr. Lickfield's explanation of the unreliability of Duncan's sampling methodology is supported by standards published by the AIHA, an association Duncan lauds in her report. The AIHA's *Field Guide for the Determination of Biological Contaminants in Environmental Samples* advises that an investigator must have a clear and developed sampling strategy and objective before samples are taken. (Ex. 25 (AIHA) at 5.2.1.) Depending on the circumstances of the investigation, the investigator must purposefully identify the various locations from which samples will be taken. The AIHA advises the investigator to determine the appropriate indoor locations to sample depending on the particular spatial variables. (*Id*. at 5.2.2.) The AIHA advises the investigator to take both indoor and outdoor samples, which "provide a methodology to determine if the indoor species are atypical or indicative of indoor amplification." (*Id*. at 5.2.4.) Finally, the AIHA states that "thorough source sampling" is an important component of the diagnostic investigation strategy, including in both complaint and non-complaint areas. (*Id*. at 5.2.5.) Duncan acknowledged this proper methodology in her deposition. (Ex. 11 (Duncan Tr.) 34:5–19, 55:12–57:1.) Yet Duncan's sampling methodology involved none of the aspects of the careful, purposeful, and thorough strategy recommended by the AIHA and which she has acknowledged.

Other courts in similar mold cases have excluded experts as unreliable due to inadequate sampling. *See*, *e.g.*, *Jenkins v. Slidella L.L.C.*, No. 05-370, 2008 WL 2649510 (E.D. La. June 27, 2008); *Fraser v. 301-52 Townhouse Corp.*, 831 N.Y.S.2d 347 (Sup. Ct. 2006). In *Jenkins*, the

plaintiffs alleged injuries caused by exposure to high levels of mold in their apartment. The defendant sought to exclude plaintiffs' mold expert because he deviated from accepted industry standards, including his failure to take an adequate number of samples in different locations and of the air, and he failed to take samples on more than one day. *Jenkins*, 2008 WL 2649510, at *1–2. The court agreed with the defendant that the expert's sampling methodology was unreliable and therefore excluded the expert. *Id.* at *3.

Similarly, in *Fraser*, the plaintiff brought an action to recover for personal injuries allegedly arising from mold in plaintiffs' water-damaged apartment. 831 N.Y.S.2d at *1. In excluding the plaintiffs' expert, the court identified several deficiencies with the expert's mold sampling reports—the same deficiencies that are present but even more extreme in Duncan's report. Significantly, the court determined that air, bulk and wipe samples collected on only one occasion were insufficient to establish causation. *Id.* at *25. In reaching this conclusion, the court noted that from a review of the relevant scientific literature that "it is generally accepted in the scientific community that standard, reliable methods of measuring indoor airborne mold do not exist and that multiple airborne sampling on different days must be done to get an accurate reading." *Id.* at *3.

Here, Duncan's sampling methodology is even less reliable than the methodology used by the purported experts in *Jenkins* and *Fraser*. The experts in *Jenkins* and *Fraser* took more than one sample and yet were nonetheless found to be unreliable. Duncan took only a single sample. Under Plaintiff's theory, vast volumes of mold spores escaped through the foam (the alleged mold was on the bottom side) and through the pillow-top (the top layer) of Plaintiff's bed. Yet Duncan did not test, at any time, to see if there was mold on the pillow-top. Dr. Hemming, however, thoroughly sampled and cultured the mattress cover, yet found no evidence

11

of mold.  (*See* Ex. 16 (Hemming Rbtl.) at 8, ¶ 7.)  Duncan's methodology falls woefully short of the *Daubert* standard.  Moreover, the need for multiple samples is even more acute in this case because the sample taken by Duncan was at high risk for contamination and procedural error.  Duncan shipped the sample through the mails in standard packaging under unknown conditions to a lab in New Jersey.  We have no idea—because no one from the lab testified or was even listed as a fact or expert witness—what procedures were in place at EMLab to ensure that the sample was not contaminated, how it was processed, or how or whether it was kept separate from other samples.

In addition, Duncan's sampling methodology is insufficient to serve as a reliable basis for any opinion regarding the quantity and severity of mold in Plaintiff's bed.  "[A] single microscopic examination of unknown magnification and unknown sample preparation, using unknown quantification techniques provides insufficient data to make anything other than a qualitative assessment of said sample."  (Ex. 18 (Lickfield Rbtl.) ¶ 37; *see also* Ex. 16 (Hemming Rbtl.) at 6–7, ¶ 5.)  Indeed, "[t]ape sampling is meant to be used for qualitative rather than quantitative analysis."  (Ex. 16 (Hemming Rbtl.) at 7, ¶ 5.)  Duncan failed to use means to specifically quantify the amount of mold on a surface, which are readily available and understood by those qualified to use such means.  (Ex. 18 (Lickfield Rbtl.) ¶ 37.)

As noted above, Duncan only did a visual inspection of the foam.  However, as the need for laboratory testing shows, visual inspection is insufficient to confirm mold.  It is even more unreliable here since Duncan did no testing to determine how Plaintiff's perspiration would stain

12

the foam, how Plaintiff's excessive drooling would stain the foam (Ex. 11 (Duncan Tr.) 108:1–5) or how any spilled liquids would stain the foam.[3]

Consequently, Duncan's insufficient and unreliable testing methodology based on a single tape-lift sample strips her report of any reliability, and her opinion should therefore be excluded.

IV. **DUNCAN'S PROPOSED TESTIMONY IS NOT RELEVANT TO WHETHER PLAINTIFF WAS EXPOSED TO AIRBORNE MOLD ORIGINATING IN HIS BED AT THE TIME HE WAS SLEEPING ON IT AND THEREFORE WILL NOT ASSIST THE TRIER OF FACT.**

For Plaintiff to prevail on his claims, the trier of fact must find that Plaintiff's bed contained mold at the time he was sleeping on it and that the mold became airborne. In an attempt to prove these facts, Plaintiff relies on Duncan's opinion. However, even if Duncan's sampling methodology were reliable, her report is entirely irrelevant to proving these facts because the tape-lift sample was taken months after the foam had been put in storage. Therefore, Duncan's opinion should be excluded as not relevant and incapable of assisting the trier of fact.

Plaintiff stopped using his bed on or around March 1 or 2, 2013, when he claims he found mold. Yet Duncan did not sample the foam pad from Plaintiff's bed until nearly five months later, on July 26, 2013. And in those intervening months, the foam pad was rolled and unrolled, stored in a plastic bag, in a garage, and in a closet, and had been laid outside on a driveway while damp. Plaintiff and Duncan simply cannot account for the likelihood that any mold found on the foam pad developed, not while the bed was being used months previously by Plaintiff, but during any number of the activities that disturbed the foam pad during those intervening five months. Indeed, Plaintiff essentially performed the equivalent of taking a damp towel and placing it in a

---

[3] Dr. Hemming, a Ph.D. in microbiology and the operator of two sophisticated laboratories in St. Louis, Missouri, noted that the dark discoloration on the foam appeared to be a perspiration stain. (Ex. 16 (Hemming Rbtl.) ¶ 7.)

plastic bag for several months. Of course, it is common knowledge that this will cause mold to grow on the towel. As explained in the rebuttal expert report of Dr. Bruce Hemming:

> To the extent Duncan's tests are accurate and she found mold on the foam, it is impossible for Duncan to determine whether the mold she found on [Plaintiff's] bed was present on March 2, 2013. It is just as likely, and probably more so, that [Plaintiff's] treatment of the foam by laying it on his driveway in a damp condition in an area certainly populated with abundant *Cladosporium* spores, sealing it in a plastic bag, and then stor[ing] it with his attorney . . . he created the perfect environment for incubation of mold.

(Ex. 16 (Hemming Rbtl.) at 6, ¶ 4.) Importantly, Duncan herself limits her report's relevance to solely the date of sampling, nearly five months after Simon used the bed:

> All samples taken during this project are limited to representing conditions at the time of sampling. The results do not imply or deny conditions that may have existed prior to our sampling or inspection.

(Ex. 12 (Duncan Rpt.) at 16.) Accordingly, Duncan's opinion, even if it were reliable and valid, would only assist the trier of fact in determining whether there was mold in Plaintiff's bed on July 26, 2013, the date of the sampling. But that fact is entirely irrelevant to whether mold existed on the bed months earlier on March 2, 2013, when Plaintiff was using the bed.

Furthermore, for mold to cause health problems, a person must inhale a substantial number of airborne spores. The presence of mold on or in a particular surface, as determined by a tape-lift sample, does not indicate mold spores in the air. (Ex. 16 (Hemming Rbtl.) at 6–7.) Duncan performed no air sampling of Plaintiff's residence at any time. Consequently, not only is Duncan's report irrelevant to whether Plaintiff's bed contained mold at the time he was using it, Duncan's report does not even address the presence or absence of mold in the air of Plaintiff's home. Duncan's report and testimony should therefore be excluded.

## **CONCLUSION**

Because Patsy Duncan has no education or qualifications in mold or microbiology, did not perform any test or analysis and is not qualified to do so, and because her opinion does not

14

relate to the time Plaintiff used his bed, her testimony should be excluded under the *Daubert* standard.

Date: August 28, 2015.

**OPPENHEIMER WOLFF & DONNELLY LLP**

By: s/ Andrew S. Hansen
Andrew S. Hansen (MN #285894) (*pro hac vice*)
Heidi A.O. Fisher (MN #320638) (*pro hac vice*)
Ellie J. Barragry (MN #395207) (*pro hac vice*)
Campbell Mithun Tower, Suite 2000
222 South Ninth Street
Minneapolis, MN 55402-3338
Telephone: (612) 607-7000
Facsimile: (612) 607-7100

**BRYAN CAVE**

Eric Martin, #47558
Jamie Hais, #64882
One Metropolitan Square
211 North Broadway, Suite 3600
St. Louis, MO 63102-2750
Telephone: (314) 259-2324
Facsimile: (314) 259-2020

**ATTORNEYS FOR DEFENDANTS**

15