**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | |
|---|---|
| RALPH SIMON,<br><br>           Plaintiff,<br><br>v.<br><br>SELECT COMFORT RETAIL CORP.,<br><br>and<br><br>SELECT COMFORT CORPORATION,<br><br>           Defendants. | Case No.  4:14-cv-1136 (JAR)<br><br>**DEFENDANTS' STATEMENT OF UNCONTROVERTED MATERIAL FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT** |

Defendants Select Comfort Corporation and Select Comfort Retail Corporation (collectively "Select Comfort"), submit this Statement of Uncontroverted Material Facts in Support of their Motion for Summary Judgment, ECF 60, pursuant to Local Rule 7-4.01(E):

**Background**

1.   Plaintiff Ralph Simon is a resident of St. Louis, Missouri. (Ex. 1 (Simon Tr.) 7:3–4.)[1]

2.   Plaintiff purchased a 1999 model 5000 series Sleep Number® bed on or about November 19, 1999. (Am. Compl. (Dkt. 31) ¶ 1; Answer (Dkt. 43) ¶ 1.)

3.   Select Comfort designs, manufactures and sells the Sleep Number® bed.  (Am. Compl. (Dkt. 31) ¶ 3; Answer (Dkt. 43) ¶ 3.)

---

[1]   All exhibits cited in support of Defendants' Statement of Uncontroverted Material Facts are attached to the Declaration of Andrew S. Hansen and cited hereafter as "Ex.___."

4.     Instead of using springs like a traditional mattress, Plaintiff's 5000 series Sleep Number® bed contains uniquely designed inflatable air chambers that can be adjusted by a remote control to provide firmer or softer support for the user. (Ex. 31 (SC000149–50).)

5.     Directly on top of the air chamber sits a foam layer and on top of that there is additional padding layers and a pillow-top or mattress cover layer. (*Id.*)

6.     The air chamber, foam, and padding are encased in the mattress cover, which zips around the perimeter and encloses the inner workings of the mattress, giving it the exterior appearance of a traditional mattress. (*Id*.)

7.     The Sleep Number® mattress rests on a flat foundation, and the entire sleep system (mattress and foundation) is referred to as the Sleep Number® bed.

8.     Beginning in 1996, Select Comfort began treating its beds with antimicrobial agents. (Ex. 36 (SC000819).)

**Plaintiff's Claims**

9.     After using the bed from 1999 through 2006, Plaintiff moved to a new house. (Ex. Simon Tr. 24:4–9.) During that move, Plaintiff testified that he disassembled his bed to move it. (*Id*. 25:5–26:21.)

10.    Plaintiff did not see any signs of mold in his bed when he disassembled and reassembled it in 2006. (*Id.*)

11.    In addition to perspiring at night, Plaintiff also drooled. (Ex. 1 (Simon Tr.) 79:24–80:5.)

12.    Plaintiff contacted Select Comfort on February 22, 2013 to report a comfort issue with his bed. (Ex. 1 (Simon Tr.) 80:2–19; Ex. 35 (SC00636).) Despite the bed being

approximately 14 years-old, Select Comfort sent Plaintiff replacement foam to alleviate the comfort issue. (*See* Ex. 1 (Simon Tr.) 81:6–19; Ex. 35 (SC000636).)

13. Approximately two weeks later, Plaintiff opened his bed to replace the foam. (Ex. Simon Tr. 78:11–21) He claims that on March 1 or 2, 2013, he discovered "toxic mold" on his foam pad. (Am. Compl. (Dkt. 31) ¶ 7.)

14. Plaintiff thereafter rolled up the foam pad, took it to his garage, and placed it in a black plastic bag. (Ex.1 (Simon Tr.) 80:5–11).

15. Plaintiff contacted Select Comfort and reported mold on his bed. (Ex. 1 (Simon Tr.) 80:2–19) He was promptly sent replacement air chambers. (Ex. 1 (Simon Tr.) 81:10–19.) The Select Comfort representative and Plaintiff then discussed the bed components.

**Plaintiff**: Okay. Alright. Um, so since I want this out of my house, let me just understand that ah, the control and the pump are all one assembly.

**SC Representative**: Um hmm.

**Plaintiff**: So, I'm getting a new pump and a control and the chamber so all that can go out in the trash tomorrow.

**SC Representative**: All that you can throw away. Yeah. Um, and then just so you know too as a kind of like a heads-up, the new pump that comes to you is going to be wireless because that's how they are now – wireless.

**Plaintiff**: Okay.

(Exs. 34, 35 (SC000635, SC000636).)

16. Plaintiff apparently placed the air chambers in the trash. (Ex. 1 (Simon Tr.) 81:10–19.) He took no photos of the air chambers and there is no evidence that the air chambers were discolored in any way due to mold.

17. Later that day, Plaintiff discussed with his sister bringing a lawsuit against Select Comfort. (Ex. 1 (Simon Tr.) 84:19–83:7; Ex. 4 (K. Driskill Tr.) 13:10–20.) Plaintiff conducted

3

online research but did not remove and preserve his air chambers from the trash. (Ex. 1 (Simon Tr.) 85:14–86:21.)

18. Plaintiff later removed the foam from the plastic and unrolled it on his driveway, exposing it to the outside air. (Ex. 1 (Simon Tr.) 90:2–7.) Plaintiff described the foam as "slimy," indicating a damp condition. (Ex. 1 (Simon Tr.) 78:21–24.)

19. After placing the damp foam on the driveway, Plaintiff took a photograph for use in his lawsuit. (Ex. 1 (Simon Tr.) 90:2–7.)

20. Plaintiff then placed the foam in the sealed plastic bag and returned it to his garage. (*Id.*)

21. Soon thereafter, Plaintiff retained counsel. (Ex. 1 (Simon Tr.) 88:5–7.) He then took the foam pad in the plastic to his counsel's office. (Ex. 1 (Simon Tr.) 90:10–13.)

**Mold Testing**

22. On July 24, 2013, after having the foam pad for several months, Plaintiff's counsel contacted Patsy Duncan, who runs a business out of her home called Fungus-A-Mungus. (Ex. 12 (Duncan Rpt.) at 1.) Fungus-A-Mungus is a mold remediation company. (*Id.*) Duncan was asked to look at the foam. (*Id.*)

23. Far from being a microbiologist or fungus expert, Duncan graduated with an economics degree. (*Id.*) Duncan has taken no formal science courses and is not trained or educated to confirm the presence of mold through any of the accepted means of testing. (Ex. 11 (Duncan Tr.) 21:24–22:21.)

24. On July 26, 2013, Duncan went to Plaintiff's counsel's office where counsel presented her the plastic bag containing Plaintiff's foam pad. (*Id.* 73:3–14.)

4

25. Duncan proceeded to take a single small tape lift sample the size of one-square-centimeter. (*Id.* 78:14–16.) This was taken nearly five months after Plaintiff originally claimed to have seen mold on his bed. (*Id.* 96:1–12.)

26. Duncan took no samples of the air in the storage closet or in counsel's office and Duncan took no samples of the air in the inside or outside Plaintiff's home. (*See* Ex. 12 (Duncan Rpt.).)

27. Duncan did not and has not ever talked to Plaintiff about the mold he claims to have seen on his foam. (Ex. 11 (Duncan Tr.) 98:21–22.)

28. Duncan sent the tape sample to a third-party laboratory for testing, since Duncan has no laboratory of her own, is not qualified to work in a laboratory, and is not qualified to interpret tape samples to confirm mold. (Ex. 11 (Duncan Tr.) 35:14–15.)

29. Duncan did no analysis to determine if perspiration or drool caused staining of Plaintiff's foam as opposed to mold. (Ex. 11 (Duncan Tr.) 108:1–5.)

30. Duncan also has no experience with how foam will stain due to perspiration or how mold looks when growing on foam. (*Id.*)

31. The laboratory that purportedly examined the tape sample is called EMLab, located in New Jersey. (Ex. 12 (Duncan Rpt.) at 2.) No one from EMLab was disclosed as a witness or person with knowledge of any facts in this case. (*See* Ex.38 (Pl.'s Initial Disclosures).) No one from EMLab was disclosed as an expert witness in this case.

32. Duncan received results of the purported test which indicated that the common mold *Cladosporium* was found on the tape sample. (Ex. 12 (Duncan Rpt.).) The EMLab test does not identify the person who conducted the test, describe that person's qualifications, or identify anything about the person's credentials. (*See id.*)

5

33. The results of EMLab did not contain any photomicrographs of the microscopic examination, preventing review of the tape results by any other person. (*Id.*)

34. Select Comfort was allowed access to the foam and remaining bed parts on March 12, 2015. (Ex. 15 (Hemming Rpt.) at 1.)

35. Select Comfort's expert, Dr. Bruce Hemming, who has a Ph.D. in microbiology and operates two laboratories in St. Louis, Missouri, took four swab samples from the foam. (Ex. 15 (Hemming Rpt.) at 1.)

36. Dr. Hemming then cultured the swab samples which showed that there was no mold present on the foam. (Ex. 15 (Hemming Rpt.) at 5.)

37. *Cladosporium* is ubiquitous and commonly found indoors and outdoors. (Ex. 9 (Chiodo Tr.). 32:19; Ex. 22 (Wedner Tr.) 82:14–25; Ex. 23 (Wedner Rpt.) at 3; Ex. 6 (Carlson Tr.) 137:3–10; Ex. 14 (Hemming Tr.) 25:24–26:6, 96:19–20.))

38. The median outdoor *Cladosporium spp.* concentration in the United States in clear weather is 610 spores per cubic meter. (Ex. 7 (Carlson Rpt.) at 3.)

39. Consistent with neighboring states, spore levels in Missouri are likely even higher than the national average. (Ex. 7 (Carlson Rpt.) at 3–4 (Illinois and Ohio reported median spore levels of 693 and 838 spores per cubic meter respectively.))

*40.* Three or our four years ago, St. Louis set the world record for *Cladosporium* spores. (Ex. 22 (Wedner Tr.) 82:14–22.]

41. Dr. Hemming also examined other components of Plaintiff's bed. Significantly, the pillow-top contained no visible evidence of potential mold and, after Dr. Hemming's testing, it was confirmed that no mold was present on the pillow-top. (Ex. 15 (Hemming Rpt.) at 8, ¶ 7.)

6

Plaintiff's theory of mold escape is based on vast quantities of mold pushing through the pillow-top, yet Dr. Hemming's testing showed no such mold was present.

### Plaintiff's Bed

42. Plaintiff also retained Dr. Christopher Pastore to opine that Plaintiff's bed was defective, which caused mold to grow.

43. However, Pastore is not a microbiologist and has no experience with mold. (*See* Ex. 20 (Pastore Rpt.) at 18–35.)  (Ex. 19 (Pastore Tr.) 14:15–15:19; 89:2–17.)

44. Pastore also does not have any experience with bed design. (*See* Ex. 20 (Pastore Rpt.) at 18–35.)  (Ex. 19 (Pastore Tr.) 16:16–17:4.)

45. Pastore did not test any of his theories, but instead relied on Duncan's opinion of mold on a square centimeter of foam five months after the foam had been used and months after it had been exposed to outside air and placed in a plastic bag. (Ex. 19 (Pastore Tr.) 62:4–9, 65:13–66:6, 67:18–68:17, 72:24–73:20, 80:2–6, 92:3–9.)

46. From there, Pastore merely assumed mold grew in Plaintiff's bed when Plaintiff was using it and theorized as to why mold grew. (*Id.*)

47. Pastore did no testing to determine if any of his theories are correct. Pastore also relied on an incorrect estimate of one size of mold spores in claiming that they would escape from the bed, actually basing his opinion on believing that mold spores are approximately 100x smaller than they actually are. (Ex. 19 (Pastore Tr.) 74:7–20; Ex. 18 (Lickfield Rbtl.) ¶ 47.)

48. Neil Carlson actually tested whether mold, even if present in the bed, could escape through the various layers and come into contact with Plaintiff. (*See* Ex. 7 (Carlson Rpt.))  (Mr. Carlson's test revealed that mold would not escape the confines of the bed during a normal night's use. (*Id.*)

7

**Plaintiff's Alleged Injuries**

49. In his Amended Complaint, Plaintiff alleges that he suffered a sudden-onset of "mysterious" health problems in 2009. (Am. Compl. (Dkt. 31) ¶¶ 4–6.)

50. Plaintiff alleges that as a result of his mold exposure, Plaintiff's health has been severely and permanently impaired, including substantial vision loss in his left eye; substantial loss of hearing; and loss of a substantial amount of his sense of smell. (Am. Compl. (Dkt. 31) ¶¶ 12–17.)

51. Plaintiff's theory now also includes an allegation that as a result of his mold exposure and ailments, he was prescribed gentamycin and prednisone, and as a direct result those medications, he has suffered permanent hearing loss and developed cataracts. (Ex. 10 (Chiodo Rpt.) at 5.)

52. In November 2013, when his attorney first contacted Select Comfort, Plaintiff offered an unsolicited, signed affidavit that stated his physical symptoms attributed to mold began "in 2006." (Ex. 32 (Simon Aff.) ¶ 4.)

53. In Plaintiff's original petition (Dkt. 2, Ex. A) and Amended Complaint (Dkt. 31), filed in April 2014 and March 2015 respectively, Plaintiff claimed his injuries began in 2009.

54. On May 15, 2015, Plaintiff testified at his deposition, under oath, that his symptoms due to alleged exposure to mold began in approximately 2002 or 2003. (Ex. 1 (Simon Tr.) 78:5–10.)

55. Plaintiff has offered three different alleged years that this "sudden-onset" of injuries began, spanning over a seven-year period. (Ex. 32 (Simon Aff.) ¶ 4; Compl. (Dkt. 2), Ex. A; Am. Compl. (Dkt. 31) ¶ 4; Ex. 1 (Simon Tr.) 78:5–10.)

8

56. Plaintiff has admitted that he "was not informed by his physicians" that his mysterious illness is related to mold. (Am. Compl. ¶ 20.)

57. Plaintiff does allege that a year after he claims he discovered mold in his bed, and after he has presumably ceased using it, he allegedly continues to suffer from his symptoms. (*Id.* ¶¶ 14–15.)

58. Plaintiff saw his treating ENT on June 25, 2014, and at that time he was continuing to take allergy medicine. (Ex. 3 (Craig Tr.) 120:4–23.)  He also continued to call his doctor to request refills of medications used to control allergies and inflammation of the nose, including allergic rhinitis.  (*Id*. 122:17–124:5.)

### *Dr. H. James Wedner, MD, FACP, FAAAI*

59. Allergist and immunologist Dr. H. James Wedner is a tenured professor of medicine, medical director of the Asthma and Allergy Center, and chief of the Division of Allergy and Clinical Immunology at the Washington University School of Medicine in St. Louis. (Ex. 23 (Wedner Rpt.) at 1.)

60. Select Comfort engaged Dr. Wedner to conduct an Independent Medical Exam ("IME") of Plaintiff.  (*Id.*)

61. Select Comfort provided Dr. Wedner all of Plaintiff's medical records obtained in this litigation.  (Ex. 24 (Wedner Rbtl.)at 1.)

62. Dr. Wedner evaluated Plaintiff on March 10, 2015, as part of a Federal Rule of Civil Procedure 35 medical examination. (Ex. 23 (Wedner Rpt.) at 4.)

63. Dr. Wedner sought a thorough patient history from Plaintiff. (Ex. 23 (Wedner Rpt.) at 5; Ex. 22 (Wedner Tr.) 8:2–16, 58:15–60:11.)

64. Plaintiff provided Dr. Wedner incorrect and incomplete facts, alleging he did not have allergies other than mold and had no family history of allergies. (Exs. 23 (Wedner Rpt.) at 12-18; 24 (Wedner Rbtl.) ¶ 7.)

65. Dr. Wedner conducted an allergy skin testing of Plaintiff and discovered numerous allergies. (Ex. 23 (Wedner Rpt.) at 7, 11.)

66. Based on the allergy skin test performed on Ralph Simon, Dr. Wedner determined Plaintiff is sensitive to trees, grasses, and weeds which give him seasonal symptoms; Plaintiff is reactive to multiple fungal genera including both indoor and outdoor fungi, including mushrooms, toadstools, smuts and rusts; and Plaintiff's skin tested positive to cat, mouse and dust mite allergies. (Ex. 23 (Wedner Rpt.) at 7.)

67. Plaintiff has never conducted any testing to eliminate other mold sources or dust mites as the cause of any of his alleged symptoms.

68. Dr. Wedner concluded that Plaintiff is a highly atopic individual and his medical history is consistent with this finding. (Ex. 23 (Wedner Rpt.) at 7.)

69. Based on Dr. Wedner's review of the documents provided to him and his evaluation of Plaintiff, Dr. Wedner concluded to a reasonable degree of medical and scientific certainty that Plaintiff did not suffer adverse health effects from his Sleep Number® bed. (Ex. 23 (Wedner Rpt.) at 8.)

**Dr. Ernest P. Chiodo, M.D., J.D., M.P.H., M.S., M.B.A., C.I.H.**

70. In support of his allegations that he has suffered injuries from his purported exposure to mold, Plaintiff offered the testimony of professional expert and degree collector, Ernest P. Chiodo.

71. Dr. Chiodo is a career professional expert that admitted he may make as much as 90% of his income through paid expert testimony. (Ex. 9 (Chiodo Tr.) 143:9–20.)

72. Dr. Chiodo offers his opinion on Plaintiff's ailments based on a review of his medical records, cursory physical examination, and based on the false patient history provided by Plaintiff. (Ex. 9 (Chiodo Tr.) 65:16–24.)

73. Unlike Dr. Wedner, Dr. Chiodo did nothing to independently verify Plaintiff's statements regarding his patient history. (Ex. 9 (Chiodo Tr.) 58:20–60:11.)

74. Dr. Chiodo makes the scientifically unsupported conclusion that Plaintiff has suffered permanent hearing loss as a result of his treatment with gentamycin. (Ex. 9 (Chiodo Tr.) at 5.)

75. As explained in Dr. Wedner's rebuttal report, there has never been a report in the literature of intranasal studies of gentamycin causing ototoxicity. (Ex. 24 (Wedner Rbtl.) ¶ 8.)

76. Dr. Chiodo also asserts the scientifically unsupported opinion that Plaintiff has developed cataracts as a result of his treatment with prednisone. (Ex. 10 (Chiodo Rpt.) at 5.)

77. Dr. Neal Sher, MD, FAAAO, FACS, a board-certified opthamologist who has performed thousands of surgeries and studied the causal connection between steroid use and cataracts, submitted an expert report explaining that neither the type of cataracts Plaintiff has developed nor the length of his use of Prednisone are consistent with the scientific literature. (*See* Ex. 21 (Sher Rpt.).)

78. Dr. Sher stated that Plaintiff's visually insignificant cataracts are not related to steroid use and the most likely cause is a "combination of factors, including age, life style, and genetics." (Ex. 21 (Sher Rpt.) at 7.)

79. Dr. Chiodo makes the unsupported assumption that if *Cladosporium* mold existed in Plaintiff's bed, Plaintiff was exposed to the mold. (Ex. 10 (Chiodo Rpt.) at 5.)

80. Dr. Chiodo further does not account for, nor explain away, the undisputed fact that Plaintiff is constantly exposed to *Cladosporium*, yet now alleges no symptoms.

81. When evaluating potential exposure, Plaintiff's failure to take air samples makes it impossible to account for the constant presence of *Cladosporium* in indoor and outdoor environment. If the concentration of *Cladosporium* is equal to or less than the outdoor sample, then the indoor sample cannot be implicated as a source for mold spores. (Ex. 23 (Wedner Rpt.) at 4.)

82. The median outdoor *Cladosporium spp.* concentration in the United States, in clear weather, is 610 spores per cubic meter. (*Id.* Ex. 7 (Carlson Rpt.) at 3.)

83. Consistent with neighboring states, spore levels in Missouri are likely even higher than the national average. (*Id.* Ex. 7 (Carlson Rpt.) at 3–4 (Illinois and Ohio reported median spore levels of 693 and 838 spores per cubic meter respectively).)

84. St. Louis, Missouri, in particular has a remarkably high concentration of *Cladosporium* and only a few years ago set the world record for *Cladosporium* spores per cubic meter. (Ex. 22 (Wedner Tr.) 82:17–22.)

85. Plaintiff's own physician described it is a "wonderful place to practice sinus medicine" because of the widespread allergies, which are due to "a lot of moisture, a lot of humidity, a lot of vegetation, resulting in a lot of pollen and mold.... [S]o we have a lot of exposures here." (Ex. 3 (Craig Tr.) 90:1–91:20.)

86. Moreover, and as described above, testing performed by Select Comfort's expert indicates that even if mold had grown inside Plaintiff's bed, any amount of *Cladosporium* that

12

was released into the air would not have been over the typical outdoor or indoor concentrations. (Ex. Carlson Report.)

87. *Cladosporium* was found at Plaintiff's home (years after his Sleep Number® bed was removed), work, and place of worship. (Ex. 16 (Hemming Rbtl.) at 3–5 ¶ 1.)

88. There is no evidence regarding the dose or level of any purported exposure to mold spores to which Plaintiff was allegedly exposed.

89. Dr. Chiodo could not explain why Plaintiff's daily exposure to *Cladosporium* does not affect him, but purported exposure from *Cladosporium* from his bed would cause allergic reactions. (Ex. 9 (Chiodo Tr.) 133:20–134:25, 139:4–141:5.)

90. Dr. Chiodo did not test Plaintiff for a reaction to allergens such as pollen, grass, trees, and outdoor mold species, nor did Dr. Chiodo consider the possibility of other allergens. (*See* Ex. 1 (Simon Tr.) 41:14–42:16; 47:3–51:17; Ex. 10 (Chiodo Rpt.).)

91. Based on the above and as outlined in the consecutively-filed motion to exclude the expert testimony of Dr. Chiodo, Dr. Chiodo's opinions are unreliable.

92. Given the complete absence of any reliable evidence of product defect or reliable expert testimony regarding the causal connection between Plaintiff's Sleep Number® bed and his purported ailments, Select Comfort submits that summary judgment be granted and Plaintiff's Amended Complaint be dismissed against Select Comfort in its entirety with prejudice.

Date:  August 28, 2015.  **OPPENHEIMER WOLFF & DONNELLY LLP**

By:   s/ Andrew S. Hansen
Andrew S. Hansen (MN #285894) (*pro hac vice*)
Heidi A.O. Fisher (MN #320638) (*pro hac vice*)
Ellie Barragry (MN #395207) (*pro hac vice*)
Campbell Mithun Tower, Suite 2000
222 South Ninth Street
Minneapolis, MN 55402-3338
Telephone:  (612) 607-7000
Facsimile:  (612) 607-7100

**BRYAN CAVE**

Eric Martin, #47558
Jamie Hais, #64882
One Metropolitan Square
211 North Broadway, Suite 3600
St. Louis, MO 63102-2750
Telephone:  (314) 259-2324
Facsimile:  (314) 259-2020

**ATTORNEYS FOR DEFENDANTS**