# Exhibit 6

**to**
**Declaration of Declaration of Andrew S. Hansen**

**Ralph Simon v. Select Comfort Retail Corp.,**
**and Select Comfort Corporation**
**Case No.:  4:14-cv-1136 (JAR)**

# In The Matter Of:

*Ralph Simon vs.*
*Select Comfort Retail Corp., et al.*

---

*Neil Geoffrey Carlson*
*August 7, 2015*

---



depo international
worldwide deposition services

*Min-U-Script® with Word Index*

Neil Geoffrey Carlson - August 7, 2015
Ralph Simon vs. Select Comfort Retail Corp., et al.

---

Page 1

```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF MISSOURI
 2                   EASTERN DIVISION

 3  - - - - - - - - - - - - - - - - - - - - - -

 4  RALPH SIMON,              )
                              )
 5          Plaintiff,        )
                              )
 6  vs.                       ) Case No. 4:14-cv-1136(JAR)
                              )
 7  SELECT COMFORT RETAIL      )
    CORP. et al,              )
 8                            )
            Defendants.       )
 9  - - - - - - - - - - - - - - - - - - - - - -

10

11                  DEPOSITION

12          The following is the deposition of

13  NEIL GEOFFREY CARLSON, taken before Jean F. Soule,

14  Notary Public, Registered Professional Reporter,

15  pursuant to Notice of Taking Deposition, at the

16  office of Oppenheimer Wolff & Donnelly, LLP,

17  Campbell Mithun Tower, Suite 2000, 222 South Ninth

18  Street, Minneapolis, Minnesota, commencing at

19  8:59 a.m., Friday, August 7, 2015.

20

21

22                  *    *    *

23

24

25
```

---

Page 2

```
 1  APPEARANCES:

 2

 3      On Behalf of the Plaintiff:

 4          David S. Corwin, Esquire
            SHER CORWIN WINTERS, LLC
 5          190 Carondelet Plaza
            Suite 1100
 6          St. Louis, Missouri 63105
            Phone:  (314) 721-5200
 7          e-mail:  dcorwin@scwstl.com

 8      On Behalf of the Defendants:

 9          Heidi A.O. Fisher, Esquire
            OPPENHEIMER WOLFF & DONNELLY, LLP
10          Campbell Mithun Tower
            Suite 2000
11          222 South Ninth Street
            Minneapolis, Minnesota 55402-3338
12          Phone:  (612) 607-7450
            e-mail:  hfisher@oppenheimer.com

13

14

15

16

17

18

19

20

21

22

23

24

25
```

---

Page 3

```
 1              P R O C E E D I N G S

 2      Whereupon, the deposition of NEIL GEOFFREY

 3  CARLSON was commenced at 8:59 a.m. as follows:

 4                  * * *

 5      (Reporter's Note:  The oath was

 6  administered by the court reporter.)

 7      MR. CARLSON: I do.

 8              * * *

 9      NEIL GEOFFREY CARLSON,

10  after having been first duly sworn,

11  deposes and says under oath as follows:

12              ***

13          EXAMINATION

14  BY MR. CORWIN:

15      Q.   Good morning, sir.

16      A.   Good morning.

17      Q.   Could you please state your name for

18  the record?

19      A.   Neil Geoffrey Carlson.

20      Q.   And you have been disclosed and, in

21  fact, have written a report in the case of Ralph

22  Simon versus Select Comfort; is that correct?

23      A.   Yes.

24      Q.   Did you write the report?

25      A.   Yes.
```

---

Page 4

```
 1      Q.   I see.  And, first of all, we have

 2  your report and your rebuttal reports.  Are you

 3  familiar with those?

 4      A.   Yes.

 5      Q.   The opinions that you're prepared to

 6  express in this case, are they contained in your

 7  initial report and your rebuttal report?

 8      A.   I think I may have other opinions that

 9  are outside, but the opinions that -- you know, I

10  can speak to the opinions that are in the report.

11      Q.   Well, what other opinions can you

12  think of that are outside of your reports?

13      A.   I don't know.  It would be dependent

14  upon the questions that you ask me, sir.

15      Q.   I understand.  But you appreciate the

16  fact that this is a case where the rules require

17  that you put your opinions down in a report and

18  give them to us, you understand that?

19      A.   I understand that.  I just -- I can't

20  control your questions, sir.

21      Q.   I see.  So, first of all, you're going

22  to have to tell me if you come up with an opinion

23  that is outside your reports.  Okay?

24      A.   As to the best of my knowledge, I will

25  attempt to do that, yes, sir.
```

---

Neil Geoffrey Carlson - August 7, 2015
Ralph Simon vs. Select Comfort Retail Corp., et al.

Page 5

1    Q.    Thank you.
2         What materials, if any, were you given
3    with regard to your preparation for this case?
4    A.    Could you clarify, sir, what you mean
5    by materials?
6    Q.    Sure.  Have you read a deposition of
7    any of the individuals who have been deposed in
8    this case?
9    A.    Um, I have glanced at a couple of the
10   depositions.  I didn't read them thoroughly.
11   Q.    Which couple of depositions did you
12   glance at?
13   A.    I glanced briefly at -- at a summary
14   of Mister -- I guess the plaintiff's deposition.
15   Q.    What is the plaintiff's name?
16   A.    I don't remember.  I just -- this is
17   the first time I've -- I've -- when you stated it,
18   that was the first time I ever heard it.
19   Q.    So, I have your report that's been
20   provided to me.  Did you disclose in your report
21   that you had reviewed the deposition of the
22   plaintiff in this case?
23   A.    It was a cur -- I don't know if I did
24   or not.  If you point it out to me, then --
25   Q.    What other depositions did you glance

Page 6

1    at, if any?
2    A.    I'm trying to recall.  I -- I was sent
3    some and I just -- I looked at, essentially, the, I
4    think -- and I'm going from recollection, summaries
5    of -- of the deposition provided to me by the
6    attorney.
7    Q.    By Ms. Fisher or Mr. Hansen?
8    A.    I -- I believe so, although there may
9    have been another person, because I had at least --
10   it looks like three different names that were
11   contacting me.
12   Q.    I see.  And you did not bring those
13   summaries with you today?
14   A.    No, I did not, sir.
15   Q.    And you did not disclose those in your
16   report that you --
17        MS. FISHER: Objection.  It would be
18   attorney-client privileged information.
19   BY MR. CORWIN:
20   Q.    You did not disclose in your report --
21        MR. CORWIN: Is he your client?
22        MS. FISHER: We are representing him
23   for the purposes of this deposition.
24        MR. CORWIN: Okay.
25        THE WITNESS: Well, go ahead.

Page 7

1    BY MR. CORWIN:
2    Q.    So you did not disclose that you had
3    the summaries and you did not bring them today; is
4    that right?
5    A.    I did not bring the summaries today.
6    Q.    Did you, by any chance, have a summary
7    or review the deposition of any Select Comfort
8    witnesses that had been deposed?
9    A.    I don't recall seeing any of those,
10   sir.  And I'll have to check my memory, but I don't
11   recall any.
12   Q.    So the sole source of the information
13   that you have with regard to the allegations and
14   the testimony in this case is from Ms. Fisher and
15   her office; is that right?
16        MS. FISHER: Objection, misstates
17   testimony.
18        THE WITNESS: Yeah, that would be
19   correct, it does misstate testimony.
20   BY MR. CORWIN:
21   Q.    How so?
22   A.    In that I said I -- as I spoke
23   previously, I did glance at the information from
24   that one.
25        Now, I have a question to make sure

Page 8

1    that I'm understanding this correctly.  Are we --
2    When we talk about deposition, are we also talking
3    about rebuttal or not?  I want to be clear about
4    that, sir.
5    Q.    I don't understand your question.
6    A.    Okay.
7    Q.    If we're talking about rebuttal or
8    not, what do you mean?
9    A.    Well, for instance, there was
10   depositions and then people wrote rebuttals to
11   reports.  So do you include rebuttals to reports in
12   your -- in that statement that you asked me about
13   or are you just talking about strict depositions?
14   Q.    I'll tell you what.  I want to be on
15   the same page with you, so I'll start over.  Okay?
16   A.    Sure.
17   Q.    You have been provided summaries of
18   some depositions, that's one thing, correct?
19   A.    That's correct, sir.
20   Q.    And you don't remember who the
21   summaries -- what deposition the summaries were?
22   A.    Um, let's see, let's -- let's clarify
23   that again.  Could you restate that?  I want to
24   make sure I answer you correctly, sir.
25   Q.    Okay, sure.  And maybe -- well, let's

Neil Geoffrey Carlson - August 7, 2015
Ralph Simon vs. Select Comfort Retail Corp., et al.

Page 9

1  try this again.
2          Do you know which depositions were
3  summarized for you?
4      A.   I don't recall all of them, which --
5  all of them that were summarized, sir.  I have,
6  let's see, a few facts that I gleaned from some
7  summaries, but I don't know where they were all
8  gleaned from, sir.  So I -- that's my honest
9  answer.
10     Q.   And your recollection is there was
11 about three deposition summaries that you reviewed?
12     A.   I'm going to ballpark it at that, but,
13 again, I'm not -- I'm trying to be as accurate as
14 possible to you, sir.
15     Q.   And I appreciate that, and the
16 summaries that you reviewed were provided to you by
17 Ms. Fisher or somebody from her office?
18     A.   By representatives from Oppenheimer.
19 Would that be clear enough for you?
20     Q.   Fair enough.
21     A.   Okay.
22     Q.   Now, have you been provided other
23 expert reports in this case?
24     A.   I have been provided and I glanced at
25 some of the rebuttals to my -- to this, and I don't

Page 10

1  recall the individuals and I don't recall the exact
2  number, but I was provided summaries of that, and I
3  did glance at those, just to get a flavor of where
4  they were concerned about.
5      Q.   So we've talked about some expert
6  reports and rebuttals, we've talked about
7  deposition summaries and possibly glancing at the
8  deposition of the plaintiff in this case, correct?
9      A.   Yeah.
10     Q.   Is there any other material that's
11 specific to this case that you reviewed as part of
12 your work in this case?
13     A.   I'm not sure what extent you mean by
14 other materials.  So if -- if something comes up in
15 your line of questioning, then I will say, you
16 know, that, but I don't know where your line of
17 questioning is going, sir, because I don't know if
18 I'm -- if, for instance, you ask me a line of
19 questioning and I'll say, well, this informed my
20 opinion and it was a reference in a book.  Do you
21 know what I mean, sir?
22     Q.   Well, I'm not talking about references
23 to books.
24     A.   Oh, okay.
25     Q.   I'm talking about case specific

Page 11

1  materials.  For instance, have you reviewed or
2  looked at any photographs --
3      A.   Oh.
4      Q.   -- that were taken in this case?
5      A.   Thank you, that's very helpful.
6          I did see images of, let's see, the
7  bed in a driveway, and then I glanced at some of
8  the images, and I don't know if they were provided
9  by -- let's see, I believe it was the doctor
10 that -- or the person that was hired by Oppenheimer
11 to do the analytical work or the cultured samples
12 for the -- the bed.  So I --
13     Q.   Do you know who that is?
14     A.   I don't recall the person's name, but
15 it -- I'm -- I'm not -- I don't remember the name.
16     Q.   So we've now added to your reference
17 materials, if you will, case specific --
18     A.   Thank you, sir.
19     Q.   -- photographs.  Anything else that
20 you can think of that you've reviewed to do your
21 work in this case?
22     A.   I'm not sure.  If in the course of
23 inquiry that comes up, I will notify you of that,
24 sir, but I'll try to be as --
25     Q.   But as you sit here today, the

Page 12

1  glancing at the plaintiff's deposition, the
2  deposition summaries provided by Oppenheimer, and
3  the sets of photographs that you identified, those
4  are the only things that you can think of that are
5  specific to this case that you reviewed during your
6  work on this case?
7      A.   I would -- I would add the rebuttal
8  that I mentioned.
9      Q.   Sure.  The expert reports and the
10 rebuttal?
11     A.   Okay.  I wanted to make sure that we
12 added that so we'd be clear.  As far as -- and,
13 again, I will tell you that I will let you know if
14 during the course of questioning something else
15 comes up.  Is that fair, sir?
16     Q.   What I want now is a -- I've detailed
17 for you everything that you can think of right now
18 that you've reviewed during your work for this
19 case; is that correct?
20     A.   I will say that --
21          MS. FISHER:  Objection, asked and
22 answered.
23          THE WITNESS:  Um, I'm looking for a
24 little guidance here.
25 BY MR. CORWIN:

Neil Geoffrey Carlson - August 7, 2015
Ralph Simon vs. Select Comfort Retail Corp., et al.

Page 13

1   Q.   It's a yes or no answer.
2        MS. FISHER: I believe the witness
3   said that he's told you everything that he can
4   think of at this time, and he will supplement his
5   answer as the deposition goes on.
6        THE WITNESS: I don't want to be --
7   sir, I don't want to be in a position where I'm
8   being untruthful to you. Do you understand, sir?
9   BY MR. CORWIN:
10   Q.   I want to be in a position where I
11   don't have any surprises, sir. Do you understand
12   that?
13   A.   I understand your need to not be
14   surprised.
15   Q.   Okay. So let's try this again.
16        You have glanced at the deposition of
17   the plaintiff?
18   A.   Uh-huh.
19   Q.   You've reviewed summaries of other
20   depositions of individuals you can't think of the
21   names that were provided by Oppenheimer?
22   A.   Yes.
23   Q.   You've reviewed expert reports and
24   rebuttal reports, the rebuttal reports you believe
25   are those that discuss your opinions, and you've

Page 14

1   reviewed some photographs. As you sit here today,
2   can you think of anything else that you reviewed
3   specific to this case during your work on this case?
4   A.   I -- at this point, no, at this right
5   moment in time, no.
6   Q.   Now, you would agree that tease tape
7   sampling is useful for determining if a material
8   surface has fungal growth on it, wouldn't you?
9   A.   Yes, sir.
10   Q.   And you would agree that tease tape
11   sampling is useful to determine whether a surface
12   has heavy spore deposition of problematic
13   organisms, wouldn't you, sir?
14   A.   Yes, sir.
15   Q.   And you would agree that tease tape
16   sampling of a surface is useful to determine
17   whether that surface has normal spore deposition
18   with no fungal growth, correct?
19   A.   Yes, sir.
20   Q.   So in your business, tease tape
21   sampling is an acceptable method for identifying
22   mold; is that correct?
23   A.   Yes, sir.
24   Q.   I'd like to talk to you a little bit
25   about mold, if I may. There are all types of molds

Page 15

1   in this world, are there not?
2   A.   Yes, sir.
3   Q.   And we have talked -- or we will talk
4   about Cladosporium in this case, correct? Well,
5   I'll ask the questions.
6        You're aware that Cladosporium is a
7   mold that's involved in this case; is that right?
8   A.   Yes, sir.
9   Q.   And you are aware of the studies in
10   which people can have a sensitivity to Cladosporium;
11   is that right?
12   A.   I would ask you to define sensitivity,
13   sir, so I want to make sure --
14   Q.   Allergic to it?
15   A.   Yes, sir.
16   Q.   There are other molds in this world
17   that people -- common molds that people can be
18   allergic to, right?
19   A.   Yes, sir.
20   Q.   So, can you describe what Aspergillus
21   is?
22   A.   It's a genus of fungi that are --
23   well, they were named after -- if you're familiar
24   with the Catholic faith, the -- when they dip the
25   Aspergillus into the water and you put the Holy

Page 16

1   Water, and then when they saw it under a microscope
2   they said this looks like a Catholic Aspergillus.
3   So the structure of the mold looks like an
4   Aspergillus. So when they saw it under a
5   microscope, they had a nice name for it.
6   Q.   And would you consider Aspergillus a
7   common mold?
8   A.   Yes.
9   Q.   Aspergillus can be toxic in some forms
10   to humans?
11   A.   It depends -- can I clarify that it
12   depends on the species?
13   Q.   Sure, and that's why I said in some
14   forms?
15   A.   Yes, that's correct. I wanted to make
16   sure --
17   Q.   So what species of Aspergillus can be
18   toxic?
19        MS. FISHER: I'll just object to the
20   phrase toxic. I think it's vague.
21        THE WITNESS: Do -- Can I ask for
22   clarification by what you mean by toxic?
23   BY MR. CORWIN:
24   Q.   Well, what did you mean when you said
25   yes?

Neil Geoffrey Carlson - August 7, 2015
Ralph Simon vs. Select Comfort Retail Corp., et al.

Page 17

1    A.    Well, I would say -- let's say
2 aflatoxin, which is present in peanuts, which is
3 usually caused by Aspergillus flavus.  So that
4 would be a toxin that by ingestion causes health
5 effects.  Does that clarify it?
6    Q.    It sure does.
7    A.    Okay.
8    Q.    And you're familiar with the studies
9 that people can be allergic to Aspergillus,
10 correct?
11    A.    Yes.
12    Q.    And people certainly can be harmed if
13 it is the species of Aspergillus that creates
14 aflatoxin, correct?
15    A.    If they ingest material that has
16 aflatoxin in it, they can -- produced by that
17 fungus, they can be harmed by it, yes, sir.
18    Q.    Fusarium, is that a common mold?
19    A.    It's a little bit less common, but,
20 yes, it is both a -- it's a -- the organism -- it
21 comes in various shapes, but the typical organisms
22 will be canoe shaped with multi-septations.  It is
23 a plant pathogen.  It can cause problems with
24 spoilage of grain.  They, for instance, will have
25 problems with -- let's say during a harvest if the

Page 18

1 moisture event or rain event occurs at the wrong
2 time, it will spoil the -- the Fusarium will take
3 over the crop and spoil it; and it can produce,
4 under appropriate conditions, several different
5 types of toxins, depending upon the species of
6 Fusarium.
7    Q.    I'm going to butcher this one.
8 Cunninghamella, how do you say that?
9    A.    Yeah, you're -- you're good.
10    Q.    I'm good?
11    A.    Yeah.
12    Q.    Okay.  Tell me about that mold?
13    A.    That one is -- I'm recalling it's a
14 little bit less common.  It is, I believe, a -- as
15 I -- my recollection, it's a Zygomycetes-type
16 organism.  So those organisms are slightly
17 different from other ones, particularly when --
18 their sexual reproduction is -- it produces
19 Zygotes, and they have two -- two different
20 sections that come together and they clamp, and
21 then there's a zygospore that's produced in the
22 middle of it.  It also has a method of asexually
23 reproducing so the head of it looks, at least on
24 first examination, somewhat similar to an
25 Aspergillus head, but then you'll have buds that

Page 19

1 come out from it like that (indicating).
2    Q.    Great.  And can it be found in the
3 homes of individuals, people in the United States?
4    A.    That one is less commonly identified
5 than some of the other organisms that you
6 mentioned.  It can be found, but it's less common.
7    Q.    What are ochratoxins?
8    A.    Ochratoxins?
9    Q.    Yes, sir.
10    A.    Those are toxins of, I guess, the --
11 the Seminole organism that produces it is
12 Aspergillus ochraceus, that organism that is -- it
13 produces a stipend, and it's got a roughened edge
14 on the stipend, and the head is a beautiful yellow
15 color.  It's -- ochraceus is named for the color of
16 the organism, and that organism can produce a
17 toxin.  I am a little bit less familiar with the
18 effects on it, but it does produce one.
19    Q.    Let's talk about the effects.  If
20 somebody ingests an aflatoxin, what are some of the
21 common reactions?
22    A.    Typically, the toxic effects are
23 related more toward long-term exposure, and my
24 recollection on this is a -- whether it's more a
25 kidney or a liver toxin, but you can produce

Page 20

1 some -- I believe some carcinogenic effects.
2    Q.    And you mentioned it was like a peanut
3 allergy.  I was on a plane recently --
4    A.    No, no, it's not like a peanut
5 allergy.
6    Q.    Oh, I thought you said it was?
7    A.    No.  It grows -- it grows on peanuts,
8 but it's not an allergy.
9    Q.    I see.
10    A.    Just to clarify.
11    Q.    Thank you.
12         Some people will be more sensitive
13 than others to aflatoxins; is that right?
14    A.    I -- I actually don't know about
15 variable sensitivity to the aflatoxin.
16    Q.    What is a mycotoxin?
17    A.    A mycotoxin is a toxin that is
18 produced by a fungal organism, hence, the M-Y-C-O,
19 which would be -- designation as fungal organism,
20 and the toxin would be the chemical that's
21 typically a fairly large structure, typically -- at
22 least the best research we know, not typically
23 volatile but be -- be present either on the spore
24 or on the -- the mycelia.
25    Q.    And what are the health effects of

Neil Geoffrey Carlson - August 7, 2015
Ralph Simon vs. Select Comfort Retail Corp., et al.

Page 21

1  somebody -- to somebody, generally speaking, that
2  ingests a mycotoxin?
3      A.    It depends on the mycotoxin, it
4  depends on the dose.  So the typical -- there's two
5  tracts, for instance, if we were talking about a
6  couple -- it depends on the growth characteristics
7  and how it was growing and how it was produced.
8  So, for instance, like it's -- let's look at
9  Stachybotrys as an example.  If -- if you ingest
10 it, you can have one of two main tracks, one would
11 be a suppressed immunity, the other one would be --
12 and this is primarily in animals that have ingested
13 hay that has Stachybotrys growing on it.
14     Q.    I don't mean to interrupt you.  I'm
15 talking about the health effects on humans, not on
16 animals.
17     A.    On humans?
18     Q.    Yes, sir.
19     A.    Ingestion is -- is -- as far as
20 inhalation, it's very difficult.  They had a --
21 they had a case of hemosiderosis in CDC, and it's
22 since been disproved, so it's really difficult by
23 inhalation to prove that people get enough dose to
24 have an ill health -- health effect.
25     Q.    And that's what the literature says?

Page 22

1      A.    That's what the literature says.  And
2  when it first came out, they were really concerned
3  because the hemosiderosis that was seen was
4  somewhat similar to what they were seeing in
5  animals, but they did subsequent tests on it and
6  there was concomitant exposure to high levels of
7  tobacco smoke, which made that problematic for them
8  to determine cause and effect.
9      Q.    Are you just talking about one
10 particular mycotoxin or all mycotoxins?
11     A.    I was talking, in particular, that
12 mycotoxin.
13     Q.    No, and I -- see, that's where I want
14 to make sure --
15     A.    Sure.
16     Q.    -- we understand each other.
17     A.    Okay, thank you, thank you.
18     Q.    Because there are a number of molds
19 and fungal materials that create mycotoxins, right?
20     A.    Yeah, that is correct, sir, yes.
21     Q.    And some of those molds and/or fungal
22 materials can be found in the house of people in
23 the U.S., correct?
24     A.    Yes, sir.
25     Q.    All right.  So those mycotoxins, they

Page 23

1  are called myco, meaning mold, toxin meaning they
2  are toxic to individuals, correct?
3      A.    In the appropriate dose, yeah.
4      Q.    So that's what I was asking you.  So
5  of those mycotoxins, say, for instance, the
6  Aspergillus that can create a mycotoxin or a
7  aflatoxin, in this case, what kind of health
8  effects can an individual have if they're exposed?
9      A.    The best data we have is by inhal --
10 ingestion.  The inhalation data is not so good.  So
11 the ingestion data would be -- for instance, I
12 think I talked about with the aflatoxin, the kidney
13 and liver problems and potential associated cancer,
14 I believe, aflatoxin is listed as a carcinogen;
15 and, then -- then the other effects that I
16 mentioned for Stachybotrys, which would be
17 primarily by ingestion, would be immunosuppression
18 and -- and, then, in animals, although the human
19 part isn't proved, the hemosiderosis issue.
20     Q.    What type of conditions does
21 Aspergillus need to grow?
22     A.    It depends on the species.  So I can
23 give you a specific one for fumigatus, if you would
24 like.
25         Fumigatus is a thermophile, so it

Page 24

1  grows well at conditions that are above body
2  temperature.  So, for instance, in a compost pile,
3  the heat in the compost pile, typically, gets above
4  37 degrees and can get quite warm, and that's how
5  the compost works; and Aspergillus fumigatus will
6  grow very well at those temperatures.  It needs --
7  I think all -- all --
8      Q.    And that's fine.  What I'm looking
9  for, are there any Aspergillus that grow at less
10 than body temperature?
11     A.    Oh, yes.  A fumigatus will grow
12 through that wide -- it's a wide ranging.
13     Q.    What type of food sources, in general,
14 does an Aspergillus require?
15     A.    It's, again, dependent on the species.
16 But this goes for -- it would, essentially, require
17 dust, moisture, proper temperature or any one of
18 those three, and you have to have those in the
19 right combination, then you can -- you can get
20 growth.  If -- if, for instance, if it's completely
21 dry -- fungal organisms need some -- some moisture
22 to work, because the way they digest food is their
23 stomachs are, essentially, outside their bodies, so
24 they have to have some sort of moisture to -- to
25 allow them to digest.

Neil Geoffrey Carlson - August 7, 2015
Ralph Simon vs. Select Comfort Retail Corp., et al.

Page 25

1    Q.    Cladosporium is the same way, it needs
2  dust, moisture and temperature?
3    A.    Yeah.  And it would also -- yeah, I
4  think that's --
5    Q.    And it can grow over a wide range of
6  temperatures?
7    A.    It's a little more limited than
8  fumigatus.  I believe there is one species of
9  Aspergillus that can grow above body temperature.
10  Cladosporium, in general, is like -- it goes from
11  psychrophilic to mesophilic.  Psychrophilic means
12  above freezing to generally below body temperature.
13  So the vast majority of Cladosporium would grow in
14  that temperature range.
15    Q.    And did you do any testing to
16  determine the temperature that's reached on a
17  Select Comfort bed while a person is sleeping in
18  it, and what I mean the temperature where you put
19  the mold sample?
20    A.    You asked a couple questions.
21    Q.    And let me rephrase it for you.
22    A.    Yeah, yeah.
23    Q.    Because we're going to get into your
24  experiment in a little bit.
25    A.    Sure, yeah.

Page 26

1    Q.    But you put the mold sample next to
2  the air chamber and below the foam topper pad; is
3  that right?
4    A.    Yeah.  We put it on the -- the chamber
5  and then below the foam topper.
6    Q.    Did you do any testing of the
7  temperature, the typical temperature, the
8  minimum -- the high temperature that is reached in
9  that area with a human body sleeping on the bed?
10    A.    We did not do temperature measurements
11  with a human body on that.
12    Q.    Did you do any temperature
13  measurements at the location where you placed the
14  mold sample for your experiment?
15    A.    Our -- I want to be clear about it.
16  We did general temperatures in the room.  But are
17  you saying like a thermocouple placed --
18    Q.    Yes.
19    A.    -- at that location?  We did not do a
20  thermocouple at that location.
21    Q.    Would you agree with me that molds in
22  a damp environment do not release spores well?
23    A.    Um, it depends on whether there is a
24  mechanical disturbance of the material or not.  So
25  I -- do you -- do you want to rephrase your

Page 27

1  question?
2    Q.    Nope.
3        You would agree with me that when mold
4  spores are dry, they are able to be more readily
5  released, usually with the help of mechanical
6  forces, correct?
7    A.    Um, let's see.  I got to think through
8  all the different scenarios there, sir.  If the
9  mold spores are in a position where it's, let's
10  say, completely saturated, soaking wet, it's
11  difficult for them to be released.  If, however,
12  it's damp underneath, but like the spores on top
13  are in a condition where it's -- it's not soaking
14  wet and it's able to be released, it's going to be
15  fairly similar between -- because the organism when
16  they're dry they tend to behave a little bit
17  differently, and they may not aerosolize as well
18  because of the structure of them because they're --
19  they're desiccated.  So it's kind of -- well --
20    Q.    Mold spores that are living and damp,
21  do they release into the air?
22    A.    Yes, sir.
23    Q.    You need a mechanical process, is that
24  what you were going to say?
25    A.    Um.

Page 28

1    Q.    Or you do not need a mechanical
2  process?
3    A.    It depends -- so I'm going to define
4  the mechanical process for you.  So you would --
5  let's give an example.  Let's say we had spores
6  growing on the wall there.  If I bumped the wall,
7  it would be released.  If you had air flowing by,
8  it would be released.  And when I'm talking about
9  mold, I'm talking just about mold, not
10  basidiospores, to be clear, because basidiospores
11  provide their own energy for releasing, so they
12  ballistically shoot these out, but the organism
13  that we're talking about, Cladosporium, doesn't
14  have a method of shooting it out on its own.  Does
15  that help you?
16    Q.    Sure.
17        You agree with me that for some
18  individuals Cladosporium can be the cause of
19  allergies?
20    A.    Yes, sir, I did.
21    Q.    You wrote that, in fact, right?
22    A.    I -- I -- I if it's in my report, yes.
23    Q.    Do you know what type of Cladosporium
24  was identified by Patsy Duncan?
25    A.    No.  She didn't indicate that in the

**Neil Geoffrey Carlson - August 7, 2015**
**Ralph Simon vs. Select Comfort Retail Corp., et al.**

Page 29

1  report.  I did -- she -- and if this was not
2  included in my original statement there, I want you
3  to add that, because I did -- she -- I did see
4  that, the EMLab P&K part.  So if you want to add
5  that, I did see that it was Cladosporium, but I
6  didn't see whether it was -- the species wasn't
7  identified.  It was a tease tape that said
8  Cladosporium species.
9      Q.    Did you see the pictures associated
10  with it?
11     A.    I didn't see a picture of the
12  organism.  That would have been really helpful, but
13  I did not.
14     Q.    You agree that Cladosporium is
15  commonly found indoors, growing on dusty surfaces?
16     A.    If -- if there's sufficient moisture,
17  yes, sir.
18     Q.    These surfaces include window sills,
19  concrete walls, supply diffusers, shower walls, and
20  labels on bottles stored in walk-in coolers?
21     A.    Yeah.  There's others, but, yeah.
22     Q.    Did you do any analysis to determine
23  whether the air chamber of the bed used by Ralph
24  Simon could grow Cladosporium mold?
25     A.    I did not have access to Mr. Simon's

Page 30

1  chamber.
2      Q.    Did you do any testing as to whether
3  the topper pad, the foam pad of Mr. Simon's bed,
4  could grow mold?
5      A.    I was not -- I did -- not given access
6  to that.
7      Q.    Did you ask to see it?
8      A.    Um, I'm trying to recall if I did.
9  I -- I can't recall if I did or not.  I -- it would
10  have been nice to have the -- have access to it.  I
11  believe access was given to the other -- the person
12  who did the microbial work for Select Comfort that
13  was local.
14     Q.    What do you mean by microbial work,
15  what does that mean?
16     A.    The person that used techniques to
17  determine if they could find growth on a --
18  microbial would -- is a -- if we're going to have a
19  Venn diagram, microbial would be here, and it means
20  growth that's visible microscopically.
21     Q.    Okay.  Do you remember that person's
22  name?
23     A.    No, I don't.  I -- it's a rather
24  long -- but I can't remember his exact name.  But
25  he was --

Page 31

1      Q.    Did you speak with that person as you
2  were designing your experiment in this case?
3      A.    No, I did not talk to that person.
4      Q.    You would agree with me that the IAQA
5  suggests that being prompt, serious and transparent
6  in managing complaints is sound and will keep
7  people informed and on track towards resolving the
8  problem?
9          MS. FISHER: Objection, vague.
10         THE WITNESS: I -- I -- I'm not
11  familiar with that -- that IAQ -- could you --
12  BY MR. CORWIN:
13     Q.    Indoor Air Quality Association.
14     A.    I'm familiar with that organization.
15  I haven't seen that specific statement.  So if you
16  could re -- reread it for me?
17     Q.    You don't remember that statement?
18     A.    I want you to reread it for me so that
19  I can recall.
20     Q.    Okay.  The IAQA suggests with regard
21  to complaints that being prompt, serious and
22  transparent in managing complaints is sound and
23  will keep people informed and on track towards
24  resolving the problem?
25         MS. FISHER: Objection, vague as to

Page 32

1  complaints.
2          THE WITNESS: I'm not understanding
3  what -- where you're going with this or --
4  BY MR. CORWIN:
5      Q.    Do you agree with that statement?
6      A.    Um, prompt -- I'm going to paraphrase
7  it so that I kind of understand what it -- to me,
8  it sounds like they want people to clearly
9  communicate and respond with -- respond in a timely
10  fashion.  Does -- does that -- that's my
11  understanding of that statement.
12     Q.    And do you agree with that?
13     A.    I think it's appropriate to get -- get
14  information and respond in a timely fashion, yeah.
15     Q.    And be transparent?
16     A.    I'm not sure what the --
17         MS. FISHER: Objection, vague.
18         THE WITNESS: I don't understand where
19  you're going with transparent.  Do you mean -- what
20  do you mean by that?  I -- if I under --
21         MS. FISHER: Objection.  There's no
22  context for the statement.  We have no idea what --
23  the witness has no idea what you're talking about.
24  BY MR. CORWIN:
25     Q.    I'm talking about complaints,

**Depo International, Inc.**
**(800) 591-9722**

Neil Geoffrey Carlson - August 7, 2015
Ralph Simon vs. Select Comfort Retail Corp., et al.

Page 33

1 complaints about indoor air quality, about mold?
2     A.    So, in other words -- this will help
3 me understand where you're going with it. Can I --
4 I'm just trying to clarify.
5          So, in other words, if I get a
6 complaint from somebody and they say I think I've
7 got a mold problem here, and then I do an analysis
8 with them and I confirm that, yes, there is mold
9 growth or not growth and I'm being transparent with
10 them about the results, is that what you mean?
11     Q.    You understand what the Indoor Air
12 Quality Association is, right?
13     A.    Yes.
14     Q.    Are you a member of that?
15     A.    I believe at one time I was. I don't
16 believe I am anymore.
17     Q.    So in the context of complaints to a
18 building manager --
19     A.    Uh-huh.
20     Q.    -- or owner from a tenant that there
21 is a complaint of mold, the IAQA suggests that
22 being prompt, serious and transparent in managing
23 the complaints is sound and will keep people
24 informed and on track towards resolving the problem?
25     A.    I would agree.

Page 34

1     Q.    Wouldn't you agree that a manufacturer
2 of a product that is being sold into the community
3 has that same obligation?
4          MS. FISHER: Objection, foundation.
5          THE WITNESS: I'm not sure where
6 you're going with that. I don't know if they are
7 obligated legally to do that, sir.
8 BY MR. CORWIN:
9     Q.    Don't the same principles apply, that
10 promptness, seriousness and transparency will
11 manage the complaint and keep people on track to
12 resolving the problem?
13     A.    I don't know a company's legal
14 obligation. So you're asking me on something that
15 is a matter of, let's say, a corporate decision,
16 and I -- I'm not -- I'm not a person that
17 manufactures anything.
18     Q.    In your opinion, what is the easiest
19 way to kill mold such as Cladosporium or
20 Aspergillus?
21     A.    Cladosporium is really tough to kill.
22 The -- let's see, because I've tried to kill it.
23 We had -- I'll give you an example, and then we can
24 work through it.
25          We had Cladosporium when I first

Page 35

1 started working growing on dust on fiberglass, and
2 I -- we did mechanical cleaning of the surface and
3 then did follow-up sampling. It was still there.
4 We treated it with a quaternary ammonia compound.
5 It was still there. We did treat it with bleach,
6 and as a short-term biocide it does a pretty good
7 job of -- of taking care of it.
8     Q.    But you would agree with me there are
9 molds that can actually use bleach as a food
10 source, right?
11     A.    I don't think they use it as a food
12 source. Here's the way it would be. Let's think
13 about -- let's think about it from an ecological
14 perspective and you're looking at competition. So
15 if bleach comes along and wipes out all of your
16 competition but doesn't kill all the spores that
17 are left over, then they look and say, hey, after
18 the bleach turns back to sodium chloride and after
19 a sufficient amount of time, then it says I've got
20 an open field and then another organism will take
21 up. Typically, in this ecological niche, it would
22 be penicillium that would take over.
23     Q.    So using bleach or a bleach/water
24 solution to attempt to kill mold could actually
25 have the opposite effect and ultimately create a

Page 36

1 better environment for the mold?
2          MS. FISHER: Objection, misstates
3 testimony.
4          THE WITNESS: It -- it would -- it
5 works better for penicillium. The Cladosporium
6 typically doesn't come back, at least in the
7 studies that I was doing, but like a penicillium
8 may come back after -- after -- if the underlying
9 conditions with respect to dust deposition and
10 humidity. If underlying conditions are -- are a
11 little bit better, then, it can be an effective
12 biocide. So it depends on the conditions
13 subsequent to the use.
14 BY MR. CORWIN:
15     Q.    And I appreciate that, but you
16 mentioned penicillin. But can a mold such as
17 Aspergillus come back once the other organisms are
18 killed?
19     A.    I've got more experience with
20 penicillin personally. I can't speak to the
21 Aspergillus, but I can speak to the penicillin.
22     Q.    You can't rule out that Aspergillus
23 could?
24     A.    That is correct, sir, I couldn't.
25     Q.    You would agree that based on your

Neil Geoffrey Carlson - August 7, 2015
Ralph Simon vs. Select Comfort Retail Corp., et al.

1  experience effective mold remediation has resolved
2  allergy and asthma symptoms associated with mold
3  exposure?
4        MS. FISHER: Objection, foundation.
5        THE WITNESS: Um, I'm going to have to
6  go with -- the Institute for Occupational Medicine
7  indicates that they haven't even found an
8  association between mold remediation and -- and
9  that -- the reduction in exposure.  They have,
10 however, found a -- an association between removal
11 of water damage materials, of which mold is a
12 constituent of it, and so there's that association,
13 but they're having a difficult time getting to
14 the -- getting to the association specifically with
15 mold, but they -- but mold would be a constituent
16 of the water-damaged material.
17 BY MR. CORWIN:
18    Q.    So let me ask you once again.  Do you
19 agree or disagree with the statement that based
20 upon your experience effective mold remediation has
21 resolved allergy and asthma symptoms associated
22 with mold exposure?
23       MS. FISHER: Objection, asked and
24 answered.
25       THE WITNESS: Yeah.  I'd have to add

1  the other caveats to that to make that an honest
2  answer.
3  BY MR. CORWIN:
4     Q.    Do you agree that there was evidence
5  of reduced antihistamine use and the ability of
6  asthmatic individuals to return to the workplace
7  following mold remediation?
8     A.    With the caveat that we were talking
9  about, other water-damaged materials, because I
10 don't want to step beyond what the scientific
11 literature says.
12    Q.    So if somebody makes those two
13 statements in writing to the public, they should
14 put those caveats in there?
15    A.    It would be -- at least based on the
16 information from the Institute For Occupational
17 Medicine, that would be the most scientifically --
18 or that would be the scientifically accepted way
19 of -- of -- of doing it, and it may be a few years
20 or some years from now that we're able to tie that
21 down specifically to get an association, but right
22 now it's -- it's a little bit -- it's -- we're
23 parsing it -- we have to parse it out as saying
24 that the mold is a constituent of the water-damaged
25 material, but they're trying to link that and

1  they're having a dickens of a time doing it.
2     Q.    So if somebody made those statements
3  that I read to you --
4     A.    Yeah.
5     Q.    -- without the caveats, those
6  statements would be misleading?
7     A.    Minorly misleading.  In other words,
8  they're talking about -- I can't say that they're
9  completely incorrect, but I can -- so it -- it's
10 really kind of parsing it.  And, typically, when
11 you do remove the mold you're also removing the
12 water-damaged material.  So a -- as a practical
13 application, it's the same.
14    Q.    Have you ever done mold remediation?
15    A.    Um, I have done it, and then I have
16 specified it, and I've taught courses in it.
17    Q.    So I'd like to talk to you a little
18 bit about this experiment that you performed.  Okay?
19    A.    Yes, sir.
20    Q.    All right.  Now, I'm going back to
21 high school science, and bear with me, but I
22 remember that the process was you developed a
23 hypothesis, you designed a test, you performed the
24 test, you record data, and then you reach a
25 conclusion, correct, is that kind of a basic way of

1  saying it?
2     A.    That's the basic scientific method.
3     Q.    Okay, great.  It's been a while since
4  I've been in high school.
5        So, when you started this endeavor,
6  what was your hypothesis?
7     A.    Um, with -- particular with respect to
8  this experiment, the hypothesis would be that mold
9  spores placed -- or, in other words, placed in that
10 material would essentially be released through
11 the -- the chamber, all the way through the top,
12 and that we would -- by using the rollator, we
13 would, essentially, see if there was -- if there
14 was enough mechanical energy, we would see
15 progressively more spores released throughout the
16 course of the experiment because we're agitating it
17 and trying to release the spores from the chamber.
18       The null hypothesis would be that the
19 agitation of the chamber material would not release
20 spores above background levels and that you
21 wouldn't see a progression of elevated spores.
22    Q.    So you had to have information or a
23 request that led you to start developing this
24 hypothesis.  What information did you have to
25 develop this hypothesis?

Neil Geoffrey Carlson - August 7, 2015
Ralph Simon vs. Select Comfort Retail Corp., et al.

Page 41

1    MS. FISHER: Objection, vague.
2    THE WITNESS: Um, the --
3  BY MR. CORWIN:
4    Q.    If it's vague, I don't want you to
5  answer a vague question.
6    A.    Yeah.
7    Q.    What information did you have about
8  this case that you used or assisted you in
9  developing this hypothesis?
10   A.    Thank you for clarifying that.
11   Q.    Sure.
12   A.    The information I had was that the
13  mold that -- essentially that was identified, let's
14  say approximately two months after the person
15  observed this discoloration, and then there was a
16  tease tape sample taken by this person from
17  Fungus-A-Mungus, and then two months later that
18  person took the tease tape sample.  It was sent to
19  EMLab P&K, and they identified it as Cladosporium.
20  There wasn't a specific species identified.
21       Other piece of information was that
22  the discoloration observed was on the foam material
23  that was pressed up against the chamber material,
24  and I learned post-experiment that -- and I want
25  you to correct me if I'm -- if I don't understand

Page 42

1  it correctly, that the chamber at that time was
2  discarded by the person.  So we didn't have that.
3  So I assumed that we were looking at the interface
4  between the chamber material and the foam.
5    Q.    How long -- well, let me back up.
6         Your test, over what period of time
7  did you do the agitation and recording of the mold?
8    A.    We used the average sleep time for
9  both British and Americans, and that average sleep
10  time, according to various surveys, is six point --
11  between 6.8 and 6.7 hours per night, so --
12   Q.    How many nights did you conduct the
13  study?
14   A.    We conducted the study for one night,
15  sir, yes.
16   Q.    And do you know how long Ralph Simon
17  suffered with allergies associated with possible
18  mold exposure, was it just one night?
19   A.    I don't -- I don't have the knowledge
20  of the -- of how long Mister -- the plaintiff
21  suffered.
22   Q.    Why did you choose one night to
23  analyze?
24   A.    Well, we wanted to do more, but we
25  only -- we had a -- we were told -- we were told to

Page 43

1  get ready, so we had to have the -- let's see,
2  Mister -- the team for Mister -- I got to get the
3  guy's name right.  Mr. Barnum's team had to
4  manufacture the bed because we -- they don't make
5  that style of bed anymore, and we had to get it
6  assembled, and then we had to get the stuff to grow
7  cultures.
8         So we performed one experiment, and
9  then we wanted to perform another one, but Mike
10  Buck was on vacation, so we didn't.  We would have
11  liked to have performed as many as we could have.
12  Mike Buck needs the money for his college students,
13  so -- We would have loved to do as many as we
14  could.  So it was time limitation.  I would have
15  liked to have done a lot of --
16   Q.    And the more samples that you do, the
17  more accurate your test results or you can repeat
18  them or you can verify them, correct?
19   A.    Yeah.  I mean, I've done a similar
20  experience, but I can't -- I don't know if I can
21  reveal it because it was for a different case, so --
22   Q.    Sure, you can.  In fact, I'm going to
23  ask you about other experiments you've done for
24  Select Comfort?
25       MS. FISHER: Without divulging things

Page 44

1  that we talked about or you talked about with
2  Oppenheimer for the case, if you want to talk about
3  the facts of another experiment, you can go ahead
4  and do that.  I think it bears on this.
5         THE WITNESS: Okay.  Is -- Do you want
6  me to discuss it now or not?
7  BY MR. CORWIN:
8    Q.    We'll get into it in a minute.
9    A.    Okay.
10   Q.    But I think we're saying the same
11  thing.  You would agree that the testing would be
12  of greater validity if you could do it over a
13  period of time and repeat the results or develop a
14  trend, correct?
15       MS. FISHER: Objection, misstates the
16  testimony, and objection to the word validity.
17       MR. CORWIN: I'm not misstating
18  anything, I'm making a new statement.
19       THE WITNESS: I think -- we'll speak
20  generally about the scientific process.  If you can
21  do more tests, it strengthens the -- the result or
22  the -- the findings of the result, so --
23  BY MR. CORWIN:
24   Q.    And you don't know based upon your
25  testing, given all other conditions the way you

Neil Geoffrey Carlson - August 7, 2015
Ralph Simon vs. Select Comfort Retail Corp., et al.

Page 45

1 establish them, what the levels in the air of
2 Cladosporium would be over a five-year period of
3 normal use in sleeping by an individual, do you?
4 **A.    Um, I don't think it's possible for**
5 **a -- with the current methods we have to establish**
6 **that.**
7 Q.    And you can't even tell the jury what
8 those levels would look like after 30 days because
9 you only did it once, right?
10 **A.    I could -- with respect to this**
11 **experiment and, let's say, outdoor levels, I could**
12 **give them a ratio on it.  I could say the average**
13 **exposure outside is between 106,000 spores per**
14 **cubic meter of Cladosporium.  I could give them**
15 **really good data with respect to outdoor levels,**
16 **and I could state that based on the experiment that**
17 **we ran here, the levels didn't approach that, but I**
18 **can't state that -- what 30 days would look like.**
19 Q.    How much did you charge for this
20 experiment?
21 **A.    I don't recall the exact amount.  It**
22 **was -- Oppenheimer would have that information.  We**
23 **just -- we charged for the amount of time that we**
24 **put into it, and our fee was $150 an hour to do**
25 **the -- for our work.  I think there were some --**

Page 46

1 **also some additional costs that we weren't involved**
2 **with with respect to getting a rollator and -- and**
3 **constructing the -- the --**
4 Q.    Well, how do I find out what this
5 experiment cost Select Comfort?
6 **A.    I was doing the work for Oppenheimer,**
7 **so --**
8 Q.    And you don't believe under the
9 Federal Rules you have an obligation to tell us
10 what your costs were, what you charged?
11 **A.    I would tell you -- I told you 150 --**
12 **I don't recall the exact amount.**
13 Q.    How many hours did you put into this?
14 **A.    Let me ballpark it.  I don't -- it was**
15 **less than 40 and more than -- because there was**
16 **some report preparation, and more than 10.**
17 Q.    And did Mr. Buck charge separately?
18 **A.    I can't remember how we did the**
19 **billing.  I don't know if he -- we rolled our bills**
20 **together or if we did it separately, but his was**
21 **the same rate, was $150 an hour.**
22 Q.    And do you have those bills back at
23 your office or someplace, have you kept them?
24 **A.    I do, and Oppenheimer has them since**
25 **we billed them.  So you could obtain that from them**

Page 47

1 **if you're interested, sir.**
2 Q.    I'm interested in obtaining what you
3 have.
4 **A.    I don't --**
5 Q.    And so far Ms. Fisher hasn't offered
6 to produce them, so --
7 **A.    I don't know my obligations on this.**
8 **MS. FISHER:** We'll talk after the
9 deposition regarding the fee issues.
10 **THE WITNESS:** Okay.
11 If -- if there's no legal impediment
12 to me providing that to you, sir, then I will be
13 happy to do so.  Does that answer your question?
14 BY MR. CORWIN:
15 Q.    Sure.  And there were separate costs.
16 Was there warehouse space that had to be rented?
17 **A.    I didn't -- I wasn't involved with any**
18 **of that.**
19 Q.    Oppenheimer set that up?
20 **A.    Yeah.  I wasn't involved with that.**
21 Q.    And making arrangements -- Who decided
22 to use the roller, whose idea was that?
23 **A.    We asked -- we did a determination**
24 **about what would -- what we're trying to do is we**
25 **did an inquiry about what would be an appropriate**

Page 48

1 **way or industry accepted standard way of simulating**
2 **sleep.  I -- I toyed with the idea of actually**
3 **having a human being roll around on it, but then**
4 **you have to control for a lot of different**
5 **variables, and I want to make sure --**
6 Q.    Like mold exposure?
7 **A.    Well, no, like -- looking at it like**
8 **if I was going to have somebody repeat it, we'd**
9 **have to get somebody of exact weight, and we want**
10 **something that's controlled so that -- you know, we**
11 **have a rollator that goes over like this and comes**
12 **back and you've got a piece of equipment that's**
13 **generally accepted by the industry as far as**
14 **durability testing.**
15 So it would be somebody -- if they
16 **wanted to do that experiment again or repeat it,**
17 **they would -- okay, we've got a rollator and we can**
18 **use it, and it would be a lot more controlled**
19 **rather than having a human being do it.  I have**
20 **done the human being part, but, again, that was**
21 **something I --**
22 Q.    Was what?
23 **A.    What?**
24 Q.    I didn't hear what your last thing
25 was.  You said --

Neil Geoffrey Carlson - August 7, 2015
Ralph Simon vs. Select Comfort Retail Corp., et al.

Page 49

1    A.    I have --
2    Q.    -- human being part but, and then you
3  trailed off.
4    A.    I have done that, but that would be
5  something that -- I don't know if you'd be able to
6  have access to that information.
7    Q.    Why, was that involving a case that
8  was in litigation?
9    A.    As far as I -- it would be under a --
10  let's see. I have done work for Select Comfort,
11  but it's written -- I have a confidentiality
12  agreement. So I don't want to be violating that,
13  sir.
14    Q.    Was that the experiment you did when
15  you compared traditional mattresses to Select
16  Comfort beds with regard to the propensity of mold
17  growth?
18        MS. FISHER: Objection, assumes facts
19  not in evidence.
20        THE WITNESS: I have done that -- a
21  different experiment, but not what you're talking
22  about.
23  BY MR. CORWIN:
24    Q.    Are you aware of any testing in which
25  Select Comfort beds were compared to traditional

Page 50

1  mattresses and box springs with regard to the
2  propensity to grow mold?
3    A.    I have done tests with respect to a
4  wide variety of mattresses, over 101, with respect
5  to spores that were in the -- approximately
6  90 percent of the mattresses had Cladosporium mold,
7  approximately a third of the mattresses had either
8  heavy Cladosporium deposition or mold growth. The
9  surface area sampled was -- when I cut the beds up,
10  was approximately about two-by-two, or a RODAC
11  plate, which is approximately two square inches.
12        I do not know where the beds came
13  from. It was a strictly observational study. I do
14  not know any of the conditions that the beds
15  were -- were -- the conditions prior to me seeing
16  them, I don't know anything about that.
17    Q.    Who asked you -- who paid for that
18  study?
19    A.    Um, I be -- I'm not sure who paid for
20  it. I -- I received payment, but I'm not sure.
21    Q.    Was Oppenheimer involved?
22    A.    I'm not sure if they were. I -- I'm
23  not a hundred percent sure who was involved. I was
24  told to do the study, so I did the study.
25    Q.    Was Select Comfort involved?

Page 51

1    A.    It was done at a lab that -- that does
2  do Select Comfort work, but I was -- so I was
3  working on the -- on these beds.
4    Q.    Did you do a written report?
5    A.    No, I did not.
6    Q.    Did you take notes?
7    A.    Yes, I did.
8    Q.    Did you provide the results of your
9  inspections to anybody?
10    A.    I do not know if -- I did not provide
11  any written summary of the results, and I do not
12  know if anybody has the -- there was -- there was
13  no written report, so I don't know -- I don't know
14  how that information was conveyed.
15    Q.    I see. Are you aware as whether
16  Oppenheimer knew about this testing?
17    A.    I am not sure if they were or not.
18  They -- they may be aware of it.
19    Q.    Do you know whether Select Comfort was
20  aware of this testing?
21    A.    I'm going to assume that they probably
22  were, but I don't know how the information was --
23  was distributed.
24    Q.    And did you also look at Select
25  Comfort mattresses when you were doing this

Page 52

1  investigation?
2    A.    Not during this one, no, this
3  particular one. I was looking at a wide variety of
4  different mattress types during -- during this
5  investigation and just looking at what --
6  essentially cutting them up, looking at different
7  parts of the mattress and taking samples and seeing
8  what the general prevalence of it is. It's --
9  Cladosporium is incredibly common in mattress dust.
10  So I was just going to get an idea and see if that
11  was true.
12    Q.    When you did your samples, did you do
13  tape lift samples?
14    A.    I did -- on this particular one, no.
15  I did a contact agar sample. So I was looking for
16  spore growth, so -- and the media was a potato
17  dextrose agar.
18    Q.    Do you have any photographs or test
19  samples or anything related to this investigation?
20    A.    I have -- I have notes. I do not
21  have -- I don't recall if I have any photographs or
22  anything, no, other than that.
23    Q.    And you don't recall who paid for that
24  as you sit here today, under oath?
25    A.    No, but I could look at my records and

Neil Geoffrey Carlson - August 7, 2015
Ralph Simon vs. Select Comfort Retail Corp., et al.

Page 53

1   determine that, but as I -- I submitted -- I'll
2   have to see where I submitted a bill for the time
3   on that.
4       Q.   It's entirely possible that the
5   Oppenheimer firm paid your bill, isn't it?
6       MS. FISHER: Objection, calls for
7   speculation. I can tell you that's not the case.
8       MR. CORWIN: You're not under oath.
9       MS. FISHER: Well, I'm the one who
10  knows.
11      THE WITNESS: Well, I -- so I will
12  look at my -- I can provide my billing records and
13  subsequent --
14      MS. FISHER: Objection. You're not
15  required to provide anything.
16      THE WITNESS: Oh, okay.
17      MS. FISHER: It's not part of your
18  testimony here as an expert witness.
19      MR. CORWIN: You don't think so, you
20  don't think it goes to bias as to who he was paid
21  and how much, really?
22      MS. FISHER: No.
23      MR. CORWIN: Okay.
24      MS. FISHER: You don't even know when
25  this experiment took place.

Page 54

1       MR. CORWIN: I was just going to ask
2   him that.
3   BY MR. CORWIN:
4       Q.   When did this experiment, this
5   investigation take place?
6       A.   I'm going to give you a ballpark.
7   Approximately -- and I can provide it later if
8   there's -- if the -- if it's legally allowed.
9   Approximately six years ago.
10      Q.   Do you recall being informed or told
11  why you were being asked to do this investigation?
12      A.   No. It was just -- I was
13  essentially -- there was -- a mycologist was
14  working on it, and he wanted me to help out because
15  he was a bit overwhelmed by the volume of materials.
16  So I came in and worked through the --
17      Q.   What colleague was that?
18      MS. FISHER: I'm sorry. I don't
19  believe he said colleague. I believe he said
20  mycologist. Did you say mycologist?
21      THE WITNESS: Yeah, mycol -- I'm
22  sorry. It would be -- the correct statement would
23  be a mycologist.
24  BY MR. CORWIN:
25      Q.   Well, thank you. What was the name of

Page 55

1   the mycologist?
2       A.   You're going to be a little frustrated
3   with me. I know him by his first name, I call him
4   Dr. Don, and I can provide that information for you
5   later, but that's --
6       Q.   Do you know where Dr. Don is located?
7       A.   Um.
8       Q.   Is he in Minneapolis, is he
9   someplace --
10      A.   He's local. I can't give the direct
11  address.
12      Q.   And you don't know if he's associated
13  with the University or a college?
14      A.   He was a former university professor.
15  I believe right now he's working as a private
16  consultant.
17      Q.   You would agree with me that the
18  Select Comfort bed, such as the one used by Ralph
19  Simon, can develop mold, wouldn't you?
20      A.   I think that's true of any bed.
21      Q.   So you would agree with the Select
22  Comfort bed that was used by Ralph Simon could
23  develop mold, correct?
24      A.   I don't think I would use the -- well,
25  develop, I suppose, or mold spores could be --

Page 56

1   Cladosporium mold spores could be present in his
2   Select Comfort bed, yes.
3       Q.   And other mold spores could be present
4   in a Select Comfort bed such as Ralph's?
5       A.   In any bed, yes.
6       Q.   So the statement is true, that mold
7   spores such as Aspergillus can be grown or
8   developed in Select Comfort beds such as Ralph
9   Simons's?
10      MS. FISHER: Objection, misstates
11  prior testimony.
12      THE WITNESS: Are you talking about
13  the presence of spores or growth?
14  BY MR. CORWIN:
15      Q.   Both?
16      A.   I don't know about Aspergillus.
17      Q.   Can it grow?
18      A.   I don't know if -- if the conditions
19  are appropriate for Aspergillus growth. I --
20  I'm -- my focus in this one is on Cladosporium.
21      Q.   I understand. What are the conditions
22  in the Select Comfort bed that are conducive to
23  development of Cladosporium mold?
24      A.   I don't think there's any particular
25  conditions in the Select Comfort bed that are --

Neil Geoffrey Carlson - August 7, 2015
Ralph Simon vs. Select Comfort Retail Corp., et al.

Page 57

1  other than it being a -- a surface that can collect
2  dust and that it's a -- if you apply water and dust
3  to a material, you can get growth, for instance,
4  you can get water and dust to carpet, it will grow.
5       There's -- Cladosporium likes to take
6  off anywhere.  So almost anywhere where you have
7  moisture, dust and appropriate -- moisture, dust,
8  spores, and appropriate temperature.
9     Q.    The same thing with Aspergillus,
10  correct?
11    A.    It's a little tougher for Asper -- it
12  doesn't have as -- Cladosporium has got a wider
13  niche.  Aspergillus is a little bit more selective
14  in its niche.
15    Q.    But it can, you're not ruling out the
16  possibility with the way of the design of the
17  Select Comfort bed that Ralph Simon was using could
18  develop Aspergillus?
19    A.    I -- you're asking me to speculate,
20  sir.
21    Q.    No, I'm not.  I'm asking you to use
22  your expertise in training, and I presume you know
23  how this bed was put together and what happens when
24  a person sleeps?
25       MS. FISHER: Objection, calls for

Page 58

1  speculation, and asked and answered.
2       THE WITNESS: Yeah.  I -- I don't know
3  where you're -- I -- I can't speak to Aspergillus,
4  I can speak to Cladosporium.
5  BY MR. CORWIN:
6     Q.    Well, you said that Aspergillus needs
7  water, source, food source, and temperature to grow,
8  correct?
9     A.    Yes, and -- and -- but the conditions
10  for it are a little bit more picky than for
11  Cladosporium.  So I -- let's say when I'm looking
12  at a walk-in cooler, I can see Cladosporium
13  everywhere, but I don't necessarily see Aspergillus,
14  fumigatus or Aspergillus growth as much.
15    Q.    Because of the temperature?
16    A.    Because of the temperature or -- you
17  know, I'm looking at an environment and I see
18  Cladosporium a lot.  I don't see -- and when we do
19  air samples, let's say, for instance, outdoor air
20  samples, Cladosporium is the most common mold.
21  Indoor air samples -- and I'm going to give you a
22  caveat.  You don't see a lot of spores when there's
23  snow on the ground outside; and, then, inside the
24  most common organism is Cladosporium, and
25  typically -- and, then, I'm assuming that the

Page 59

1  windows aren't open.
2     Q.    But let's try to focus on the question
3  I'd like to have answered.  Okay, sir?
4     A.    Sure.
5     Q.    You're identified as an expert in this
6  case?
7     A.    Right.
8     Q.    Correct?
9     A.    Yeah.
10    Q.    So you tell me, isn't it true that the
11  Select Comfort bed that was used by Ralph Simon
12  could grow Aspergillus mold?
13    A.    I don't know if it can.
14    Q.    You know that water can be transmitted
15  from the human body down to the air chamber, correct?
16    A.    Yes.
17    Q.    You are aware that Aspergillus is
18  found in the air on occasion inside homes and it
19  can land in the chamber, for instance, when you're
20  putting the bed together, correct?
21    A.    Yes.
22    Q.    And the temperature is in a range when
23  a human body is sleeping such that the conditions
24  could be acceptable for the growth of Aspergillus,
25  correct?

Page 60

1     A.    I'm not sure about Aspergillus.  I
2  would like to be able to tell you that I -- I am
3  sure, but I don't know.
4     Q.    Well, what temperature does
5  Aspergillus grow at --
6     A.    I --
7     Q.    Let me finish.  Between freezing and
8  body temperature?
9     A.    I don't -- the -- I'm not sure about
10  the lower end of Aspergillus, whether it -- I think
11  there may be one species that grows at the
12  psychrophilic temperature, in other words, cooler,
13  and there's one that grows -- and, then, there's
14  one that grows way up high, which would be
15  fumigatus.
16       It's in the right temperature range,
17  but I don't know if it grows in that.
18    Q.    What about Fusarium, would conditions
19  be right or could they be right for growth on a
20  Select Comfort bed such as the one that Ralph Simon
21  slept on for years?
22       MS. FISHER: Objection, calls for
23  speculation.
24       THE WITNESS: Again, that would be
25  speculation.  I don't know.

Neil Geoffrey Carlson - August 7, 2015
Ralph Simon vs. Select Comfort Retail Corp., et al.

Page 61

BY MR. CORWIN:

1  Q.    Only because you haven't looked into
2  the issue?
3  A.    I don't know if it's -- if -- yeah.  I
4  don't -- I don't know if the conditions are
5  appropriate for that.  It's -- it's a better plant
6  pathogen than it is -- like we see it in soils, but
7  I don't know if the conditions would be right for
8  it.
9  Q.    Now, getting back to your scientific
10  study, when you design a test, you have to have
11  controls?
12  A.    Yes.
13  Q.    And what were your controls in this
14  test?
15  A.    There's a couple -- we had essentially
16  multiple controls.  We had culture plate controls,
17  we had -- we had samples that occurred, for
18  instance, we had -- we put nothing in the -- we
19  introduced -- we didn't introduce the -- I believe
20  it's five-by-ten piece of material with the yeast
21  and everything with the Cladosporium, we didn't put
22  that on first.
23        So we took a sample after we agitated
24  the bed with nothing in it.  So that was a control

Page 62

1  just to see what the background level was in the
2  room, and we also checked the particle levels at
3  that, and also checked the pressurization that --
4  we had HEPA-filtered air in there.
5        Then we placed the material in the
6  room and into control for any spores that may have
7  been released while we put that in there.  We
8  did -- we purged that space again so it would be
9  clean and -- so that was another control; and then
10  we agitated it, and then that's when the
11  experimental process began.
12        We also had controls where we did an
13  outdoor air sample, and then we did a control where
14  we did a sample inside the warehouse.
15  Q.    But I thought you concluded in your
16  report that the increase of Cladosporium found in
17  the air sampling was likely from the introduction
18  of warehouse air, did you not say that?
19  A.    I said it could have been because
20  the -- when we were measuring the particle counts,
21  at least in the initial part, we were keeping it
22  low, but as -- there was a tremendous amount of
23  activity in the warehouse, and the spore
24  concentrations were quite high.
25  Q.    So it's possible that your experiment

Page 63

1  was contaminated by the outside warehouse air?
2  A.    That -- in particular, with respect to
3  the penicillium.  So the way I would interpret the
4  results would be that I would -- to be fair with
5  the plaintiff, I would assume that the Cladosporium,
6  at least for the most part, would be from the bed,
7  but I couldn't rule that out.  I would have looked
8  to have been able to rule it out, but I couldn't.
9  So I would like to have -- you know, if -- if we
10  would have seen that the -- for instance, when we
11  were going we -- we'd see a nice increase, but we
12  didn't.  I don't think the outside, the air in the
13  warehouse would have caused any diminution in the
14  levels.
15        MR. CORWIN: Let's take a quick break
16  so I can get into a lightning round.  Can we do
17  that?
18        MS. FISHER: We sure can.
19        (Break from 10:19 to 10:25.)
20  BY MR. CORWIN:
21  Q.    So one of the things we had mentioned,
22  and I promised you we'd get back to this, is this
23  sounds like this is not the first case that you've
24  worked on at either Oppenheimer or Select Comfort's
25  request; is that correct?

Page 64

1  A.    That's correct, yes, sir.
2  Q.    How many other cases have you worked
3  on?
4  A.    I'm not exactly sure with respect to
5  number.  I -- I -- because -- and the reason I'll
6  give to you is I'm doing some research, but I --
7  sometimes I'm not told whether it's related to a
8  case or sometimes I'm not even -- I just do some
9  work and then that's all I hear about it, so I'm
10  not sure.
11        I can specifically state that I was
12  working -- there is one I can think of in
13  particular where -- where I was working for
14  Oppenheimer because I was paid by them.
15  Q.    And can you give me the basic facts of
16  that case --
17  A.    I don't --
18  Q.    -- in your work?
19  A.    I wasn't appraised of the basic facts
20  of the case, other than there was Cladosporium and
21  the particular species was Cladosporium and I'm --
22  I'll have to give you the spelling later, it's
23  ferosperum (phonic).  We can look it up for you to
24  help you out.  And I was asked to -- in this case
25  it was a much smaller spot, it was a one-by-one

Neil Geoffrey Carlson - August 7, 2015
Ralph Simon vs. Select Comfort Retail Corp., et al.

Page 65

1 piece, and so, essentially, we did the same
2 experiment that we did for this one, and we didn't
3 see anything above background levels on that one.
4        So I anticipated -- that's why I had
5 the hypothesis that when we doubled the surface
6 area to, let's say, 50-by-10 that I might see, say,
7 50 times what I'd seen in that one, but I didn't
8 see it. So that surprised me.
9    Q.    Was that done over a one --
10    A.    That was --
11    Q.    -- night period, also?
12    A.    Yeah.  It was, essentially, the same,
13 average sleep cycle is -- very similar test.
14    Q.    And was that involving a personal
15 injury claim, also, do you know?
16    A.    I'm not sure if there was or not.
17 I -- I was just told the organism and they wanted
18 to run the test.
19    Q.    So you have not run this test with any
20 other organisms, Fusarium, Aspergillus, anything
21 else, it's always been Cladosporium; is that right?
22    A.    Yes.  It's been -- it's been either
23 Cladosporium as a genus or Cladosporium as a
24 specific species with this farosperum (phonetic).
25        THE WITNESS: And I'll give you the

Page 66

1 spelling later.
2 BY MR. CORWIN:
3    Q.    And we talked about the investigation
4 you did of 70, 80, 90, I think, I can't remember
5 the exact number but --
6    A.    A hundred and one.
7    Q.    A hundred and one different mattresses?
8    A.    Yeah.
9    Q.    And you don't know whether Select
10 Comfort mattresses were included in those?
11    A.    Well, they weren't included because
12 when I was looking at the cut -- cutouts, they
13 weren't Select Comfort ones, they were all
14 different manu -- I mean, there were some that were
15 pretty old.  I think there was some that had even
16 horse hair on it, so that was like a really old
17 one, and I don't think they do a lot of that, and,
18 then, there was modern, solid foam ones, and all
19 these different chambers.  It was a hodgepodge of
20 mattresses, mattress designs.
21    Q.    And as you sit here today, you can't
22 recollect whether your investigation was requested
23 or directed by Select Comfort or Oppenheimer?
24        MS. FISHER: Objection.  I just want
25 to clarify.  Which specific investigation, the 101

Page 67

1 mattress investigation?
2        MR. CORWIN: Yes.
3        THE WITNESS: Okay.  I will -- I can
4 provide information to make sure, because I would
5 know that from my billing.  So I'll be happy to
6 provide to make sure you're accurate on that.
7        MR. CORWIN: Great, thank you.
8        THE WITNESS: Yeah.
9 BY MR. CORWIN:
10    Q.    So, we've talked about your
11 investigation, we've talked about the current case,
12 we've talked about the case where you did a similar
13 test.  Do you recall what year that was when you
14 did that similar test?
15    A.    Um, I'll give you the exact date for
16 sure.  I recall it was probably 2013, but I will
17 give you -- if I -- if it's different from that, I
18 will inform you to make sure you've got it correct.
19    Q.    Great, thank you.
20        Any other work that you can think of
21 either with regard to a case or an investigation or
22 research that you have done with regard to mold and
23 beds?
24    A.    Yes.  The -- I've done other work for
25 Select Comfort.  Again, the work that I -- other

Page 68

1 work that I've done for them has been with respect
2 to a confidentiality agreement.  So I don't know
3 how -- what the legal rules are for disclosure on
4 that, since I'm --
5    Q.    Well, are you talking about other work
6 on one occasion or multiple occasions that is
7 subject to this confidentiality agreement?
8    A.    It would be multiple occasions.
9    Q.    And you were paid?
10    A.    Yes, I was paid, by Select Comfort.
11    Q.    And do you know how much total you've
12 been paid by Select Comfort?  I'm looking for a
13 ballpark?
14    A.    I -- oh, boy.
15    Q.    Over the years I'm talking about?
16    A.    Um, let's see, I'm going to give you a
17 range.  It's -- it's more than 5,000, but less than
18 50,000, because I'll give you -- that's a big
19 ballpark, but I'm pretty sure it's not -- it's less
20 than that, and I'm pretty sure it's not under that,
21 so --
22    Q.    But you would have those records at
23 home or someplace, at your office, someplace?
24    A.    Yeah.  I would have to go through all
25 of that to kind of make sure that that's accurate;

Neil Geoffrey Carlson - August 7, 2015
Ralph Simon vs. Select Comfort Retail Corp., et al.

1   **and if requested and if it's legally appropriate, I**
2   **can give you the rough total.**
3       Q.   You may not be aware of this, but
4   there is a protective order in place in this case,
5   which prevents us from disclosing things that are
6   marked confidential to anybody but a very limited
7   circle.
8           Given the fact that there's a
9   confidentiality agreement and protective order in
10  place, can you please tell me what those multiple
11  occasions were in which you have done work for
12  Select Comfort?
13          MS. FISHER: Let me object.  I'd like
14  to go off the record and find out.  I have a
15  feeling that these are like NDAs or R&D stuff.  I
16  just want to find out what he's got in his head and
17  then we'll --
18          MR. CORWIN: Well, here's the problem.
19  He's under oath right now, and I want to know what
20  he's got in his head.  You can designate it as
21  confidential.  There's nothing I can do about it if
22  it's designated other than comply with the order.
23  So I'd like an answer without a break.
24          MS. FISHER: Well, this is also not a
25  fact deposition.  So, to the extent that this bears

1   talk to him to find out --
2           MR. CORWIN: I don't want any talks.
3   I want him to testify under oath.  You don't get to
4   decide what I ask your expert and what I don't.
5           MS. FISHER: I get to take a break and
6   talk to him and find out -- I can protect the
7   interests of my client and make sure that he's not
8   disclosing information that they would not want
9   disclosed that goes beyond what the court ordered
10  in the protective order.
11          MR. CORWIN: I disagree, and I think
12  what you're going to do is sanctionable.
13          MS. FISHER: Really?
14          MR. CORWIN: Yes.
15          MS. FISHER: Get the Judge on the
16  phone, I'm happy to ask him.
17          MR. CORWIN: No.
18          MS. FISHER: Because this is not --
19          MR. CORWIN: I am not.
20          MS. FISHER: This is not one of those
21  situations in which I'm going to let you do a bunch
22  of discovery that you didn't do before in the
23  litigation and you're going to try to get through
24  this witness, because he doesn't know the ins and
25  outs of Select Comfort, but you're going to get him

1   on his credentials as an expert in this case,
2   that's one thing.  But this isn't a fishing
3   expedition for fact-finding.
4           MR. CORWIN: Oh, sure it is.  This is
5   a deposition of an expert, and you don't have the
6   black robe on, so you don't get to make those
7   decisions.
8   BY MR. CORWIN:
9       Q.   So, can I have an answer to my
10  question, please?
11          MS. FISHER: We're not going to delve
12  into just blanket facts, information about Select
13  Comfort.
14          MR. CORWIN: Yes, we are, because
15  it's --
16          MS. FISHER: But it's not --
17          MR. CORWIN: Because it goes to his
18  bias.
19          MS. FISHER: That is not what the
20  purpose of this deposition is.
21          MR. CORWIN: You don't --
22          MS. FISHER: And I'm not going to
23  allow --
24          MR. CORWIN: You don't --
25          MS. FISHER: And that's why I want to

1   to try to say a bunch of stuff.
2           I want to know exactly what he's got
3   in his head.  It might be fine, and we'll come back
4   and he'll testify.
5           MR. CORWIN: And I object to you doing
6   that.  I want an answer to my question.
7           MS. FISHER: Off the record, or you
8   can keep it running if he wants to run his time.  I
9   just want five minutes.  I want to find out what
10  he's got in his head.  Let's go.
11          THE WITNESS: Okay.
12          MR. CORWIN: And I'd like to note that
13  there's a question pending.
14          (Break from 10:34 to 10:35.)
15          MS. FISHER: Okay.  I'm comfortable,
16  he can testify.
17          MR. CORWIN: So before you give your
18  answer I'm going to make a record that over my
19  objection Ms. Fisher stopped the deposition, took
20  the witness outside, talked to the witness about
21  what his answer or answers could be and then came
22  back, while he was under oath and with the question
23  pending.  Now, go ahead, please.
24          MS. FISHER: I will also note that I
25  did not talk to the witness about his answer, what

Neil Geoffrey Carlson - August 7, 2015
Ralph Simon vs. Select Comfort Retail Corp., et al.

Page 73

1  his answers would be, I asked him about the topic
2  he had in his head, to determine whether or not
3  that would be appropriate for him to talk about
4  today.
5        THE WITNESS: So, I think, given the
6  passage of time, if you could restate the question,
7  that would help me give you an accurate answer,
8  sir.
9        MR. CORWIN: Can you read the
10 question, please?
11       (Whereupon, the court reporter read
12 back the following question: "You may not be aware
13 of this, but there is a protective order in place
14 in this case, which prevents us from disclosing
15 things that are marked confidential to anybody but
16 a very limited circle. Given the fact that there's
17 a confidentiality agreement and protective order in
18 place, can you please tell me what those multiple
19 occasions were in which you have done work for
20 Select Comfort?")
21       THE WITNESS: Okay. So you would like
22 me to offer a characterization of the work that I
23 did?
24 BY MR. CORWIN:
25    Q.   I want you to describe the work that

Page 74

1  you did, yes?
2     A.   Okay, all right. Select Comfort works
3  on quality control and doing methods to prevent
4  fungal growth on their material. So I assist them
5  in their -- the work that I've done has been to
6  assist them in their quality control with respect
7  to that they stress their beds with tremendous
8  amounts of water and run the tests for 90 days, and
9  I assist them to see if there are any cases where
10 somebody or some -- there was -- if there was
11 insufficient antimicrobial added to a particular
12 material, so identify and say, yep, this particular
13 one they messed up with their quality control and
14 we need to -- we need to make sure that they've got
15 additional antimicrobial added to this. So I'll do
16 the testing for that.
17       I'll also do -- when they want to set
18 up a brand-new chamber area, I'll do some testing
19 to say, okay, this is clean enough so that you can
20 restart work where you're going to do aggressive
21 product control; and, then, I also assist in
22 determining, let's say, background levels in places
23 where they're working so that they can see if
24 there's any problem with a building that they're
25 planning on using; and, then, the last one is that

Page 75

1  they had a water event in -- this is three broad
2  categories. They had a water event in their
3  building, and I assisted with figuring out what
4  water-damaged materials were in the building so
5  that we could help with them removing the
6  water-damaged materials.
7     Q.   Have you described for me, in general
8  terms, other than the two cases that we've
9  previously discussed and your investigation into
10 the 101 mattresses, have you described for me the
11 work that you've done for Select Comfort?
12    A.   As I recall right now, there was some
13 additional work. I actually went out to -- at
14 least on two occasions, and there may be another
15 one, where I've gone to actual homes of Select
16 Comfort users who had concerns about their
17 mattresses and I took air samples, and it was part
18 of QC, we were trying to determine if there was
19 problems in their homes; and, then, I also did work
20 attempting to set up an experiment. So I did
21 samples in an area where would this be an
22 appropriate place to aggressive test a mattress to
23 see if it would be a very -- an environment that
24 would be very conducive to mold growth and it would
25 be a good place to attempt to see if the quality

Page 76

1  control worked well.
2     Q.   Where was that?
3     A.   That was in a -- like a crawl space, a
4  damp crawl space.
5     Q.   Of somebody's home?
6     A.   Yeah.
7     Q.   So let's talk about part of the QC
8  with regard to the antimicrobial substances. When
9  did you first start doing that type of work?
10    A.   I don't have the specific date. The
11 original -- I was originally contacted, I believe,
12 through Aspen Research, which I believe did
13 research, quality control research through Select
14 Comfort, and I don't have specific dates on that.
15 I can provide that to you at a later date, but I
16 don't have a specific date.
17    Q.   You can't give me a general date, if
18 it was 2005, 2010, 2012, 2000?
19    A.   Well, let's see, it was prior to 9/11.
20 So it would be prior to 2001.
21    Q.   Now, when you participate in these
22 90-day evaluations that you talked about --
23    A.   Right.
24    Q.   -- to determine whether mold can grow
25 in a Select Comfort bed, you're just not looking

Neil Geoffrey Carlson - August 7, 2015
Ralph Simon vs. Select Comfort Retail Corp., et al.

Page 77

1  for Cladosporium, are you?
2      A.   Ah, no.  The -- and -- no, and looking
3  at the whole system.  So occasionally we'll find
4  that, like, the sheets that are put on the bed by
5  various manufacturers, sometimes the sheets really
6  get moldy and they tend to be more problematic than
7  the beds themselves.  So we have to figure out
8  what -- what's an appropriate sheet to use on the
9  bed that --
10     Q.    But my question was, when you're doing
11 that --
12     A.    Yeah.
13     Q.    -- testing for mold --
14     A.    Yeah.
15     Q.    -- for part of the quality control,
16 that's what QC stands for, correct?
17     A.    Yes, uh-huh.
18     Q.    You're not just testing for
19 Cladosporium, there are other molds that you're
20 testing for?
21     A.    That's correct, and -- that's correct.
22     Q.    And I've seen some of them, okay, I
23 understand what you're talking about, and I don't
24 have one in front of me, but I know you're testing
25 for Aspergillus, correct?

Page 78

1      A.    I'm testing for a wide variety.  I
2  just don't recall if -- if I -- at that point if I
3  recall if I found the -- that organism growing on
4  material in the bed.  So if I do, upon reflection
5  looking at the reports, note that that was found,
6  then I can revise that testimony, but I don't
7  recall specifically.
8      Q.    And the testing protocols that you
9  followed, those were designed by Select Comfort?
10     A.    Let's see, yeah.  I -- I, in fact,
11 helped -- helped work with them to figure out.
12          I -- I guess I should add one other
13 test that I did do is I did testing on small
14 sections of chamber material in conjunction with
15 Aspen, and we were trying to figure out what would
16 be the best way to rapidly attempt to do QC testing
17 so that we could get it done, let's say, in a month
18 instead of having to go out nine -- you know, three
19 months.
20     Q.    When did you do that?
21     A.    That would -- I believe would be prior
22 to -- I think that would be prior to 9/11.  I can't
23 give you the exact date, but I would put it in --
24 I'd wet it down, put it in a plastic container and
25 we're trying to get -- and Aspen was doing similar

Page 79

1  research at the time to see how -- see if they
2  could get anything to rapidly grow, or if we had to
3  spread spores on it and see if we could try to get
4  it grow.  It was much more difficult than I
5  anticipated to get it to grow.
6      Q.    I just asked you when you did it?
7      A.    Oh, sorry.
8      Q.    So, moving on, when you do this
9  quality control and you do these experiments,
10 you're not differentiating between a single chamber
11 and a dual chamber mattress, are you?
12     A.    Um, I -- I'm trying to recall.  I
13 can't recall if I did many dual chamber, I know
14 I've done a lot of single chamber.
15     Q.    But as far as the conditions for
16 growing mold or not, the way the mattress, the bed
17 system performs, it doesn't matter whether it's a
18 single or a dual chamber, the conditions are the
19 same, correct?
20     MS. FISHER: Objection, calls for
21 speculation.
22          THE WITNESS: I -- I -- I guess I
23 can't say because they are slightly different in
24 the way that they're put together, because one
25 typically has a -- sometimes it has a foam piece,

Page 80

1  but other times they're -- they usually have a foam
2  piece going down the middle.  So they're -- they're
3  slightly different.
4  BY MR. CORWIN:
5      Q.    Sure.  But as far as where a person
6  sleeps -- and you can appreciate that we mostly
7  sleep on the same place on our beds every night,
8  right?
9          MS. FISHER: Objection, calls for
10 speculation.
11          THE WITNESS: I don't know how --
12 BY MR. CORWIN:
13     Q.    You don't know?
14     A.    I don't know how people sleep.
15     Q.    But assuming people do sleep --
16     A.    Yes.
17     Q.    -- generally in the same place --
18     A.    Uh-huh.
19     Q.    -- every night on their bed, if it's a
20 dual chamber they're sleeping on one chamber that
21 is constructed the same way as a single chamber,
22 correct?
23          MS. FISHER: Objection, calls for
24 speculation.
25          THE WITNESS: I don't know -- I don't

**Neil Geoffrey Carlson - August 7, 2015**
**Ralph Simon vs. Select Comfort Retail Corp., et al.**

Page 81

1 know how -- I'm not privy to the exact
2 manufacturing process with respect to one versus
3 two.
4 **BY MR. CORWIN:**
5     Q.    You've never differentiated, said I
6 need to test -- for this to be valid for your
7 investigation, your quality control, you've never
8 said I need to do both a single chamber and a dual
9 chamber bed, have you?
10         **MS. FISHER:** Objection, misstates
11 prior testimony, misunderstands prior testimony.
12         **MR. CORWIN:** No, it doesn't.
13         **THE WITNESS:** I don't know if I ever
14 have, sir, and I'd have to think back.  I can't
15 recall if I've ever made that distinction.
16 **BY MR. CORWIN:**
17     Q.    So you indicated you went into a
18 couple of homes?
19     A.    Yes, I did.
20     Q.    Where were those homes?
21     A.    I don't know the precise location.
22 One was north metro, and I think another one was
23 west metro.  There may have been another one, but
24 those are the two that I recall.
25     Q.    Do you recall the circumstances as to

Page 82

1 why you were asked to go into those homes?
2     A.    Um, one -- let's see, one person was
3 concerned about their environment and also,
4 apparently, their bed; and so we looked at the
5 environment in that place and they had a crawl
6 space underneath that was -- had mold growth in it,
7 and I -- so I did a general investigation for them
8 and said we got an issue with the crawl space and
9 you aren't -- you aren't keeping it up, it's got
10 moldy cardboard and everything.
11     Q.    But before you go to the next one?
12     A.    Sure.
13     Q.    Did you look at the bed that was
14 involved?
15     A.    Yes, I did.
16     Q.    Did it have mold?
17     A.    I can't -- I'm trying to recall if --
18 if it did.  I will say -- let's see.  I'm -- let's
19 see.  I believe -- I want to make sure I'm accurate
20 on this.  I believe I -- I -- I will --
21         **MS. FISHER:** If you --
22         **MR. CORWIN:** Let him answer.
23         **MS. FISHER:** If you don't recall, you
24 don't recall.
25         **MR. CORWIN:** Don't instruct him.

Page 83

1         **THE WITNESS:** I'm -- okay.  Yeah, this
2 is a bunch of years back, so I'm trying to -- let's
3 see, give me a moment.  I can't recall, and I would
4 like to be able to say I did, I can't recall if --
5 for a hundred percent certain, which I'd like to
6 be, whether I took a sample from that chamber.  I
7 know I took an air sample in the location where the
8 bed was.
9 **BY MR. CORWIN:**
10     Q.    Well, it makes sense, does it not,
11 that there was mold in the bed or Select Comfort
12 would not have gone to the expense of sending you
13 in there to test the air, correct?
14         **MS. FISHER:** Objection, calls for
15 speculation.
16 **BY MR. CORWIN:**
17     Q.    Doesn't that make sense?
18     A.    I don't know.  I would -- what I --
19 what occasionally happens is individuals will
20 suspect that there is, and given their level of
21 expertise with respect to -- or the general
22 public's expertise with respect to differentiating
23 between discoloration and mold that they would have
24 said we sus -- I think an accurate term is the
25 homeowner suspected that there might be mold

Page 84

1 growth.  That would be accurate.
2     Q.    Was the homeowner claiming injury, do
3 you recall?
4         **MS. FISHER:** Objection.  This is
5 starting to get into a fact deposition, which we're
6 not here to do.
7         **THE WITNESS:** I don't know.
8 **BY MR. CORWIN:**
9     Q.    But your best recollection is, you
10 can't say with 100 percent certainty, I understand
11 that, but your best recollection is that there was
12 mold in that mattress and --
13         **MS. FISHER:** Objection.
14 **BY MR. CORWIN:**
15     Q.    -- that house --
16         **MS. FISHER:** Misstates testimony.
17 **BY MR. CORWIN:**
18     Q.    -- where you went in to test?
19     A.    I don't know.  I do know that -- that
20 there was suspect -- the homeowner -- it would be
21 accurate to state that the homeowner suspected that
22 there was mold growth.
23     Q.    When was the second instance where you
24 went into a home?
25     A.    I don't recall the date.  It was a --

Neil Geoffrey Carlson - August 7, 2015
Ralph Simon vs. Select Comfort Retail Corp., et al.

Page 85

1  a house that was in fairly good -- it was a lot of
2  blues in it, and then we took a look -- the bed was
3  unremarkable. I don't recall if I saw any mold on
4  that bed. The downstairs was a mess. They had
5  storage, and there was problems with the storage
6  area, and there were water leaks down there. But
7  that's one I don't recall if there was any growth
8  on the material at all.
9      Q.    Any other instances where you
10 investigated mattresses or homes -- let me rephrase
11 that.
12         Any other instances that you can
13 recall where you investigated beds or homes from
14 users of Select Comfort beds?
15     A.    I did a -- an investigation unrelated
16 to any work with Select Comfort or Oppenheimer, and
17 it was a general inspection of a home.
18     Q.    Somebody else hired you to do that?
19     A.    The homeowner hired me to do that.
20     Q.    Any other instances you can think of
21 where you investigated a bed or a home with regard
22 to mold growth?
23     A.    Um, there may be other ones, but as
24 I'm searching the cavities of my brain I'm not
25 finding it right now. I'd like to be more helpful,

Page 86

1  but my memory isn't a hundred percent.
2      Q.    Have you ever given any advice to
3  Select Comfort or Oppenheimer with regard to
4  whether a warning should be issued to the users or
5  purchasers of Select Comfort beds or the content of
6  it, discuss the content of any such warning that
7  might be issued to users or purchasers of Select
8  Comfort beds?
9      A.    I don't recall doing that.
10     Q.    Did you videotape any part of your
11 experiment in this case?
12     A.    Not in this one. I did in the
13 previous study.
14     Q.    Does that videotape still exist?
15     A.    Um, I'm not sure if that does. If it
16 would, it would be on the hard drive of my computer.
17     Q.    Will you check for me, please?
18     A.    Yes, and I will disclose if it's
19 legally allowed.
20     Q.    Now, when you went to the break --
21 First of all, we took a brief break before there
22 when you went to the bathroom. Did you talk to
23 Ms. Fisher during that break?
24     A.    Yes, briefly.
25     Q.    Did you discuss any of the questions

Page 87

1  that had been asked or any of your testimony?
2      A.    We discussed the fact that -- mostly
3  your demeanor.
4      Q.    Anything else?
5      A.    I'm trying to think. Nothing --
6  nothing that I recall being specific to the case.
7  It was more things seem to be going okay, just be
8  honest with your answers and -- I would like to
9  recall more on it, but that's the general -- and
10 then I went to the bathroom.
11     Q.    And then when you took a break when my
12 question was pending earlier, you discussed this
13 specific question that I had asked, correct?
14     A.    It was --
15     Q.    With Ms. Fisher?
16     A.    The main thing is she asked me what
17 was the bulk of the work that you did, and I just
18 said it was primarily QC work, and she says, well,
19 that's fine to discuss.
20     Q.    Anything else that you told her?
21     A.    That was, essentially, it. I said I
22 was doing QC work, and she said that was fine to
23 discuss.
24     Q.    Okay. I'd like to ask you a few quick
25 questions.

Page 88

1          MR. CORWIN: How much time have I been
2  going so far?
3          (Discussion off the record.)
4  BY MR. CORWIN:
5      Q.    You don't have your reports in front
6  of you?
7      A.    That is correct, sir.
8      Q.    So if I asked you questions about your
9  report, can you do them from memory or would you
10 like to have copies of your report in front of you?
11     A.    I would be happy to have copies of my
12 report in front of me if you have them.
13     Q.    So I'm handing you a copy of your
14 original report first.
15     A.    All right, thank you.
16     Q.    I don't know if we need to mark it,
17 and --
18         MS. FISHER: You don't need one for
19 me, I've got one.
20         MR. CORWIN: No, I know. What I'm
21 looking for is a second copy of his rebuttal
22 report, and I'm having trouble putting my hands on
23 one that doesn't have my notes. So if we get into
24 it and you need a copy, we'll get you one. Okay?
25         THE WITNESS: That sounds fine. Thank

Neil Geoffrey Carlson - August 7, 2015
Ralph Simon vs. Select Comfort Retail Corp., et al.

Page 89

1 you, sir.
2 **BY MR. CORWIN:**
3   Q.   So I have a couple questions about
4 your original report. You indicated that a patch
5 of bed chamber was cleaned, and then yeast, which
6 provided nutrition for the growth of Cladosporium?
7   **A.   Uh-huh.**
8   Q.   And then swabbed it with Cladosporium;
9 is that correct?
10   **A.   Yes, sir.**
11   Q.   Which species did you swab it with?
12   **A.   We didn't attempt to speciate it. If**
13 **I were to give you my --**
14   Q.   You don't know, do you?
15   **A.   I don't know the exact one.**
16   Q.   Okay. So the specific species of the
17 Cladosporium was not significant to you with regard
18 to performing this test?
19   **A.   The -- what was important to me is**
20 **I -- I used it -- picked up the Cladosporium, we**
21 **had a recent air sample from a building. So I had**
22 **two different types that I could choose from, and I**
23 **picked one that had a really nice sporulation so**
24 **we'd get a lot of spores. So I picked the one that**
25 **produce -- that was a really good spore producer.**

Page 90

1   Q.   And the bed chamber, the five-inch
2 patch of the bed chamber you used, that was
3 provided by Select Comfort?
4   **A.   Yes.**
5   Q.   Do you know whether it had any type of
6 antimicrobial agent in it?
7   **A.   I'm not sure what we -- no. We**
8 **attempted to -- I think in this case the bed**
9 **chamber material was just primarily useful as a --**
10 **as a surface that we could paint the yeast on. I**
11 **could have used a lot of other different ones, but**
12 **I chose to use that one since it would best we**
13 **could to kind of replicate the -- the conditions.**
14   Q.   So what was the material made out of,
15 do you know?
16   **A.   I don't know what it was made out of.**
17 **It was the -- it was the chamber material, and we**
18 **had to wash it off because it was -- there's a --**
19 **a -- it was kind of dusty, so we had to clear the**
20 **dust off of it, attempted to rinse it with -- with**
21 **water, and then we dried it out enough so that we**
22 **could put the -- the yeast extract and, then,**
23 **subsequently put the Cladosporium on it.**
24   Q.   Did it have any type of fabric on it,
25 do you recall?

Page 91

1   **A.   I --**
2   Q.   Or was it just rubber?
3   **A.   I'm not sure if -- I don't know how to**
4 **describe if it was just -- I don't know if it's a**
5 **fabric material or rubberized material. I don't**
6 **know what the -- you're asking me something out of**
7 **my area of expertise. I just know it was chamber**
8 **material.**
9   Q.   Do you still have that chamber
10 material someplace?
11   **A.   I don't know if I still have that one**
12 **or not. I have similar material, because we --**
13 **we -- we were short of time, so we made up several**
14 **different ones and wanted to make sure at least one**
15 **caught so that we'd have a option to -- to do**
16 **additional tests.**
17   Q.   When you say made several, was it
18 several from the same type of bed chamber material
19 that was provided by Select Comfort or did you use
20 other materials?
21   **A.   We used -- we use all material**
22 **provided by the same ones. So I cut out large**
23 **sections. It's difficult material to cut. So I**
24 **cut it out, and we put it in different conditions**
25 **because we were trying to see which one would get**

Page 92

1 the best -- the best growth.
2   Q.   So with regard to -- and I'm going to
3 ask a series of questions with regard to the
4 materials and the way you set this experiment up.
5       Were you coordinating your efforts
6 with Mr. Barnum at Select Comfort?
7   **A.   The -- the extent that I coordinated**
8 **the efforts with him would be construction of**
9 **the -- Mike Buck actually specked out the**
10 **construction of the -- the large enclosure. We**
11 **worked with Mr. Barnum to -- let's say prior to our**
12 **going there we asked some workers that were there**
13 **to turn on the HEPA filter so it would be cleaned**
14 **out well. We also asked them to clean the area,**
15 **the interior of that spot so it would be clean so**
16 **when we got there it would have had at least a**
17 **couple hours to purge. Let's see, we coordinated**
18 **with them to -- because we -- to get a rollator,**
19 **and --**
20   Q.   Who did you interact with with regard
21 to getting the materials to construct the bed?
22   **A.   It was part of Mr. Barnum's team. We**
23 **just -- we -- I don't know how they got the**
24 **information about what type of bed it was, but**
25 **apparently they got -- somebody got some information**

Neil Geoffrey Carlson - August 7, 2015
Ralph Simon vs. Select Comfort Retail Corp., et al.

Page 93

1   about the type of bed that the plaintiff had, and
2   then they -- again, it would probably be hear --
3   somewhat hearsay testimony, but essentially they
4   said they don't -- they didn't manufacture it.
5          So part of the delay in the experiment
6   was they had to specially manufacture that bed, and
7   then they ran into a material that they didn't
8   manufacture the foam that was originally on that
9   bed anymore. So we were given some options, and
10  they said we have a foam that's similar, it's a
11  little more porous, and it's virgin material, and
12  I -- we said, well, that -- that will be our best
13  substitute because otherwise we'd be dealing with
14  non-orig -- non-new material.
15     Q.    Let's talk about that foam. You
16  indicate in your report that it's a light color
17  foam?
18     A.    Yeah. It was not the -- it was not
19  the same one as the -- cause we -- we tried but we
20  couldn't get, you know, that -- that exact same
21  one. So we tried our best to get something that
22  would be as close as possible represent it.
23     Q.    And you indicated that you believed --
24  and I'm looking at the paragraph on --
25     A.    Are we still on page 1?

Page 94

1      Q.    Yes, still on page 1, the paragraph
2   that starts with Select Comfort in the middle
3   there, you said, you identified the foam that was
4   used on Ralph Simon's bed to be black foam; is that
5   right?
6      A.    Yeah. It was darker, darker color. I
7   guess somebody would look at it and -- maybe look
8   at it and say it was gray, but it was a dark color
9   foam.
10     Q.    Well, you put black. That's much
11  different from gray, isn't it?
12     A.    Yeah.
13     Q.    So is it your belief it was black
14  foam?
15     A.    It's hard to tell from the picture, so
16  I -- because I'm basing it on what I saw, and it
17  was either -- would either be characterized as
18  black or gray, and I chose black.
19     Q.    How do you know it was more porous,
20  the test material you used, as compared to the
21  mattress, the foam that was on Ralph Simon's bed?
22     A.    I was relying on the -- relying on
23  the -- Mr. Barnum's team to provide that
24  information. It would -- you'd have to ask -- you
25  know, have -- you could have separate tests done on

Page 95

1   that type of foam to find out if that, in fact, was
2   the case. We just relied on -- on that.
3      Q.    Do you remember the individual that
4   told you that?
5      A.    It was a member of Mr. Barnum's team.
6      Q.    The rollator that you used, what were
7   the dimensions of it?
8      A.    I don't have -- I don't -- I've never
9   specifically measured it. It's the -- it's the
10  industry standard. So it -- oh, let's see. I'd
11  have to measure it to tell you, sir.
12     Q.    As you sit here today, you don't know?
13     A.    I don't know the exact.
14     Q.    What was the weight of the rotate --
15     A.    I'd have to measure it.
16     Q.    I'm sorry, I want to get this right.
17  Rollator?
18     A.    I'm not sure. It's the standard
19  weight for it. I believe it's -- the actual
20  rollator part I believe it's somewhere around --
21  I'll give you a ballpark range, be somewhere
22  between 200 and 400 pounds, but it's -- yeah.
23     Q.    When you were rolling the rollator
24  over the bed during your testing, was the full
25  weight of the rollator on the bed or was it less

Page 96

1   than that?
2      A.    I don't know if it was the full weight
3   or not. It -- it was compressed, at least at the
4   end it was compressed down about like this
5   (indicating), so it --
6      Q.    When you say -- I don't want to
7   interrupt, but I want to make a record.
8          When you say it was compressed, you
9   had your hands about eight, ten machines apart?
10     A.    I'm going to ballpark it because I'd
11  have -- I'd have to look at it. I may have -- you
12  asked specifically for video, I may have a photo of
13  it, so that would -- of the compression on the end,
14  so that may help provide some information that
15  would be helpful to you, but it was -- I don't
16  think there's any photos that are in that document
17  that would be helpful, but if you wanted that
18  information that would be where we could get it.
19     Q.    How fast did the rollator move over
20  the bed?
21     A.    Let's see (indicating). The cycle for
22  it was more than a second but less than five
23  seconds, to give you the appropriate range.
24     Q.    And when you rolled it, it went from
25  one length of the bed to the other, it didn't stop

Neil Geoffrey Carlson - August 7, 2015
Ralph Simon vs. Select Comfort Retail Corp., et al.

Page 97

1  and move back and forth or anything like that, did
2  it?
3      A.    No.  It rolled and then went back
4  (indicating).
5      Q.    So, for the record, again, you're
6  using your hand, you're putting one hand stationary
7  and you're moving with your other hand at an even
8  pace to the end.  That's what the roller did, and
9  then it moved back at the same pace?
10     A.    Yeah, to wherever the stopping point
11 was, and I'd have to look at the pictures to be
12 exact about the precise stopping point, and then it
13 rolled back, and then it would be near the end of
14 the -- so it would be kind of on the edge of the
15 bed.
16     Q.    Now, you identified that this was a
17 standard industry rollator.  What industry are you
18 referring to?
19     A.    The mattress manufacturing one.  It's
20 a -- the rollator at least -- I looked online,
21 because it's not my specific area of expertise, but
22 a rollator is used by, let's see, bedding companies
23 to test the durability of the bed.  So they'll
24 attempt to stress a bed for, let's say, ten years
25 worth of life in a shorter period of time than

Page 98

1  actually doing ten years of mattress life.
2      Q.    Do you have any of that literature or
3  what you reviewed in your file someplace?
4      A.    I don't have it in the file.  It would
5  be something that you could probably pick up off
6  the -- off the Internet.
7      Q.    Well, I'm more interested in where you
8  picked it up?
9      A.    That's where I picked the information
10 up, would be on the rollator site, and I looked at
11 it, and then I have seen at the Select Comfort
12 where they are testing the beds, and they have this
13 rollator and manufacture a bed, and they're using
14 it and they're going back and forth over it to test
15 the durability of the bed (indicating).
16     Q.    This warehouse, was it on a Select
17 Comfort property?
18     A.    It was a rented location, as I
19 understand.
20     Q.    And, then, who constructed the chamber
21 to put the bed in and do the test?
22     A.    That would be Mr. Barnum's team that
23 did the construction.
24     Q.    Did you give them any specifications
25 on how it should be constructed?

Page 99

1      A.    Mike Buck gave them the specifications
2  on that.
3      Q.    Tell me who Mike Buck is?
4      A.    Mike Buck is the person that worked
5  with me on this study.  He -- the consulting
6  company that he works for is I believe Mike Buck,
7  Inc.  We are also colleagues -- and this is
8  unrelated somewhat to this -- at the University of
9  Minnesota, and we do similar work there.  But
10 the -- and I want to clarify, the work that I'm
11 doing and Mr. Buck is doing is part of a separate
12 consulting thing that we're doing and not in any
13 way affiliated with the University of Minnesota.
14     Q.    I'm sure the University of Minnesota
15 appreciates that disclaimer.
16     A.    Right.  I have to say that because I
17 don't want to misrepresent myself.
18     Q.    So Mike Buck has his own consulting
19 firm?
20     A.    That's correct, yes.
21     Q.    And does he get involved in litigation
22 consulting, also?
23     A.    I don't know.  I don't -- I -- I guess
24 you'd have to ask him.  I don't recall if he does a
25 lot of work on -- most of the stuff that he does is

Page 100

1  fungal identification for other different
2  companies, and he also assists on asbestos work,
3  and he also does a lot of work with hospitals
4  around the country on infection control issues.  He
5  doesn't -- as a rule, in my conversations with him,
6  he doesn't do a lot of legal work, mostly it's
7  consulting, trying to help -- help other --
8      Q.    So in this case you were asked to
9  provide your testimonial experience either by way
10 of deposition or trial for the last four years, and
11 we were told you haven't given a deposition or
12 testified in trial in the last four years; is that
13 correct?
14     A.    That's correct.  I have previous to
15 that, but it -- you looked at that window of
16 opportunity, and I hadn't --
17     Q.    How many times do you think you've
18 given a deposition?
19     A.    I'll give you a range, if that helps
20 out.
21     Q.    Sure.
22     A.    And I want you to clarify it.  Is it
23 all depositions, because I have on occasion given
24 depositions or testimony for the University of
25 Minnesota, or are you taking specifically for NG

**Neil Geoffrey Carlson - August 7, 2015**
**Ralph Simon vs. Select Comfort Retail Corp., et al.**

Page 101

1  Carlson Analytical, sir?
2      Q.    NG Carlson litigational service.  I'm
3  not talking about if the University was involved in
4  something.
5      A.    I just wanted to clarify.
6      Q.    Yes.
7      A.    Okay.  It is more than five and for
8  sure less than twenty.
9      Q.    Over what period of time?
10     A.    That would be from -- well, one was
11 prior to incorporation.  So I incorporated in -- so
12 that would be -- I'm trying to remember when I
13 incorporated.  It would be on my resume.  So it
14 would be like ninety --
15     Q.    You have your resume in front of you,
16 if that will help you?
17     A.    That will be helpful, yeah, because
18 then I can get that and give you a little bit
19 better date on that.  I think that's all the way in
20 the back.  Okay, vagued it out with '90s.
21           So I would say for sure since nine --
22 let's see, I didn't do any work prior to my -- or
23 testimony prior to my employment at the University.
24 So, for sure, it would be post 1988 to present.
25     Q.    In those more than five less than

Page 102

1  twenty depositions --
2      A.    Yeah.
3      Q.    -- do you know if you were ever asked
4  to consult by the attorney representing the injured
5  person, either injured because of a house property
6  claim or personal injury?
7      A.    Yeah, I was.  There was a -- one home
8  where the -- there was a construction defect issue.
9  It was a very large home, and they had mold growth
10 on the exterior wall, and the litigants were
11 complaining about health effects associated with
12 it.
13           I don't know if that was central to
14 the case -- or I don't believe that was central to
15 the case.  They were -- they did testify to the
16 personal injury that they had, and, then, they also
17 were testifying to the inadequate disclosure on the
18 real estate piece with respect to the property.  So
19 they felt that they didn't -- this goes preexisting
20 damages.  There was another case --
21     Q.    Wait.  But before you go there --
22     A.    Sure.
23     Q.    -- do you recall what your opinion was
24 in that case?
25     A.    My opinion was that the -- there was

Page 103

1  water-damaged materials on the property and that
2  there was mold growth on those materials.
3      Q.    Okay.  And you were describing the
4  next one?
5      A.    And, then, the next one was a -- one
6  that I didn't know what the particulars were until
7  I saw it later.  They had a -- a house that was
8  under construction, and they had photos of it that
9  I was aware of.  It was, essentially, the basement
10 was three-quarters under water, and they had placed
11 a house in a -- let's say in a place with a high
12 water table; and I was called in to do sampling on
13 the -- in the room where they felt that there was
14 some -- some -- somebody was experiencing some
15 discomfort when they slept there, and I found along
16 the tack strip and on the wallboard in that room
17 and, then, adjacent to it that there was fungal
18 growth and, then, I also confirmed or at least
19 associated that with elevated airborne samples
20 taken in that room that were a little bit higher
21 there than they were in the upper parts of the
22 house, and -- and I had a deposition that was
23 fairly short.
24     Q.    Do you remember any of the attorneys,
25 between five and twenty, do you remember any of

Page 104

1  attorneys that had retained you in any of those
2  cases?
3      A.    Let's see.  I got to think about the
4  one that was --
5      Q.    I'm not just talking about the two you
6  said you were retained by the person injured, I'm
7  talking about all of them, if you can remember the
8  names?
9      A.    I'm trying to recall the one.  I know
10 the consultant that I worked as a sub to, and his
11 name was McDunna (phonetic), I don't recall his
12 first name.  The other one I'm not sure if I was --
13 if I was working with Tom Conlin or not or if he
14 was an attorney that referred me to the owners of
15 this house.  This is actually a third case where we
16 had, essentially, construction defect in a house,
17 and they ended up getting the house repaired; and,
18 unfortunately, the builder went bankrupt.
19     Q.    Any other attorneys you can think of?
20     A.    I wish I remembered the one that was
21 on that big house.  I remember the people, the
22 Markses (phonetic), but --
23     Q.    That was the name of the people, the
24 individuals?
25     A.    The individuals who had the home.

Neil Geoffrey Carlson - August 7, 2015
Ralph Simon vs. Select Comfort Retail Corp., et al.

Page 105

1    Q.    And the home was in the Minneapolis
2  area?
3    A.    It was in the Minneapolis area, yeah,
4  a very beautiful home on a lake.
5    Q.    Isn't every home in Minneapolis on a
6  lake or in Minnesota on a lake?
7    A.    It would be nice.  We have more than
8  our share because we have a lot of lakes.
9          And there may be some other small ones
10  in -- so occasionally I'm asked to -- an attorney
11  will ask me to offer an opinion, they'll send me
12  a -- some pieces on it and I'll say -- they'll ask
13  me does it make sense for us to pursue litigation
14  on this or not, and I'll look at it and say it
15  looks like they may have a pretty good case, I
16  think I'd probably -- from what I can see, it looks
17  like something you want to settle on, or I'll say I
18  don't say why they're -- they're generating this
19  lawsuit.  But those were not depositions, they were
20  just --
21    Q.    Consulting?
22    A.    Yeah.
23    Q.    And you've been hired by Oppenheimer
24  in the past, we talked about that?
25    A.    Yes.

Page 106

1    Q.    Do you remember the names of those
2  cases?
3    A.    Actually, no.  I -- they just say we
4  need you to do some work, but --
5    Q.    You don't know where the cases were
6  pending?
7    A.    No, I don't.  I -- I -- essentially,
8  I'm kind of a consultant.  They said we need you to
9  do this kind of test, and then I do it.
10    Q.    Let's go back to your report.  We're
11  still on the first page.  You indicate that "Select
12  Comfort no longer" manufactures "the 5000 Series
13  Sleep Number® bed."  Did I read that correctly?
14    A.    And that was information provided by
15  Mr. Barnum's team.  I -- I don't have any
16  particular knowledge other than that I was relying
17  on their opinion.
18    Q.    Do you know anything about the design
19  of a 5000 Series Sleep Number bed?
20    A.    Oh, just -- it would be just from the
21  observation of the -- I'm assuming the bed that
22  they gave to us was a reasonable facsimile of one,
23  but it would be just from looking at the one that
24  we had in the -- the -- the --
25    Q.    That's your assumption?

Page 107

1    A.    That -- my assumption would be that
2  they made something that was as best equivalent to
3  what the plaintiff was sleeping in.
4    Q.    Now, you say that "All materials
5  Select Comfort used in making the bed were new."
6    A.    That's correct.
7    Q.    You talked about that earlier?
8    A.    Yeah.
9    Q.    "The black foam that was originally
10  used in the 5000 Series beds is no longer
11  manufactured.  As a result, we substituted a yellow
12  foam in the test bed."
13    A.    Yes.
14    Q.    Do you know whether the yellow foam
15  that was used was manufactured or otherwise
16  impregnated or coated with antimicrobial solutions?
17    A.    I don't have any knowledge of that.
18    Q.    Wouldn't that be important for you to
19  know when you're doing this type of test, if it in
20  fact did, it could affect the test results, couldn't
21  it?
22    A.    I don't know if it could, because it
23  would affect the ability -- for instance, if we
24  were attempting to grow stuff on it, it would
25  affect that.  I don't know -- I don't think it

Page 108

1  would affect the ability of the spores to transfer,
2  because what we're looking at in this case is are
3  we providing enough mechanical energy to get the
4  spores from this Point A up to Point B, which would
5  be the top of the mattress.
6    Q.    Can you say with scientific certainty
7  that if the pad had antimicrobial substances either
8  coated on it or manufactured in it, it would not
9  affect the transfer of spores?
10    A.    I think we're talking about a
11  mechanical process.  The caveat would be is if
12  somehow in the coating it made it more difficult
13  for the spore to transfer.  But it's, basically, a
14  mechanical process, I'm not trying to grow it.
15    Q.    Well, I'm asking you, can you say with
16  scientific certainty that it didn't matter whether
17  it had antimicrobial -- it sounds like it might
18  because, at a minimum, it could close --
19    A.    I wouldn't say with a hundred percent
20  certainty, no.
21    Q.    I'm sorry?
22    A.    I could not say that with a hundred
23  percent certainty.
24    Q.    That -- okay.  And just so that I'm
25  clear, you cannot say with a hundred percent

Neil Geoffrey Carlson - August 7, 2015
Ralph Simon vs. Select Comfort Retail Corp., et al.

Page 109

1 certainty whether it had antimicrobial agents
2 impregnated into the material or the material was
3 washed with it would affect or not affect the
4 porousness of the material?
5     A.    Right, I can't say that with a hundred
6 percent scientific certainty.
7     Q.    And you can't say with -- well, I
8 understand a hundred percent, but I'm asking for
9 scientific certainty, which is a reasonable
10 scientific basis.  Okay.  With that definition, you
11 cannot say that if it had antimicrobial agents
12 impregnated in the foam or the foam was washed with
13 it that it did not affect your testing?
14     A.    I would say that's correct, because I
15 don't know if it was, in fact, impregnated or not,
16 and I don't know the application method, if it was,
17 in fact, impregnated.
18     Q.    Do you know whether Ralph Simon's foam
19 topper pad was manufactured with antimicrobial
20 agents?
21     A.    I don't know that, sir.
22     Q.    And did you ask anybody from Select
23 Comfort?
24     A.    I didn't ask that question.
25     Q.    You did not analyze the porosity of

Page 110

1 the foam, did you?
2     A.    No, I didn't.
3     Q.    Talking about the next page, the test
4 method, I think we talked about this briefly, but I
5 think we can put a time on this.  You say, "At each
6 hour interval, the first door was opened and then
7 closed."  That's the door between the warehouse air
8 and the chamber?
9     A.    No.  We had a double door setup.  So
10 we were doing our best to minimize the amount of
11 out.  So we opened up that door to go into it, shut
12 that door, and then wait for Mike Buck to -- let's
13 see, I got to look at the sequence on that.  Yep.
14 So post -- post disturbing the -- the bed with a
15 rollator, and we brought that material in so we
16 could catch it when most of the mechanical
17 engineer -- energy was available to put the spores
18 up, and then we took a sample immediately after
19 doing the rollator.
20     Q.    Okay.  Let's try this.
21     A.    Okay.
22     Q.    What type of contraption did you use
23 to sample the air?
24     A.    Okay.  That would be helpful.
25         We used a SAS dual head air sampler

Page 111

1 manufactured by Bio-Systems.  One of the heads has
2 holes in it to allow deposition of particles and/or
3 fungal spores onto a culture plate; and, then, we
4 have another one where we put a separate media, it
5 was MEA.  This one we used TSA and DG-18.  This one
6 we used MEA.  The one we used MEA had --
7         (Reporter's Note:  Mr. Corwin's cell
8     phone is vibrating.)
9         THE WITNESS:  Do you need to answer
10 that?
11         MR. CORWIN:  No, I do not.  I'm
12 interested in your testimony.
13         THE WITNESS:  So that one has a
14 smaller number of spores, holes than the other one,
15 and we did that because the MEA, the growth on that
16 media typically -- it grows a little faster and we
17 get a little bit more crowding on the plate, so we
18 controlled for that one and that one; and then we
19 placed the -- or Mike Buck placed the SAS sampler
20 at a location approximating where the head was,
21 so --
22 BY MR. CORWIN:
23     Q.    Where the head was?
24     A.    In other words, where somebody would
25 place their head, so we put it at the front edge of

Page 112

1 the -- the bed.  If you were looking at it for
2 precision, the instrument is like this, so it would
3 be slightly higher than what a head would be.  So
4 it would be roughly -- I'm going to put it at
5 approximately a little over 12 inches up on either
6 side.  The sampler works best when held in a
7 vertical position, and then I also did -- we had a
8 particle counter that was brought in to do checks
9 on that, on the particle levels, and we did --
10 although we ended up not being able to use the
11 results, I did use -- and it's not reported in
12 here, we did use a aerosol cassette one to do for
13 non-viable.  We placed them, essentially, at
14 that -- in an area approximating the location of
15 where somebody's head would be.
16     Q.    Do you have any pictures showing -- I
17 don't see any.  I'm just asking, do you have any
18 other pictures showing where you were positioning
19 these devices?
20     A.    I don't know if I have that one.  I do
21 have pictures from the other one, and it was
22 essentially we did the same design, with the
23 exception of this time we added the -- the aerosol,
24 and previously we did not have that.
25     Q.    The other one, meaning this prior

Neil Geoffrey Carlson - August 7, 2015
Ralph Simon vs. Select Comfort Retail Corp., et al.

Page 113

1  experiment?
2  **A.    This prior experiment with the -- to**
3  **be clarify, clear, with the one-inch size as**
4  **opposed to the ten -- five-by-ten size.**
5  Q.    I'd like you to turn to page 3 of your
6  report.
7  **A.    Sure.**
8  Q.    You indicate about two-thirds of the
9  way down that "The highest count of 4" cubic --
10  **A.    Colony-forming units.**
11  Q.    Colony-forming units, thank you, per
12  "cubic meter contributes less than 5% of the
13  average indoor fungal concentration of Cladosporium
14  spp. present indoors and is not considered a
15  significant indoor source."  What is your source
16  for that statement?
17  **A.    That would be the EMLab P&K samples,**
18  **and I think they're -- or EM -- EMLab P&K, that**
19  **one, and, then, there was another one of Shelton**
20  **was a -- Profiles of Airborne Fungi in Buildings**
21  **and Outdoor Environments.  So I -- let's see, in**
22  **Buildings and Outdoor Environments, so that would**
23  **be No. 8, which was -- I referenced the outdoor,**
24  **but there was also indoor ones on that.**
25  Q.    Well, you don't have a --

Page 114

1  **A.    Yeah.  I should have had a reference**
2  **point.**
3  Q.    You don't have a reference point
4  there?
5  **A.    Yeah.**
6  Q.    But that's your testimony now, is
7  you're referencing the --
8  **A.    I believe that is correct, and I**
9  **will --**
10  Q.    Let me finish the question, please.
11  **A.    Sure, go ahead.**
12  Q.    I'm sorry.
13  You don't have a reference source
14  identified in your report, but now you're
15  testifying that you believe it was from the EMLab
16  P&K report under footnote 5 and the one identified
17  at footnote 8?
18  **A.    I would have to double-check on that,**
19  **and I can provide that to make sure that we are**
20  **accurate with respect to that.  It was not**
21  **footnoted, so --**
22  Q.    Because you a little bit later, and I
23  wanted to ask you about this, but --
24  **A.    Uh-huh.**
25  Q.    -- let me back up a little bit.  What

Page 115

1  do you mean when you say "is not considered a
2  significant indoor source"?
3  **A.    Okay.  I can rely on my personal**
4  **experience, and it's -- of sampling indoor**
5  **environments for about 25 years, and Cladosporium**
6  **is the most common mold I see in indoor air**
7  **samples.  So it's -- it's -- with the exception of,**
8  **like, the middle of winter, I'm invariably finding**
9  **some levels of Cladosporium in the indoor**
10  **environment.  Typically, we're going to see it in**
11  **the range of 100 to 200 colony-forming units in the**
12  **indoor environment; and in the outside the range**
13  **is -- and I'm talking both culturable and not**
14  **culturable.  The culturable would be the agar**
15  **plates.  The nonculture would be like the aerosol**
16  **samples.  And outdoor I would be seeing anywhere**
17  **between -- it's extremely rare to do an outdoor air**
18  **sample, with the exception of during wintertime,**
19  **not to find Cladosporium, and the counts would**
20  **typically be in the range of minimum of about a**
21  **hundred spores per cubic meter to several thousand**
22  **and then a range that's in -- it's typically in the**
23  **range -- the 95th percentile is typically around**
24  **the -- about six thousand, and about the 5th**
25  **percentile is close to about a hundred.**

Page 116

1  **So it's incredibly common to find it.**
2  **You can find it in carpet dust and -- so it -- that**
3  **number ballparks with what we've -- what I've seen**
4  **over a quarter of the century sampling for this**
5  **organism.**
6  Q.    Are you aware of any sampling that was
7  done at Ralph Simon's house?
8  **A.    Um, I am aware that -- I'm not exactly**
9  **aware of the technique that was done.  I'm aware**
10  **that -- that -- and, again, I don't know the**
11  **person's name, but he was the individual that was**
12  **hired by I believe Oppenheimer to do sampling.  I**
13  **didn't look specifically at the technique that he**
14  **used to sample, but I'm aware that he did do some**
15  **samples.**
16  Q.    Are you aware, as you sit here today,
17  what the results of his sampling was?
18  **A.    I believe the technique that he used**
19  **indicated that he was surprised not to find any**
20  **during the sample period that he took, but that**
21  **would be my belief on the --**
22  Q.    Fair enough.  So a little bit later
23  you talk about "The median outdoor Cladosporium
24  spp. concentration in the U.S. in clear weather is
25  610 spores per cubic meter," and there you

**Neil Geoffrey Carlson - August 7, 2015**
**Ralph Simon vs. Select Comfort Retail Corp., et al.**

1  reference the EMLab --
2      A.    Yeah.
3      Q.    -- report?
4      A.    Yeah.
5      Q.    So in that report, this reference,
6  you're talking about the entire U.S.?
7      A.    Correct.
8      Q.    You're not talking about the Midwest?
9      A.    In -- in that particular case,
10 although that guide does have stuff for areas close
11 to -- they don't -- they don't have enough data
12 particularly in St. Louis.  So they have got data
13 on, I believe, Michigan and Ohio, but they don't
14 have closer, so --
15     Q.    Actually, you say Illinois and Ohio?
16     A.    Or Illinois, I'm sorry.  Thank you for
17 clarifying that.  I -- some Big Ten school.
18     Q.    Could you go to your first exhibit,
19 and --
20     A.    Which one is that, is that the --
21     Q.    It's air sample results.
22     A.    Thank you, sir, yep.
23     Q.    I would just like a brief explanation
24 of what I'm looking at here?
25     A.    Okay.  Let's see, you are looking at

1  the Exhibit 1, air sample.  MEA means malt extract
2  agar.  So that was a type of media that was used,
3  and that was chamber study, and the date was
4  May 20th, and then these -- and then I indicate
5  when I check the growth on the -- on the agar
6  plates post sampling, so that would be the topper.
7          The next part, location, tells where I
8  took the sample.  The volume tells the amount of
9  air that was pulled through the sampler.  The next
10 one is the normalized amount of colony-forming
11 units per cubic meter.  In other words, if I took a
12 hundred litters, then whatever count I got on the
13 plate I'd have to multiply it times ten to get the
14 colony-forming unit per cubic meter for samples 1
15 and 2.  For samples 3 and 4 and all the way down on
16 that page I didn't need to normalize the data
17 because we took a full cubic meter of air,
18 essentially, a thousand litters.
19         The next section would be the
20 organisms that were identified, and I think they do
21 see one error on the exhibit part in that it says
22 MEA, but it should not say that, it should just say
23 air samples because they look -- at least the media
24 that's listed there --
25     Q.    Where do you see that?  I just want to

1  understand what I'm looking at.  Where is there an
2  error in the report?
3      A.    There is an error in -- and I've got
4  to double-check here and make sure.  There is one
5  error in the report in that -- yes, double-check
6  here, that the designation -- it was a
7  cut-and-paste error.  The designation for the
8  location and, then, there's an indicator of the
9  type of media.  From 1 through 14, yeah, down to 3,
10 it should not say DG-18, that should be all MEA.
11     Q.    Oh, because DG --
12     A.    Because if you look at the --
13     Q.    What does DG, what would it stand for?
14     A.    Dichloran Glycerol Agar.
15     Q.    Oh, I see.
16     A.    And on page 2, that is what a DG-18
17 and TSA, so in the controls that I list at the
18 bottom there for MEA.  So that would be an error,
19 it was a cut-and-paste error, that should all be --
20 1 through 13 should all list MEA as the -- as the
21 dash afterwards.
22     Q.    I see.
23     A.    Does that help you out?
24     Q.    But is 14 correct or not correct?
25     A.    Let's see, 14, where are you talking

1  about?
2      Q.    I was just looking at 1 through 13,
3  the way I understood your --
4      A.    Oh, 1 through 14, yeah.
5      Q.    One through fourteen is?
6      A.    They all --
7      Q.    Has the error?
8      A.    They all should be MEA and, then, the
9  control plates that we have are MEA.  So that
10 should all be MEA and not DG-18.
11     Q.    And, then, the next one was the TSA?
12     A.    The TSA, slash, DG-18, yep.
13     Q.    And what does the TSA slash --
14     A.    Trypticase soy agar, and the DG-18 is
15 Dichloran Glycerol Agar.  The DG-18 is used because
16 of the growth characteristics on it, it grows a
17 little bit slower and allows for identification of
18 the -- the colonies a little bit better because
19 they don't tend to overcrowd on the plate.  TSA is
20 a standard one used for both bacteria and -- and
21 fungal organisms.
22     Q.    So here's my question for you.  Under
23 both the MEA and the DG-18 TSA, you've got multiple
24 dates that you checked the samples, and then you
25 record the numbers --

Neil Geoffrey Carlson - August 7, 2015
Ralph Simon vs. Select Comfort Retail Corp., et al.

Page 121

1    A.    Uh-huh.
2    Q.    -- of the organism and you identify
3  the organism found.  Which days were these found?
4  Can you separate from May 26th through May 29th and
5  6/3?
6    A.    The -- you can't separate that.
7  The -- what the -- the 26 was a preliminary count,
8  and I did a preliminary -- the growth of the
9  colonies in some of these cases would be enough to
10  get a count, but they would need to go a little bit
11  longer for the identification.  So I would see
12  something that looked presumptively like
13  penicillin, but then I'd have to do a tease tape
14  sample after it grew up enough so I had enough
15  spores to see if it was growing.
16    Q.    Did you record -- like I saw you bring
17  in a notebook today.
18    A.    Yeah.
19    Q.    Did you record any type of notebook or
20  on the computer what you saw on each one of those
21  days?
22    A.    It would be notes that would be -- in
23  two particular cases, if there was no change I
24  wouldn't see any change on it.  I did --
25    Q.    Did you record that, though?

Page 122

1    A.    Yeah; and, then, if I -- and, then, in
2  some cases where I -- there was a change, I -- at
3  least that I recall on this one I wrote some -- a
4  slash in red and changing or at least making the
5  identification because penicillium and Aspergillus
6  look real similar when they start growing, but then
7  when I'm able to separate it out, then I'm able to
8  separate out between penicillium and Aspergillus.
9    Q.    My question was about your notes.
10  Where are those notes?
11    A.    I'm not sure exactly.  I believe
12  they're in a file cabinet.
13    Q.    Did you give them to Oppenheimer or
14  Select Comfort?
15    A.    No.  The only thing I gave to them was
16  this (indicating).
17    Q.    Then there is another exhibit
18  labeled --
19    A.    Exhibit 2.
20    Q.    Yes, Exhibit 2.
21    A.    Yeah.
22    Q.    And it says particle counts?
23    A.    Yep.
24    Q.    What are you doing here?
25    A.    What we're doing is checking to see

Page 123

1  what the particle levels were in the -- I'd say the
2  rollator area and, then, the warehouse area, and
3  then I would periodically check it with a -- a HEPA
4  filter on the end of the intake for the particle
5  counter, and it was a check to see if -- for us, if
6  we were doing a good job of getting the particle
7  levels low enough so that we were in -- it was low
8  enough so that we could -- we wouldn't get all the
9  clutter from what was in the warehouse in the
10  chamber areas, so we would get at least some idea of
11  what was going on, because we were sampling at
12  really high volumes of -- you know, a thousand
13  litters, and if we took a sample of that like in
14  the warehouse, it would be completely overloaded,
15  so I wouldn't be able to read -- do an accurate
16  count.  So I wanted to make sure the particle
17  levels were low enough so we could get an accurate
18  count.
19    Q.    Could you explain that a little bit
20  more, please?
21    A.    Sure.  We used HEPA-filtered air
22  that -- I guess we'll have to come up with a --
23  let's say that -- we'll call it roughly the clean
24  room.  We used HEPA-filtered air, brought it into
25  the clean room to purge it out to reduce particle

Page 124

1  levels, and we positively pressurized the room
2  while we were doing it so we'd prevent particles
3  that were in the adjacent warehouse area, at least
4  when we're purging it, from entering into the room.
5    Q.    When you purged it, would you purge
6  particles?
7    A.    Yeah, we'd purge particles because it
8  would be pushing -- we would be providing clean
9  HEPA-filtered air into the space and push out the
10  other particles.  We did that initially at the
11  start of the test, and then the other time that we
12  purged it was after we inserted the -- the first
13  sample because we were concerned -- you know, we
14  were exposing the chamber material to the air and
15  we put it in there and we wanted to purge it one
16  more time so that when we ran the study it would be
17  just the vertical movement of the spore through
18  the -- the mattress up to the top that we were
19  measuring.
20    Q.    Where do I see that you purged it,
21  what time?
22    A.    Let's see, the purge was done 5,
23  "Inserted sample - Post HEPA run for 15 minutes."
24  So we ran the HEPA filter after we inserted the
25  sample, and -- there, yep.

Neil Geoffrey Carlson - August 7, 2015
Ralph Simon vs. Select Comfort Retail Corp., et al.

Page 125

1    Q.    At 3:08?
2    A.    Yeah.
3    Q.    Any other time you did the purge?
4    A.    The purge was right at the beginning
5  of the experiment, too, and that was done -- let's
6  see, that was done to clean the room out so that we
7  could have a low count and we could get started
8  right away, rather than sitting two hours and
9  waiting for the -- the -- the room to clean out.
10    Q.    What was unique to the design of the
11 room that it would clean itself out, if given time?
12    A.    Um, the room was a reasonable side
13 and we were -- size and we were able to push a
14 significant amount of air through.  I think Mike
15 Buck would have the -- probably have the
16 information about that exact volume of air.  We were
17 able to pressurize the space so that when we were
18 running it we were pushing the particles out and
19 you could not -- we had -- we kept the door open
20 slightly with the air pouring out because it was
21 impossible to close it and make the room -- so it
22 was tight enough so that we were able to push the
23 door out through the two doors.
24    Q.    So could you turn to Exhibit 4 for me,
25 please?

Page 126

1    A.    Sure.
2    Q.    Pictures of I believe what you've
3  described as mold?
4    A.    Yeah.
5    Q.    Keep going.
6    A.    Exhibit 3?
7    Q.    I'm sorry, 4.
8    A.    Four.
9    Q.    Yes, the one with the petri dishes,
10 keep going.
11    A.    Oh, okay.  Well, the one before that
12 gives you some idea what the rollator -- about
13 how -- how depressed it was.
14    Q.    Gotcha.
15    A.    In answer to your question that you
16 had.  But then the other one, page 4 also gives you
17 some type of idea, and that's Mr. Buck.
18    Q.    Okay.
19    A.    That isn't how we ran, but these were
20 samples -- pictures taken afterwards, after we'd
21 completed the --
22    Q.    I see.
23    A.    Oh, and No. 5 also gives you a
24 picture.
25    Q.    Okay.

Page 127

1    A.    So now we're going to -- you're going
2  to page 1, Exhibit 4, correct, sir?
3    Q.    Now, the picture -- you remind me of a
4  question.  The picture right before, was that taken
5  before, during or after you ran the experiment?
6    A.    Picture No. 6 or -- the page 6?
7    Q.    The one with the door open with the
8  back of an individual.
9    A.    Yeah, that's after it was -- that's
10 after it was done.
11    Q.    Okay.  So turn to the next page.
12    A.    Sure.
13    Q.    You got I call them petri dishes,
14 but --
15    A.    That's fine.
16    Q.    Okay.  And you're showing mold, I take
17 it?
18    A.    Yeah, and they're in sequence.  The
19 amber colored one is the malt extract agar, the TSA
20 is the trypticase soy agar, and the one on the end
21 is the DG-18 agar.
22    Q.    And that's Cladosporium?
23    A.    Right.
24    Q.    And that's what Cladosporium looks
25 like?

Page 128

1    A.    Right.
2    Q.    Okay.
3    A.    And, then, the photo underneath is --
4  I took a photo of each one of them as I took a
5  tease tape off of the culture.
6    Q.    Did you use your phone-with-the-flip
7  method to do that?
8    A.    Oh, no.  That one I actually -- it's
9  better quality.  I had a nice, high-end microscope
10 that I took and I took the photo.
11    Q.    And, then, if you go to -- keep
12 turning, please.
13    A.    Okay, yep.
14    Q.    There (indicating).
15    A.    Yes.
16    Q.    That's Cladosporium, and that's what
17 it looks like?
18    A.    We're looking at page 4?
19    Q.    Yes, sir.
20    A.    Okay.  And I have the 3, slash, 1000.
21    Q.    Yes.
22    A.    The one with the dark discoloration
23 right under the letters MEA, that is the back side
24 of Cladosporium; and, then, the next one, the dark
25 discoloration above that blue green one and off of

Neil Geoffrey Carlson - August 7, 2015
Ralph Simon vs. Select Comfort Retail Corp., et al.

Page 129

1  the middle one, that is the top view.  So that's
2  the Cladosporium.
3      Q.   So just so I understand --
4      A.   That one and that one (indicating).
5      Q.   This is the back side, and this one
6  right here, that's (indicating) --
7      A.   That's the top side.
8      Q.   That's the top side.  And, then, the
9  bigger samples in the bottom picture, what are
10  those?
11      A.   They would either be penicillin or
12  Aspergillus, and I'd have to look at the sample.
13      Q.   I see, good, thank you.
14          Then if you turn to the next page,
15  sample No. 4, what are we looking at there?
16      A.   Yeah.  We're looking at -- well, we're
17  looking at the photomicrograph from sample No. 3,
18  and, then, from sample No. 4 we're looking at the
19  back side of the culture plate for sample No. 4;
20  and the dark discoloration underneath the word TSA
21  is the Cladosporium.
22      Q.   Okay.  Then the next page, the top
23  picture, what are we looking at?
24      A.   We're looking at a Cladosporium spore
25  and, then, some other organisms, and, then, the --

Page 130

1      Q.   Well, what are those other organisms,
2  can you tell?
3      A.   One could be yeast or bacteria.
4  They're the brightly colored red ones, and there's
5  a little slimy yellow one, I believe, up on top.
6  The other one is --
7      Q.   Is that yeast, the yellow one, also?
8      A.   It could be yeast or bacteria.  We
9  weren't particularly concerned about it.
10      Q.   Okay.
11      A.   And, then, the bluish one probably --
12      Q.   Top left or bottom right?
13      A.   Top left, as I look at it, probably
14  penicillium, not sure about the middle one there.
15  I'd have to re-tease tape that one; and, then, the
16  bottom lower looks like Alternaria, and I think the
17  one on the right is either penicillium or
18  Aspergillus that's right above it, the kind of
19  bluish-green one with a white perimeter.
20      Q.   So you keep saying penicillium.
21  That's different than penicillin?
22      A.   Oh, penicillin is the drug that's
23  produced from penicillium chrysogenum.  That's the
24  one used for an antibiotic.
25      Q.   I see.

Page 131

1      A.   Does that clarify?
2      Q.   Sure, thank you.
3      A.   Okay.
4      Q.   And, then, the next page, what are we
5  looking at?
6      A.   We're looking at page 7, No. 10; is
7  that correct?
8      Q.   Yes.
9      A.   Okay.  We see a lot of black X's, and
10  those are spots where we're catching penicillium
11  and Aspergillus; and, then, the Cladosporium is in
12  the upper left, underneath that white colony.
13      Q.   I see.
14      A.   And, then, the reverse on that is the
15  dark discoloration to the right of the label.
16      Q.   So the ones with the X are the
17  Aspergillus and the penicillium?
18      A.   Yep, primarily, and I'd have to
19  double-check, but that -- yeah, because I was just
20  trying to get some -- some rough counts.
21      Q.   I see.  And, then, the next page, 8,
22  sample 11?
23      A.   Sample 11, that one --
24      Q.   You have three pictures, starting with
25  the top left going across and down --

Page 132

1      A.   Right.
2      Q.   -- the one that says MEA 11/1000?
3      A.   Yeah, and I want to look at that to
4  make sure that I've got the MEA, just a second.
5  Okay, okay, okay.
6          That one, 11/1000, there's a -- this
7  one, the back side of the Cladosporium is obscured
8  by the -- the label.  So it's on the upper right
9  side of the label.
10      Q.   I see.
11      A.   And, then, if you go the reverse, it's
12  the one -- there's a bunch of -- let's see,
13  probably penicillium, because they produce the
14  exudate.  Do you see the kind of glistening stuff?
15      Q.   Sure.
16      A.   Okay.  It's the one sandwiched between
17  the glistening ones, it would be upper left.
18      Q.   Gotcha.
19      A.   And, then, this would be the photo
20  micrograph of that organism (indicating).
21      Q.   Which organism?
22      A.   The Cladosporium.
23      Q.   Okay, thank you.
24      A.   Yep.
25      Q.   And in the top right picture, do you

Neil Geoffrey Carlson - August 7, 2015
Ralph Simon vs. Select Comfort Retail Corp., et al.

---

Page 133

1   see Aspergillus in that picture?
2       A.   I'll check -- I'm going to check the
3   results on it, because I'm not sure if it would be
4   Aspergillus or penicillium because they look
5   similar in colony.  So that one is page, sample 11,
6   and this one is MEA.  So sample 11 MEA, Aspergillus
7   and penicillium were both present.
8       Q.   Okay.  I'd like to ask you a couple
9   questions about your rebuttal report, if I may?
10      A.   Sure.  Is that -- oh, that's the one
11  we don't have, but we'll try from memory.
12      Q.   It's the only one that I have, that
13  has writing on it.
14      A.   Okay.
15      Q.   I'm sorry.
16      A.   That's okay.
17           MS. FISHER: Can I interject for just
18  a second?  I have a clean copy if you want to take
19  a look at it.  I haven't written on anything.
20           MR. CORWIN: If he needs it, sure.
21           THE WITNESS: That would be helpful,
22  because it was helpful in this case.
23           MS. FISHER: If that's okay with
24  everyone.  Do you want to take a look at it first?
25           MR. CORWIN: No.  I believe you if you

---

Page 134

1   say there's no notes on it.
2            MS. FISHER: I just got the binder
3   this morning, so --
4            THE WITNESS: All right.  So are we
5   looking at page 1, sir, or where are we looking?
6   BY MR. CORWIN:
7       Q.   Yes, page 1, please.
8       A.   You've got photos, those are pictures
9   later.
10      Q.   Yes.
11      A.   Okay, go ahead.
12      Q.   So you indicate that "Tests conducted
13  by the plaintiff's expert, Patsy Duncan of
14  Fungus-A-Mungus, fail to show how spores at this
15  location in the bed caused exposure above normal
16  background levels in the breathing zone above the
17  bed."
18      A.   Okay.
19      Q.   What's the basis for that statement?
20  Have you read her reports or have you seen a
21  deposition that she's given?
22      A.   I got the -- this is what I've seen
23  from her.  So this would be the basis for my -- my
24  piece on it, is that she did do a tease tape
25  sample.  I'm only aware that she did a tease tape

---

Page 135

1   sample.  I'm not aware that she did any air
2   sampling, and so she -- I -- it's impossible or
3   it's not possible to infer because there -- she
4   identified growth two months after examined it, his
5   bed, on a tease tape sample, it's not possible to
6   infer that because it's located there that we have
7   exposure here (indicating).  If we could -- she
8   could state that there's a potential for it, but I
9   don't -- I'm not aware that she did any air samples
10  to indicate that it vertically transferred.
11      Q.   What's the source of that information
12  that you just relayed to me?
13      A.   The -- I saw the -- and we discussed
14  it, the lab results from EMLab P&K that said
15  Cladosporium on the tease tape sample.  That's the
16  only thing that I know that she did.  If she did
17  something else, I'm not aware of it.
18      Q.   You take issue, at the last sentence,
19  that the upper layers of the bedding material was
20  not analyzed, you would take issue with that fact?
21      A.   I -- I -- to my knowledge, I had --
22  have not seen any reports that the upper levels
23  of -- in other words, the topper of the mattress or
24  any of the other parts were analyzed, I have not
25  been made aware of that.

---

Page 136

1       Q.   So you place significance in your
2   rebuttal, next paragraph down, that according to
3   the Hemming report, he is also exposed to
4   Cladosporium at his church and his office?
5       A.   Yeah.  During the -- and an air
6   sampling is really tricky, but it's really easy to
7   get like a false negative because you're only
8   sampling -- I think I alluded it to like a football
9   game.  You could be watching a football game on TV
10  and the spore counts would be as interesting as the
11  time out before the punt, right after a punt, so
12  you don't get anything, and then a moment later
13  you're going to see a lot of activity, like a punt
14  blocked and returned for a touchdown.  So you get
15  high levels of concentration.
16           Aerosols tend to be -- or bioaerosols
17  in particular tend to be really low and then really
18  high, then really low, then really high.  So they
19  vary logarithmically to bounce -- bouncing up and
20  down.  You can sample minutes apart and get
21  completely different counts.
22      Q.   My question was, as part of the basis
23  for your opinion to rebut Patsy Duncan's tests, are
24  you relying upon the Hemming report indicating that
25  Ralph Simon is also exposed at his church and his

---

Neil Geoffrey Carlson - August 7, 2015
Ralph Simon vs. Select Comfort Retail Corp., et al.

Page 137

1 office?
2    A.    Yes.
3    Q.    And if for some reason that report is
4 inaccurate or not relevant to Mr. Simon's exposure,
5 would you agree that that basis for your opinion is
6 not proper?
7    A.    I don't think so, because it would be
8 incredibly -- I'd say, unlikely for him to be
9 exposed at some time to Cladosporium there given
10 the ubiquity of that organism and the environment.
11    Q.    You take issue with the fact on the
12 next page that "humidity levels were not controlled
13 during storage." What's the significance of that?
14    A.    Well, and I'm relying on at least a
15 summary description of what -- how the material was
16 stored, and correct me if I'm incorrect on it, but
17 the -- my recollection is that he indicated that
18 the -- the -- we're going to call it the foam
19 material was slimy and that he -- after taking -- I
20 don't know the sequence about photos, but after
21 noticing that that he placed that material in a
22 bag. I'm inferring from the slimy that it would
23 contain moisture and that's an inference that I
24 made; and, then, if you take an object that contains
25 moisture and put it in a plastic bag, that creates

Page 138

1 an environment that could be conducive to mold
2 growth.
3    Q.    Well, in your assessment of this, what
4 do you think the slimy black stuff was?
5    A.    I don't know.  I -- I would be very
6 curious.  So, essentially, I'm not sure if it's
7 bacteria, because bacteria can be slimy and black.
8 I don't know.  So I would -- for instance, I get a
9 lot of questions about we'll get black deposition
10 right by a supply diffuser, and I'll say I don't
11 know if this is dust or if it's --
12    Q.    Mold?
13    A.    -- mold, and so I'll have to tease
14 tape it, and I've been surprised, okay, it's just
15 dust or I'll tease tape it, huh, it's mold, and
16 typically it's Cladosporium.
17    Q.    So you can't rule out as you sit here
18 today that the black slimy material that Ralph
19 Simon observed when he first took apart his bed was
20 mold?
21    A.    The only basis that I have for it
22 would be the result that occurred -- you know, the
23 sample that occurred two -- two months later; and I
24 will -- I trust the work of EMLab P&K, and if they
25 said that tease tape that was taken two months

Page 139

1 later was Cladosporium, I would trust them to
2 indicate that.
3       I don't -- it's hard to -- you know,
4 in an ideal case for all of us here it would have
5 been really great right when he opened it up to
6 take the sample and then we'd have a pretty good
7 idea, we'd say, okay, we're sure.  But we don't
8 know what transpired between those two months, and
9 I'd really like to know that.
10    Q.    My question was, you can't rule out
11 that what he observed when he took it apart --
12    A.    I can't rule --
13    Q.    -- was mold?
14    A.    -- it out completely, no.  We don't
15 have -- we don't have enough information.
16    Q.    For the mold to grow in the bag, it
17 would have to continue to have a water source,
18 correct?
19    A.    Well, and it would depend on how --
20 yeah, how tightly sealed the bag was.  If the bag
21 was tightly sealed -- for instance, I had my
22 clothes at a retreat that were kind of damp that
23 were placed in a bag, and if the bag maintains
24 moisture you can -- it gets pretty funky after a
25 while.  So it would depend on how tightly the bag

Page 140

1 was sealed.
2    Q.    Okay.  Well, I need to explore that a
3 little bit.  If it's tightly sealed, I think what
4 you said is the moisture that's already present
5 can --
6    A.    Facilitate.
7    Q.    -- facilitate the growth of mold?
8    A.    Yes.
9    Q.    If it's not tightly sealed and the
10 moisture is allowed to evaporate or dry, it's not
11 going to --
12    A.    The -- yeah.
13    Q.    -- facilitate the growth of mold?
14    A.    The looser the seal, the less
15 likelihood; and the other part is the conditions of
16 storage weren't controlled.  So I don't know what
17 the humidity was in the garage, either, so --
18    Q.    You say, "From the information
19 available, it is impossible to determine the start
20 time for fungal growth on the bed." Is that based
21 upon because there was no testing immediately when
22 he found it?
23    A.    That's correct, yeah.
24    Q.    And that's the sole basis for that?
25    A.    Yeah.  Well -- well, the -- the other

Neil Geoffrey Carlson - August 7, 2015
Ralph Simon vs. Select Comfort Retail Corp., et al.

Page 141

1  basis would -- would be -- yeah, we just don't
2  know. We know we have it two months later. We
3  have no knowledge of any time after that -- or
4  previous to that. I think for all of us it would
5  be helpful to have that.
6      Q.   You do indicate, though, under your
7  Analogy, second, that "the Plaintiff took doctor
8  prescribed prednisone." What's the source for
9  that?
10     A.   Um, I believe that was part of the
11 summary that was provided to me by the --
12 Oppenheimer.
13     Q.   And you say, "Sweating is a known side
14 effect of this drug," and then you reference it to
15 footnote No. 7. Did you do that research or was
16 that research provided to you, also?
17     A.   No. That was something I looked up;
18 and, then, I've also personally taken Prednisone,
19 and that was a side effect that occurred for me, as
20 I sweated a lot and my shirt was soaking wet.
21     Q.   And, then, the next sentence I find
22 interesting. You say, "The chamber material has
23 stains consistent with moisture exposure from
24 drooling, sweating or some other source."
25         So, what we can say as we sit here

Page 142

1  today that at some point there was moisture in that
2  area from the foam topper pad to the air chamber?
3      A.   I would say there is evidence that
4  would suggest because of the staining that that
5  would be correct, that at some time there was no
6  moisture that got to that.
7      Q.   Enough, in your opinion, to cause
8  staining?
9      A.   Yes, yes.
10     Q.   You indicate that "Dr. Pastore renders
11 his opinion without performing any tests on the bed
12 itself, nor does he compare fungal levels in
13 competitor mattresses of the same age used under
14 the same condition." Did I read that correctly?
15     A.   Ah, yes. That was my understanding.
16     Q.   Did you read his report?
17     A.   I believe I had a summary, and I can't
18 remember if I read the full report.
19     Q.   Again, that was provided by your
20 attorneys, right?
21     A.   That's correct, yeah.
22     Q.   You understand that at issue in this
23 case is the design of the Select Comfort bed,
24 right?
25     A.   Um, if that's what you're talking

Page 143

1  about. I -- I -- I -- my understanding was that
2  there is a -- that there is exposure to Cladosporium
3  and that that -- and he was concerned about that
4  affecting his health.
5      Q.   Okay. You haven't read the Complaint,
6  I take it, in this case?
7      A.   No, I have not.
8      Q.   But do you now understand -- or maybe
9  I have to tell you for the first time, the claim,
10 the allegations, in part, in this case is that the
11 Select Comfort bed is defectively designed such
12 that it's conducive to the growth of mold, are you
13 aware of that?
14     A.   Oh, I am now that you inform me.
15     Q.   There is no allegation that there are
16 other beds that were manufactured by other people
17 that cause mold exposure or were defective, are you
18 aware of any of those?
19     A.   Um.
20         MS. FISHER: Objection, vague.
21         THE WITNESS: Yeah. I don't --
22         MR. CORWIN: Okay. I'll rephrase the
23 question.
24         THE WITNESS: Yeah.
25         MR. CORWIN: Because I'm really trying

Page 144

1  to rush, and it's my fault, I always get myself in
2  trouble trying to wrap up.
3          THE WITNESS: Okay.
4  BY MR. CORWIN:
5      Q.   Are you aware of any allegations in
6  this case that traditional beds, box springs and
7  mattresses are defective?
8      A.   I -- I -- I haven't been told about
9  anything, and I haven't read that thing so I
10 don't -- I wouldn't know.
11     Q.   And then you say -- and you're
12 critical of Dr. Pastore for not comparing fungal
13 levels in competitor mattresses of the same age
14 used under the same condition. Did you do any
15 testing of competitor mattresses for fungal growth
16 under the same conditions?
17     A.   And -- no, I did not. This study I
18 had was an observational one. I've never been
19 given the funding or the time to do side-by-side
20 comparisons under --
21     Q.   When you say competitor's mattresses,
22 are you talking about other air bed systems?
23     A.   I'm just talking about beds in
24 general.
25     Q.   Beds in general?

Neil Geoffrey Carlson - August 7, 2015
Ralph Simon vs. Select Comfort Retail Corp., et al.

Page 145

1    **A.    Yeah, if that clarifies it for you.**
2    Q.    And I'm curious.  I understand the
3    points you're making in the report, but why is
4    this exhibit, these two photos, why are they
5    attached to your rebuttal report?
6    **A.    Oh, it was showing that Cladosporium**
7    **is generally found in the environment and**
8    **incredibly difficult to -- or it's a organism that**
9    **grows on a lot of different surfaces, and it's very**
10   **difficult to prevent it from growing on surfaces.**
11   **Does that kind of clarify?**
12   Q.    Where did this picture come from, this
13   top one (indicating)?
14   **A.    This one in particular is a walk-in**
15   **cooler.  I don't know the exact -- don't recall the**
16   **exact location, but it's -- essentially, there's**
17   **dust on the surface of the walk-in cooler, and then**
18   **I happened to take a tease tape on it.  I recently**
19   **did a couple other coolers, and they're growing on**
20   **about everything, and it was Cladosporium, so --**
21   Q.    Do you agree that mold exposure,
22   including Cladosporium, can cause destruction of a
23   person's sinus tissues?
24   **A.    I --**
25   **MS. FISHER:** Objection, foundation.

Page 146

1    **THE WITNESS:** I don't know about that.
2    That would be a medical doctor would do that part.
3    **BY MR. CORWIN:**
4    Q.    Would you agree with me that a
5    manufacturer of a bed cannot needlessly endanger
6    its customers in the public that's going to use it?
7    **MS. FISHER:** Objection, foundation.
8    **THE WITNESS:** I don't know --
9    **MS. FISHER:** Well outside the scope of
10   this deposition.
11   **THE WITNESS:** I don't understand what
12   you mean by needlessly endanger.
13   **BY MR. CORWIN:**
14   Q.    Okay.  Do you agree that a
15   manufacturer of a bed must test its products to
16   make sure it is safe for the people that use it?
17   **MS. FISHER:** Objection, foundation,
18   outside the scope.
19   **THE WITNESS:** What -- what safety are
20   you talking about, with respect to --
21   **BY MR. CORWIN:**
22   Q.    Just in general, do you agree?
23   **A.    Yeah, that it doesn't have iron spikes**
24   **that make people feel awful.  Yeah, I'm sure it**
25   **shouldn't -- shouldn't hurt people, physically hurt**

Page 147

1    people.
2    Q.    In fact, you're participating in
3    studies now with Select Comfort to determine
4    whether the materials they're using in their beds
5    now can cause mold growth, right?
6    **MS. FISHER:** Objection, misstates
7    prior testimony.
8    **THE WITNESS:** I am testing it to make
9    sure that the quality of the material that they're
10   doing, that the QC process is working so that the
11   antimicrobials are working.
12   **BY MR. CORWIN:**
13   Q.    So --
14   **A.    That's what I'm doing.**
15   Q.    I see.
16   Were you asked to give an opinion as
17   to whether a warning should have been given to
18   Ralph Simon when he purchased his bed with regard
19   to the possibility that mold could grow in the bed?
20   **A.    I wasn't asked.**
21   Q.    Do you have an opinion?
22   **A.    Other than I would anticipate that**
23   **it's likely that there would be mold growth in all**
24   **beds -- or not all beds, I'd say a significant**
25   **portions of beds during their lifetime, because**

Page 148

1    **it's like if I wore the same shirt for 13 years,**
2    **I'd expect it to have some wear and tear.**
3    Q.    Do you have an opinion as to whether
4    Select Comfort should have provided a warning to
5    Ralph Simon, knowing what you know, and that is
6    mold can grow, develop in the Select Comfort beds?
7    **A.    I do not have an opinion.**
8    **THE WITNESS:** May I get a glass of
9    water?
10   **MR. CORWIN:** I actually -- you can get
11   a glass, but I don't think I have more than two or
12   three more questions.
13   **THE WITNESS:** Okay.
14   **MR. CORWIN:** I don't want to stop you
15   from hydrating, so --
16   **THE WITNESS:** Yeah, otherwise you
17   won't be able to understand me.
18   (Reporter's Note:  Witness gets a
19   glass of water.)
20   **MR. CORWIN:** Better, better?
21   **THE WITNESS:** Better.
22   **MR. CORWIN:** Okay.
23   **BY MR. CORWIN:**
24   Q.    Have you taught any classes with
25   regard to corporate responsibility?

Neil Geoffrey Carlson - August 7, 2015
Ralph Simon vs. Select Comfort Retail Corp., et al.

Page 149

1  A.   No, I have not, sir.

2  Q.   Do you have any training or education

3  in corporate responsibility or responsibility of

4  retailers?

5  A.   No, I don't.

6  Q.   Do you agree with me that if a

7  manufacturer of a bed knows that its beds can grow

8  mold and knows that there are people who are buying

9  those that may be allergic or sensitive to mold,

10  that they have a duty to warn the potential

11  purchasers of the bed?

12  **A.   I think all bed manufacturers would**

13  **have to issue that -- would have to state that,**

14  **because they can't control the conditions of use on**

15  **their beds.**

16  Q.   So you agree that a manufacturer of a

17  bed with that knowledge should provide a warning?

18  **A.   No, I don't think so.  It would be --**

19  **it would be like a manufacturer of stainless steel**

20  **saying if you have this metal and you put it in an**

21  **environment that's wet and it gets dusty that there**

22  **would be mold on it.  I -- it's -- it's --**

23  Q.   You think a bed is similar to a

24  stainless steel counter?

25  **A.   I think -- I think it would be**

Page 150

1  foolish -- or it's -- it's a -- let's see.  Mold

2  will grow where you have spores, dust and water;

3  and manufacturers can't control how -- how people

4  handle their materials.  So I don't think a bedding

5  manufacturer would be any different from anything

6  else; and it's an unnecessary warning because it's

7  generally recognized that if something is wet, has

8  dust on it and has available moisture and spores

9  that there's going to be growth on it.

10  Q.   So you believe that the customers,

11  including Ralph Simon, who purchase Select Comfort

12  beds generally recognize that if moisture gets down

13  into the bed and there's dust that mold can grow?

14  **MS. FISHER:** Objection, calls for

15  speculation.

16  **THE WITNESS:** I just believe that

17  people know that knowledge in general on any

18  material, not with -- particularly with respect to

19  beds, that any material that gets wet and has

20  moisture in the spores that stuff will grow on it.

21  **MR. CORWIN:** I have nothing further.

22  **THE WITNESS:** Thank you, sir.

23  (Whereupon, the deposition of NEIL

24  GEOFFREY CARLSON was concluded at 12:19 p.m.)

25

Page 151

1  I, NEIL GEOFFREY CARLSON, do hereby

2  certify that I have read the foregoing deposition

3  and found the same to be true and correct except as

4  follows, (noting the page and line number of the

5  change or addition as desired and the reason why):

6  Page  Line    Correction

7  ____  ____  _____

8  ____  ____  _____

9  ____  ____  _____

10  ____  ____  _____

11  ____  ____  _____

12  ____  ____  _____

13  ____  ____  _____

14  ____  ____  _____

15  ____  ____  _____

16  ____  ____  _____

17  ____  ____  _____

18  ____  ____  _____

19  ____  ____  _____

20  ____  ____  _____

21  ____  ____  _____

22  ____  ____  _____

23  ____  ____  _____

24

25  Date:         NEIL GEOFFREY CARLSON

Page 152

1  STATE OF MINNESOTA  )

2                      )ss.          CERTIFICATE
   COUNTY OF DAKOTA    )

3      BE IT KNOWN that I, Jean F. Soule, Registered
   Professional Reporter, took the foregoing

4  deposition of NEIL GEOFFREY CARLSON;

5      That the witness, before testifying, was by me
   first duly sworn to testify the whole truth and

6  nothing but the truth relative to said cause;

7      That the testimony of said witness was recorded
   in shorthand by me and was reduced to typewriting

8  under my direction to the best of my ability;

9      That the foregoing deposition is a true record
   of the testimony given by said witness;

10

11      That the reading and signing of the foregoing
   deposition by the said witness were not waived by

12  the witness and respective counsel;

13      That I am not related to any of the parties
   hereto, nor an employee of them, nor interested in

14  the outcome of the action;

15      That the cost of the original has been charged
   to the party who noticed the deposition, and that
   all parties who ordered copies have been charged at

16  the same rate for such copies;

17      WITNESS MY HAND AND SEAL this 13th day of
   August, 2015.

18

19          JEAN F. SOULE, Notary Public, RPR

20

21

22

23

24

25

Neil Geoffrey Carlson - August 7, 2015
Ralph Simon vs. Select Comfort Retail Corp., et al.

Page 153

```
 1              DEPOSITION REFERENCE INDEX

 2

 3  EXAMINATION:

 4  By Mr. Corwin:  3

 5

 6  REQUESTS FOR INFORMATION:

 7  67, 86, 114

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```