**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | | |
|---|---|---|
| RALPH SIMON, | ) | Case No.  4:14-cv-1136 (JAR) |
| | ) | |
| Plaintiff, | ) | |
| | ) | **REPLY MEMORANDUM OF LAW** |
| v. | ) | **IN SUPPORT OF DEFENDANTS'** |
| | ) | **MOTION TO EXCLUDE THE** |
| SELECT COMFORT RETAIL CORP., | ) | **TESTIMONY OF PATSY DUNCAN** |
| | ) | |
| and | ) | |
| | ) | |
| SELECT COMFORT CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |

Plaintiff's opposition does not address Patsy Duncan's substantial shortcomings, but does

reinforce the following dispositive facts:

- Duncan admits she is not qualified to conduct or interpret a tape-lift test.

- Duncan has no knowledge of the "test" performed by EMLab or the qualifications or competence of the person who allegedly did the "test."

- EMLab "tested" only a square centimeter piece of foam five months after that foam was placed outside, in a damp condition, exposed to mold, and then placed in a plastic bag—a perfect mold incubator.

- Duncan conducted no testing of any part of Plaintiff's bed during the time he used the bed or within five months of his use of the bed.

- Duncan conducted no testing of the air in Plaintiff's bedroom to determine if the mold concentrations were greater than in the normal inside or outside air.

- Duncan's report provides no opinion as to when any mold formed and expressly disclaims any opinion as to the conditions of the bed when Plaintiff used it.

- No other component of Plaintiff's bed showed any evidence of mold, including the topper pad and mattress cover which, under Plaintiff's theory, mold would have traveled through to reach the Plaintiff.

These factors, in addition to Duncan's woefully inadequate qualifications, establish that her testimony is not reliable or relevant and should be excluded.

I.      **FEDERAL RULE OF EVIDENCE 703 DOES NOT PERMIT DUNCAN TO SUBSTITUTE EMLAB'S TEST RESULTS AS HER OWN OPINION.**

       A.      **Duncan Does Not Actually Offer Any Opinion And Would Not Otherwise Be Qualified To Do So.**

Duncan is far out of her field of expertise.   In a futile attempt to compensate, Duncan relies entirely on an analysis and report allegedly conducted by a separate party, EMLab, not identified as a fact or expert witness in this case.  Plaintiff glosses over Duncan's improper reliance on EMLab by citing to Federal Rule of Evidence ("FRE") 703.  However, FRE 703 only allows an expert to base an "opinion" on inadmissible "facts or data" if experts in the particular field would reasonably rely on these kinds of "facts or data."  *See Hill v. Fikes Truck Line, LLC*, No. 4:11-CV-816, 2012 WL 5258753, at *3 (E.D. Mo. Oct. 24, 2012) ("An expert's opinion must be based upon his or her own application of principles within his [or] her expertise to the facts of the case.").  Opinions that are "entirely that of another expert" are inadmissible under FRE 703.  *See id.* at *3–*4 (excluding orthopedic surgeon's proposed expert testimony about posttraumatic stress syndrome because surgeon "did not form his own opinion," but merely "adopted wholesale the opinion of another expert"); *Matter of James Wilson Assocs.*, 965 F.2d 160, 173 (7th Cir. 1992) (excluding architect's proposed expert testimony about condition of building because architect was acting as "the engineer's spokesman" and could not "vouch[] for the truth" of the engineer's opinions).  Here, the hearsay EMLab report is not a "fact" or "data" Duncan relied upon in forming her opinion.  Instead, the EMLab "test" results <u>are</u> Duncan's opinion.  Of course, this is because Duncan is not qualified to conduct such testing on her own or to verify the results as she is admittedly not qualified to perform mold identification analysis. (Pl.'s Opp'n at 4.)  Duncan is no more qualified than Plaintiff would have been had he performed

the tape-lift sampling himself with a home sampling kit and sent it to a lab to be analyzed for an additional fee. (*See* Pro Lab, http://www.prolabinc.com/mold-kits.html (last visited Oct. 16, 2015).) Indeed, Duncan is akin to an actor playing a spokeswoman to EMLab, even though she has done nothing to verify what EMLab did.

Duncan admitted that she is not qualified to identify mold. (Ex. 11[1] (Duncan Tr.) at 37:21–38:10.) Thus, any "analysis" Duncan did does not include verifying or analyzing the test results. Duncan can, of course, read the EMLab report like any other person, but she does not add any scientific or technical analysis. *See Hill*, 2012 WL 5258753, at *4. Indeed, Plaintiff concedes that Duncan "is not a microbiologist and does not claim to be qualified to perform this type of mold identification analysis carried out by a microbiology lab." (Pl.'s Opp'n at 4.) Yet Duncan claims that she "interpreted the lab report" and "summarized [her] findings in a complete report titled 'Mold Investigation and Sampling Analysis.'" (Ex. 12 (Duncan Rpt.) at 3.) Duncan, however, did nothing more than regurgitate EMLab's purported results, as well as copy into her report general, publicly available information about *Cladosporium* mold. (*Id.* at 15–21). Even the microscopic photo in her report is not of the EMLab results, rather it is a stock photo of *Cladosporium*. (*See* Ex. 11 (Duncan Tr.) at 82:1–3; Ex. 12 (Duncan Rpt.) at 15.)

Plaintiff relies on *Burnett v. Damon Corp.*, 2013 U.S. Dist. LEXIS 169367 (N.D.N.Y. Dec. 2, 2013), which actually illustrates why Plaintiff erred in not designating EMLab as an expert. In *Burnett*, the plaintiff did not try to backdoor admit testing results but instead designated the two testing companies as experts, even though other experts relied on their results. *Id.* at *15–*22. Here, Plaintiff failed to do so, leaving Select Comfort without the opportunity to

---

[1]   Exhibits 1-38 cited herein are attached to the Declaration of Andrew S. Hansen, filed August 28, 2015. Exhibits 39-41 are attached to the Second Declaration of Andrew S. Hansen, filed October 16, 2015.

3

challenge the EMLab results through cross examination.  Plaintiff's decision to proceed in this manner was likely calculated.  Perhaps the EMLab worker who did the "test" was not reliable, could not be found, was not qualified, or, most likely, would not support Plaintiff's theory in this case.  For whatever reason, Plaintiff cannot use FRE 703 to save Duncan's testimony.

> **B.**     **The EMLab "Test" Is Not Reliable, Relevant, Or Helpful To A Jury.**

FRE 703 provides an additional hurdle for Plaintiff because it requires that inadmissible "facts or data" can only be disclosed to the jury if "their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect."  Plaintiff's opposition does nothing to cure the fatal defect that the EMLab test is not reliable or helpful to a jury, and it is overly prejudicial to Select Comfort to allow such unreliable evidence.

> **1.**     **The EMLab Test Was Conducted Months After Plaintiff Seeded The Foam With Mold And Stopped Using The Bed.**

EMLab visually inspected a tape-lift sample from only a square centimeter piece of foam from Plaintiff's bed.  The foam, when in use, rests above the air chambers and below the topper pad and mattress cover.  Plaintiff destroyed the air chambers so it cannot be ascertained if the chambers, which sit against the alleged mold, showed signs of mold growth.  Under Plaintiff's theory, mold migrated from the foam through the topper pad and mattress cover and into the air.  Yet Plaintiff never tested this theory, and it is undisputed that no mold was found on the topper pad or mattress cover, negating Plaintiff's hypothesis and suggesting that mold did not exist in Plaintiff's bed during his use.  Additionally, Defendants actually tested whether mold, if it was present on the foam, would it escape into the bedroom air under normal use.  It did not.  (*See* Ex. 7 (Carlson Rpt.).)

Plaintiff is left with only the foam.  However, the EMLab "test" on the square centimeter of the foam was conducted after Plaintiff seeded the foam with mold and essentially placed it in

a mold incubator for five months.  Specifically, Plaintiff claims to have discovered mold in March 2013.  He researched a potential lawsuit (Ex. 1 (Simon Tr.) at 85:5–18), then took the foam outside and laid it on the ground, exposing it to the vast amounts of *Cladosporium* present in the St. Louis air.  (*See* Ex. 22 (Wedner Tr.) 82:14–22 ("There was a day three or four years ago in which [St. Louis] set the world record for spores [of *Cladosporium herbarum*] per cubic meter at 130,000 or 142,000.").)  Plaintiff described the foam as "slimy" clearly reflecting a damp condition.  Dampness could be caused by normal perspiration, which would likely account for discoloration in the 14-year-old foam that Plaintiff claims was mold.[2]  Additionally, Plaintiff was a drooler, adding more dampness to the foam.[3]  Such dampness would undisputedly promote mold growth when the foam was placed in a plastic bag.

Plaintiff's action undisputedly seeded the foam with mold, which was then placed into a plastic bag and given to Plaintiff's counsel where it sat for five months.  (Ex. 11 (Duncan Tr.) 72:18–73:8.)  This was akin to placing a damp towel in a plastic bag.  (Ex. 11 (Duncan Tr.) at 101:23–102:23.)  Experience tells us mold may grow in such a circumstance.

It was not until July 28, 2013 that Duncan took her tape-lift sample from a square centimeter of the foam.  That was then sent to EMLab in New Jersey for a purported microscopic visual analysis on August 1, 2013.  Accordingly, the EMLab "test" was a visual review of spores collected on tape from a tiny piece of the foam that had been in a mold incubator for five months.

---

[2]    Similarly, a common noticeable effect of perspiration is discoloration of shirts and other apparel. Both Dr. Bruce Hemming, a Ph.D. microbiologist, and Dr. Deborah K. Lickfield, with a Ph.D in Textile and Polymer Science, with two degrees in Microbiology, believe the discoloration Plaintiff claimed to see is from perspiration. (Ex. 16 (Hemming Rbtl.) at 8); (Ex. 18 (Lickfield Rbtl.) ¶ 35.)

[3]    Plaintiff's drooling and perspiration may have caused mold growth in his pillows.  *See* Fungal Contamination of Bedding, A.A. Hoodcock, N. Steel, C.B. Moore, S.J. Howard, A. Custovoc, D.W. Denning, Allergy 2006: 61:140–42.  However, Plaintiff also destroyed that evidence before it could be examined by Select Comfort.  Duncan apparently did no testing or analysis of Plaintiff's pillows.

The "test" therefore does nothing to establish, hint or suggest that mold was present when Plaintiff used the bed.  It is not reliable evidence of the conditions of the bed during use nor is it helpful to a jury.

Moreover, Duncan does not even know the person who conducted the subjective EMLab visual examination.  The person was not identified in EMLab's report.  Sensing this problem, Duncan asked EMLab for the identity of the worker shortly before her deposition.  (Ex. 11 (Duncan Tr.) at 103:12–104:1.)  However, Duncan knows nothing of this person's competence, skills, attention to detail, work history or work quality.  (Ex. 11 (Duncan Tr.) at 105:14–10.)  Nor does Duncan know anything about the EMLab employee who signed off on the report.  (Ex. 11 (Duncan Tr.) at 40:1–4, 106:22–107:17.)

Plaintiff argues that Select Comfort "never sought to depose the lab technician."  (Pl.'s Opp'n at 8–9.)  This is a rather strange argument considering that: (1) it is Plaintiff's burden to establish the reliability of its expert's testimony; and (2) Plaintiff did not identify the EMLab technician as an expert or fact witness.

### 2.      Duncan Cannot Testify As To The Subjectivity Of EMLab's Test.

The EMLab "test" notes a qualitative rating of purported "mold growth" on a scale from 1+ to 4+.  (Pl.'s Opp'n at 5 (citing Duncan Rpt. at 18–19).)  Plaintiff provides no testimony or explanation as to the methodology for calculating this "Mold Growth" number and, instead, baldly concludes that the 1-4 scale "quantifie[s] the amount of mold growth . . . on a scale of 1 to 4, 4 denoting the highest number of molds seen growing."  (Pl.'s Opp'n at 5.)  There is a distinct difference between qualitative and quantitative testing.   As described by Dr. Hemming, quantitative testing involves a "numerical determination of the number of organisms and types present."  (Sept. 30, 2015 Enright Decl. Ex. E (Hemming Tr.) at 10:8–10.)  Qualitative testing, on the other hand, is a "subjective determination of the amounts, but is not quantitative," that is,

"[i]t's not an actual determination" of the amount of mold present.  (*See* Sept. 30, 2015 Enright Decl. Ex. E (Hemming Tr.) at 10:10–14.)  Plaintiff alleges that the EMLab results "quantify" the amount of mold growth, but the report itself clearly states it was a qualitative examination (Ex. 12 (MR&A) at 19 ("Direct microscopic exam (Qualitative)")), thus a "3+" rating was a subjective determination, made by someone other than Duncan, and no amount of mold was actually quantified or determined.

Furthermore, Plaintiff's argument underscores the subjective nature of the EMLab report in its nonsensical explanation that a rating of 4 "denot[e] the highest number of molds seen growing."  (Pl.'s Br at 5.)  Duncan's report fares no better at giving meaning to what the "1+ to 4+" scale means, or what the significance or relevance of a "3+" MOLD GROWTH rating is, and instead vaguely describes the rating as "1+ to 4+ with 4+ being *very dense* and 1+ being *less dense*."  (Ex. 12 (Duncan Rpt.) at 4 (emphasis added).)  Plaintiff has not established the general methodology used by EMLab technicians in reaching this subjective number, nor offered testimony from the actual EMLab technician to establish whether the unknown methodology was reliably applied.  As Plaintiff conceded, Duncan is not qualified to perform the type of mold identification analysis carried out by EMLab, and is therefore not qualified to testify regarding the methodology used or its application in this case.  Furthermore, a rating of "3+" on a one centimeter patch of foam, with no further qualified testimony, will not assist the trier of fact in determining the condition of Mr. Simon's bed as a whole when in use by him.

Plaintiff attempts to rehabilitate Duncan's false statements regarding EMLab's procedures by arguing that Duncan was subject to "poorly asked questions" and Select Comfort merely "misunderstood" her answers.  (Pl.'s Opp'n at 9.)  In truth, Duncan's testimony underscores her fundamental lack of qualification and inability to admit, under oath, her lack of

7

qualification or training.  Even giving Duncan the benefit of the doubt that she was genuinely confused, her testimony demonstrates that she was unsure of the processes or procedures of EMLab, any other lab accredited by AIHA, or microbiology labs in general.

## II.   PLAINTIFF FAILS TO ADEQUATELY ADDRESS NUMEROUS DEFICIENCIES IN THE RELIABILITY OF DUNCAN'S SAMPLING.

### A.   Duncan's "Methodology" Is Unreliable.

Plaintiff summarily concludes, with no support, that Duncan's failure to take multiple samples, over multiple days, is merely a "minor criticism" that "is clearly not enough for the Court to determine that her opinions are unreliable."  (Pl.'s Opp'n at 10–11.)  Failure to reliably apply the scientific method is not a minor criticism.  (*See* Ex. 40 (Lickfield Tr.) at 33:2–7 ("In my experience as a scientist, one ***never*** relies upon a single sample for making a conclusive determination." (emphasis added).)  A failure to adhere to the scientific method or industry standards is frequently a basis that courts rely on to exclude expert testimony.  *See Daubert v. Merrill Dow Pharms., Inc.*, 509 U.S. 579, 590 (1993) ("[I]n order to qualify as 'scientific knowledge,' an inference or assertion must be derived by the scientific method."); *see, e.g., Jenkins v. Slidella L.L.C.*, No. 05-370, 2008 WL 2649510 (E.D. La. June 17, 2008); *Fraser v. 301-52 Townhouse Corp.*, 831 N.Y.S.2d 347 (Sup. Ct. 2006).  Incredibly, Plaintiff seeks to have a jury declare that a bed sold to millions is defective based upon a single "test," of a square centimeter, performed months after the bed was used, on a single component of the bed, analyzed by persons who will not testify in this case.

Plaintiff attempts to distinguish *Fraser* by arguing that *Fraser* was not about sampling and was instead about whether under *Frye* it was generally accepted in the scientific community that mold could cause adverse health effects.  (Pl.'s Opp'n at 13.)  While *Fraser* involved a lengthy, thoughtful discussion about the scientific literature and determined that plaintiffs could

not establish general causation, the *Fraser* court also analyzed the reliability of the plaintiffs' sampling.   *Fraser*, 831 N.Y.S.2d at *25.   Both *Frye* and *Daubert* require an expert's methodology to be reliable.  *See Daubert*, 509 U.S. at 589 ("That the *Frye* test was displaced by the Rules of Evidences does not mean, however, that the Rules themselves place no limits on the admissibility of purportedly scientific evidence. . . . To the contrary, under the Rules the trial judge must ensure that any and all scientific testimony or evidence is not only relevant, but reliable.").  In *Frase*r, the plaintiffs alleged adverse health effects due to alleged exposure to mold in their apartment.  (*Id.* at *1.)  In support of their claims, the plaintiffs' expert took air, bulk, and wipe samples, including one air sample from the backyard, as well as two air samples from inside the apartment—substantially more samples than what Duncan took in this case. Regardless, the Court held that "even were there a showing of causation here . . . . two measurements for mold in a short time span . . . [is] insufficient to give a valid mold reading." *Fraser*, 831 N.Y.S.2d at *25.

Seemingly misunderstanding the hierarchy of the New York court system, Plaintiff argues that *Fraser* has been "disavowed" by New York courts and cites to a New York Supreme Court decision, which is among New York's lowest courts.  (Pl.'s Opp'n at 13 (citing *Friedman v. Madison*, 2008 N.Y. Misc. LEXIS 3532 (N.Y. Sup. Ct. 2008)).)  In *Cornell v. 360 W. 51st Street Realty, LLC*, 9 N.E.3d 884, 892 (N.Y. 2014) *reargument denied,* 16 N.E.3d 1240 (N.Y. 2014), which was decided after *Friedman*, New York's **highest** court extensively and favorably discussed the *Fraser* opinion and determined that the plaintiffs could not establish general causation for a claim alleging adverse health effects due to exposure to mold.  (*Id.* at 899.)

Plaintiff also unpersuasively tries to distinguish *Jenkins* by arguing that the expert in *Jenkins* failed to document that his sampling was done two months after the allegedly injured

plaintiffs had moved out of the apartment and failed to document the chain of custody.  (Pl.'s Opp'n at 12–13.)  First, here, similar to *Jenkins*, Duncan's tape-lift sample of the Plaintiff's foam pad was taken approximately five months after it was removed from Plaintiff's home, subjected to outside mold in a damp condition, and then placed in a plastic bag.  Second, the Court determined that the plaintiff's expert "deviated from accepted industry standards in his testing methodologies" by "not obtain[ing] non-complaint area samples or 'reference' samples that could be measured against the complaint samples taken near the source of the alleged moldy smell in the apartment.  *Specifically, [plaintiff's expert] took only two air samples and one tape lift sample which is against industry standards*."  (*Id.* at *2 (emphasis added).)  Citing the AIHA *Field Guide for the Determination of Biological Contaminants in Environmental Samples* ("AIHA *Field Guide*"), the Court held that the plaintiff's expert did not "follow the accepted scientific methodology used by certified experts in the mold sampling field."  *Jenkins*, 2008 WL 2649510 at *3.  Duncan took only one tape-lift sample, which is against industry standards. Incredibly, Duncan took no air samples of Plaintiff's home.  This is significant because, as in any mold case, Plaintiff must prove that even if mold grew in Plaintiff's bed, that it escaped through the layers of the bed and into the air in sufficient quantities to cause Plaintiff harm.  No such test was performed by Duncan or anyone else.  Here, just as in *Jenkins*, a failure to follow accepted scientific methodology requires Duncan's expert testimony to be excluded.

Plaintiff flippantly dismisses Select Comfort's concerns regarding the cross-country transportation of Plaintiff's tape-lift sample.  (Pl.'s Opp'n at 13.)  Plaintiff relies on a single statement from the EMLab report that says the sample was received "in acceptable condition unless noted."  (Pl.'s Opp'n at 13.)  Plaintiff has failed to establish what an "acceptable" condition is, what procedures were in place to ensure the sample was not contaminated, how it

was processed, or how or whether it was kept separate from other samples.  A witness from EMLab could perhaps answer these questions, but Plaintiff failed to disclose such a witness.

### B.       Duncan Did Not Follow Her Own Purported Industry Standards.

Duncan has repeatedly emphasized her opinion of the importance of accreditation by the AIHA.  (Ex. 11 (Duncan Tr.) at 127:1–16; Ex. 12 (Duncan Rpt.) at 6–7.)  Yet, Plaintiff attempts to marginalize the applicability of the AIHA *Field Guide* because Duncan failed to follow the industry standards set forth therein.  (Pl.'s Opp'n at 11–12.)  The AIHA *Field Guide* was created to assist professionals in determining the "proper collection, storage, and transport of environmental samples for biological analysis."  (Ex. 39 (AIHA *Field Guide*) at 1.)  The authors of the guide explain that while proper sample techniques for biological contaminants "can be tedious . . . *the interpretation of the resulting data is highly dependent on the sampling strategy*." (Ex. 39 (AIHA *Field Guide*) at 2 (emphasis added).)  Duncan's failure to employ a reliable sampling strategy eliminates the possibility of a reliable interpretation of the sampling results.

Plaintiff alleges that the standards outlined in Chapter Five of the AIHA *Field Guide* do not apply to this task because it is limited to investigators "tasked with doing an overall survey of a commercial building."  (Pl.'s Opp'n at 11.)  Here, the relevant testing is Plaintiff's home, not just bed, as Plaintiff must show that mold from the bed contaminated the air that he breathed in his home.  The AIHA *Field Guide* sets forth methods and standards for designing a sampling strategy so as to produce reliable results that can be properly interpreted.  (Ex. 39 (AIHA *Field Guide*) at 2.)  For example, Chapter Five discusses one reason for planning before sampling is to control for "the airborne concentrations . . . [and] conditions" under which nearly all people may be "repeatedly exposed, day by day, over a . . . lifetime, without adverse health effects."  (Ex. 25 (AIHA *Field Guide*) at 52.)  Additionally, a planned strategy can account for external conditions that may be disproportionately impacting mold growth.  For example, in the *Jenkins* case, in

which the Plaintiff alleged injuries based on exposure to mold, the court excluded the plaintiff's expert based on his failure to follow these AIHA *Field Guide* industry standards, finding that the guidelines attempts to control for multiple variables that "directly influence fungal growth."  *See Jenkins*, 2008 WL 2649510, at *2.

Plaintiff claims that the notion of following the AIHA *Field Guide* recommendations "is simply ridiculous."  (Pl.'s Opp'n at 12.)  However, he offers no alternative standard, and if no standard applies, Duncan's testimony would amount to unreliable junk science.  *See Metro. St. Louis Equal Hous. Opportunity Council v. Gordon A. Gundaker Real Est. Co., Inc.*, 130 F. Supp. 2d 1074, 1080 (E.D. Mo. 2001) (requiring experts to be reliable prevents confusing a jury with "junk science").

## III.   DUNCAN'S TESTIMONY IS NOT RELEVANT.

Duncan's testimony is not relevant because Duncan cannot opine on whether mold was growing in Plaintiff's bed when he used it.  Duncan took a tape-lift sample of bed foam on July 28, 2013, five months after Plaintiff used his bed.  In the meantime, the foam was placed outside, damp, and exposed to the mold in the St. Louis air and on the ground.  It was then rolled up and sealed in a plastic bag and stored until Duncan did her tape-lift sample, creating ideal conditions for mold to grow.

Attempting to cure this deficiency, Plaintiff claims that Duncan does opine that mold was present on the foam when it was used by Plaintiff.  Incredibly, Plaintiff claims that Duncan reviewed photographs of the foam pad taken by Plaintiff on the day he allegedly discovered a substance on his foam pad.  (Pl.'s Opp'n at 14.)  Plaintiff claims that based on nothing more than those photos, mold was present when Plaintiff used the bed.  (Pl.'s Opp'n at 14.)

Nowhere in her report does Duncan claim to have reviewed Plaintiff's photographs taken in March 2013.  (*See* Ex. 12 (Duncan Rpt.) at 8 (listing information relied upon in formulating

12

her opinions).)   Additionally, Duncan's report does not include a single remark or opinion regarding whether mold existed on Plaintiff's bed during the time Plaintiff used his bed. Although Duncan tried to provide additional opinions outside the scope of her report in her deposition testimony, she conceded she did not rely on her review of Simon's March 2013 photographs in drafting her report (Ex. 11 (Duncan Tr.) at 94:2–94:23) and that her report contains no opinions about the existence of mold growth on Plaintiff's bed in March of 2013. (Ex. 11 (Duncan Tr.) at 91:5–15.)  *See* Rule 26(a)(2)(B)(i) (requiring an expert report contain "a complete statement of all opinions the witness will express and the basis and reasons for them"); *see also Rembrandt Vision Tech., L.P. v. Johnson & Johnson Vision Care, Inc.*, 725 F.3d 1377, 1381 (Fed. Cir. 2013) (excluding expert trial testimony because "[a]n expert witness may not testify to subject matter beyond the scope of the witness's expert report unless the failure to include that information in the report was 'substantially justified or harmless'").   Plaintiff's attempt to submit entirely new opinions, after the expert report deadline had passed, significantly prejudiced Select Comfort's ability to depose Duncan on these opinions and denied it the ability to develop or introduce competing expert testimony.

Additionally, Duncan's report expressly declares that she was ***not*** offering any opinions of the mold conditions of the foam other than on July 28, 2013 when she did the tape lift. Indeed, this statement, incorporated into Duncan's reports, is the only statement in Duncan's reports about mold other than at the time of the tape-lift sample.

Duncan and Plaintiff attempt to discredit Dr. Hemming's finding of no mold on the foam when he tested it in 2015.  Despite their criticism, neither Duncan nor Plaintiff have attempted to re-test the foam to see if it indeed contains only "dead" mold as they now claim.

## IV.   DUNCAN IS NOT QUALIFIED TO TESTIFY REGARDING THE DESIGN OF THE SLEEP NUMBER BED OR HEALTH EFFECTS OF MOLD.

Plaintiff takes the absurd position that Duncan, an economics graduate who works "in the field of inspection for and remediation of mold," is qualified to testify regarding a purported design defect and the health effects of mold exposure.  (Pl.'s Opp'n at 9–10.)   Realizing that Duncan is clearly unqualified to testify regarding any purported design defect, Plaintiff claims that Duncan does not offer an opinion that Plaintiff's bed is defective, and instead states that based on her "observation of the bed in question," Duncan's opinion is only "that the Sleep Number® bed could promote mold growth" because "the rubber air chamber, is a 'moisture barrier' (upon which the foam pad directly rests), accumulates moisture."  (Pl.'s Opp'n at 9–10.) Plaintiff cannot avoid that Duncan is unqualified to testify regarding the Sleep Number® bed design by omitting the word "defect" from her opinion.  Duncan has no education, training, or experience in engineering, design, or manufacturing of any kind and is unqualified to render an opinion regarding the design of Plaintiff's bed.  *See Krueger v. Johnson & Johnson Prof'l, Inc.*, 66 Fed. App'x 661, 662 (8th Cir. 2003); *Shaffer v. Amada Am., Inc.*, 335 F. Supp. 2d 992, 995-96 (E.D. Mo. 2003), *aff'd*, 2003 WL 26129823 (8th Cir. Sept. 18, 2003).

Even if Duncan were qualified to testify regarding the design of Plaintiff's Sleep Number® bed, Duncan's opinion lacks foundation and is not relevant.  Plaintiff claims Duncan's opinion is based on her "observation" of the bed in question.  (Pl.'s Opp'n at 9.)  Duncan does not claim to have deconstructed the bed nor does she claim to have reviewed design documents related to the bed.  (*See* Ex. 12 (Duncan Rpt.) at 8.)  Moreover, Duncan's opinion that the Sleep Number® bed "could" promote mold growth would not assist the trier of fact.  (Pl.'s Opp'n at 9.) Plaintiff is not claiming his bed *could* grow mold—expert testimony has made clear that mold can, in fact, grow anywhere (*see, e.g.*, Ex. 6 (Carlson Tr.) at 149:18–150:9), and Plaintiff's

14

design expert specifically states that that "mold growth can occur in mattresses of any construction."  (Ex. 20 (Pastore Rpt.) at 4.)   Plaintiff must prove that the design of Plaintiff's bed actually **did** promote mold growth due to a defect, and that *Cladosporium* mold actually formed in Plaintiff's bed as a result of such defect.

Plaintiff argues that Duncan is qualified to testify regarding the "known and generally accepted health risks and effects associated with mold exposure."  (Ex. 12 (Duncan Rpt.) at 10.)  Plaintiff summarily states that due to her experience "inspecting for and assessing the dangers of mold growth," Duncan is "clearly qualified" to testify regarding health effects of mold exposure. (Pl.'s Opp'n at 10.)  There are no facts in Duncan's background, her report, or her testimony that support the baseless claim that Duncan "assesses" the dangers of mold growths.  Duncan is not a doctor, nor otherwise qualified to testify regarding "health risks and effects associated with mold."  *See, e.g.*, *In re Breast Implant Litigation*, 11 F. Supp. 2d 1217, 1240 (D. Colo. 1998) (biomedical engineer was "not a medical doctor" and could not opine on medical effects of breast implants); *Trail v. Civil Eng'r Corps., U.S. Navy Facilities Eng'g Command*, 849 F. Supp. 766, 768 (W.D. Wash. 1994) (expert qualified on sampling and testing for hazardous substances was not otherwise qualified to testify as to health effects of hazardous substance).

## CONCLUSION

Because Patsy Duncan has no education or qualifications in mold or microbiology, did not herself perform any test or analysis and is not qualified to do so, and because her opinion does not relate to the time Plaintiff used his bed, her testimony should be excluded under the *Daubert* standard.

Date:  October 16, 2015               **OPPENHEIMER WOLFF & DONNELLY LLP**

   By:   <u>s/ Andrew S. Hansen</u>
       Andrew S. Hansen (MN #285894) (*pro hac vice*)
       Heidi A.O. Fisher (MN #320638) (*pro hac vice*)
       Ellie J. Barragry (MN #395207) (*pro hac vice*)
       Campbell Mithun Tower, Suite 2000
       222 South Ninth Street
       Minneapolis, MN 55402-3338
       Telephone:  (612) 607-7000
       Facsimile:  (612) 607-7100

**BRYAN CAVE**

       Eric Martin, #47558
       Jamie Hais, #64882
       One Metropolitan Square
       211 North Broadway, Suite 3600
       St. Louis, MO 63102-2750
       Telephone:  (314) 259-2324
       Facsimile:  (314) 259-2020

**ATTORNEYS FOR DEFENDANTS**