UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| RALPH SIMON, | ) | |
|---|---|---|
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:14-CV-1136 JAR |
| | ) | |
| SELECT COMFORT RETAIL CORP., et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM AND ORDER**

This matter is before the Court on the following motions: Defendants Select Comfort Retail Corporation and Select Comfort Corporation's (collectively "Select Comfort") Motions to Exclude the Testimony of Dr. Ernest P. Chiodo (Doc. No. 52), Christopher A. Pastore, Ph.D. (Doc. No. 54), and Patsy Duncan (Doc. No. 56); Motion for Spoliation Sanctions (Doc. No. 58); and Motion for Summary Judgment (Doc. No. 60); and Plaintiff's Motion to Exclude Defendants' Exhibit 44. (Doc. No. 158) The motions are fully briefed and ready for disposition. Oral argument on the motions was held on December 11, 2015.

**I.     Background**

On November 19, 1999, Plaintiff Ralph Simon ("Simon") purchased a 1999 model 5000 series Sleep Number® bed designed, manufactured and sold by Select Comfort.[1] On February

---

[1] Instead of using springs like a traditional mattress, the 5000 series Sleep Number® bed contains inflatable air chambers that can be adjusted by a remote control to provide firmer or softer support for the user. A foam layer sits directly on top of the air chamber. The foam layer in turn is covered with additional padding layers and a pillow-top or mattress cover layer. The air chamber, foam, and padding are encased in the mattress cover, which zips around the perimeter and encloses the inner workings of the mattress, giving it the exterior appearance of a traditional mattress. The Sleep Number® mattress rests on a flat foundation, and the entire sleep system (mattress and foundation) is referred to as the Sleep Number® bed. (Defendants' Statement of Uncontroverted Material Facts in Support of their Motion for Summary Judgment ("SOF"), Doc. No. 62 at ¶¶ 4-7)

22, 2013, Simon contacted Select Comfort to report that the foam layer of his bed had broken down and had an uncomfortable sag. Select Comfort sent Simon a replacement foam topper pad. Approximately two weeks later, on or about March 1 or 2, 2013, Simon went to replace the foam and discovered what he believed to be "toxic mold" on the foam pad. He took a photograph of the foam pad before rolling it up, taking it to his garage, and placing it in a black plastic trash bag. Simon then contacted Select Comfort to report the mold. A Select Comfort customer service representative offered to and did send Simon a new pump, air chamber and control. After discussing the bed components with the Select Comfort representative, Simon threw away the old air chamber. He took no photographs of the air chamber. He discarded his pillows and washed his other bedding. Within days, Simon retained counsel and took the foam pad in the plastic trash bag to his counsel's office.

On March 14, 2014, Simon filed a complaint against Select Comfort Retail Corporation in St. Louis County Circuit Court alleging that in "early 2009," he began experiencing a wide range of physical ailments, including severe skin irritations, hearing loss, eye infections and vision problems, sleep apnea and severe throat irritation, which he attributes to "toxic mold" that grew on his Sleep Number® bed.[2] The case was timely removed to this Court on June 23, 2014. (Doc. No. 1) On March 20, 2015, Simon filed an amended complaint adding Select Comfort Corporation as a defendant. (Amended Complaint ("AC"), Doc. No. 31) The operative complaint alleges causes of action for strict liability defective design, strict liability failure to warn, and negligence.

---

[2] Simon has offered three different dates of onset. In an affidavit dated November 15, 2013, Simon stated that "[i]n 2006, [he] began experiencing sudden-onset symptoms of respiratory, olfactory and vision problems that had been attributed to the common cold or allergies." (Affidavit of Ralph Simon ("Simon Aff."), Doc. No. 92 at ¶ 3) In both his original and amended complaints filed in March 2014 and March 2015 respectively, Simon alleges his physical symptoms began in "early 2009." (Doc. No. 4 at ¶ 2; Doc. No. 31 at ¶ 4) He testified on deposition that his symptoms began in 2002 or 2003. (Deposition of Ralph Simon ("Simon Depo."), Doc. No. 65-1 at 44:7-14; 78:5-10)

## II. Discussion

### A. Motion for spoliation sanctions

Select Comfort has moved for spoliation sanctions against Simon, arguing that his actions regarding the components of his bed constitute intentional spoliation which justifies dismissal or, in the alternative, an order excluding spoliated evidence. According to Select Comfort, Simon contemplated filing a lawsuit soon after discovering what he believed to be mold on his mattress. Despite this fact, Simon threw away the air chamber and stored the foam pad in such a manner as to alter its condition. Select Comfort argues it has been denied the ability to examine the entire bed and that the parts it has had access to, namely the foam pad, have been contaminated and/or altered. Because there is no way to know from the current evidence whether there was mold on Simon's bed at the time of use and, if so, whether it was caused by a product defect or conditions of use, Select Comfort argues its ability to prepare a full defense has been severely compromised. Simon responds that he is a layman with no training or experience in preserving materials contaminated with mold. Moreover, Select Comfort's customer representative told him he could dispose of both the air chamber and the foam pad and clean the remaining components of his bed.

"The ultimate focus for imposing sanctions for spoliation of evidence is the intentional destruction of evidence indicating a desire to suppress the truth, not the prospect of litigation." Greyhound Lines, Inc. v. Wade, 485 F.3d 1032, 1035 (8th Cir. 2007). "Intent is rarely proved by direct evidence, and a district court has substantial leeway to determine intent through consideration of circumstantial evidence, witness credibility, motives of the witnesses in a particular case, and other factors." Id. (quoting Morris v. Union Pacific R.R., 373 F.3d 896, 902

(8th Cir. 2004)). See also Menz v. New Holland N. Am., Inc., 440 F.3d 1002, 1006 (8th Cir. 2006); Stevenson v. Union Pac. R.R. Co., 354 F.3d 739, 746 (8th Cir. 2004).

Select Comfort points to the facts that Simon searched the internet for consumer complaints and contemplated filing a lawsuit the same day he discovered the mold. He began contacting attorneys within the week. He saved some parts of his bed and discarded others. Select Comfort also asserts that Simon misrepresented his medical history of allergies when providing a patient history to Select Comfort's medical expert Dr. Wedner and his own medical causation expert, Dr. Chiodo. According to Select Comfort, this is sufficient circumstantial evidence for the Court to conclude that Simon intentionally destroyed or altered evidence to bolster his lawsuit. The Court disagrees. Although Simon's actions have had a significant effect on Select Comfort's ability to prepare a full defense, the Court finds no bad faith on his part "indicating a desire to suppress the truth." C.f. Sentis Group, Inc. v. Shell Oil Co., 763 F.3d 919 (8th Cir. 2014) (affirming district court's decision to dismiss plaintiff's case after finding plaintiff bribed a witness to hide evidence and engaged in a pattern of abusive discovery tactics). Mere prejudice is insufficient for the Court to dismiss this case or enter any other sanctions. See Menz, 440 F.3d at 1006 (declining to adopt an "extreme prejudice" exception to the rule that a district court must find bad faith before sanctioning a plaintiff for spoliation of evidence); Johnson v. Avco Corp., 702 F. Supp. 2d 1093, 1111 (E.D. Mo. 2010). Accordingly, the motion for spoliation sanctions will be denied.

### B. Daubert motions

Select Comfort moves to exclude the testimony of Simon's proposed experts, Patsy Duncan, Ernest P. Chiodo, M.D., and Christopher A. Pastore, Ph.D. The parties have submitted an extensive evidentiary record, including deposition transcripts and expert reports.

The federal rules of evidence and related case law require that an expert be qualified and that the expert's testimony be both reliable and relevant. See Fed. R. Evid. 702; Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999). A district court acts as a "gatekeeper" when screening expert testimony for relevance and reliability. Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 590-93 (1993); Russell v. Whirlpool Corp., 702 F.3d 450, 456 (8th Cir. 2012). To satisfy the reliability requirement, the party offering the expert testimony "must show by a preponderance of the evidence both that the expert is qualified to render the opinion and that the methodology underlying his conclusions is scientifically valid." Barrett v. Rhodia, Inc., 606 F.3d 975, 980 (8th Cir. 2010) (quoting Marmo v. Tyson Fresh Meats, Inc., 457 F.3d 748, 757 (8th Cir.2006)). To satisfy the relevance requirement, the proponent must show that the expert's reasoning or methodology was applied properly to the facts at issue. Id. A court is entitled to substantial discretion in determining whether expert testimony should be allowed. "There is no single requirement for admissibility as long as the proffer indicates that the expert evidence is reliable and relevant." Russell, 702 F.3d at 456-57 (quotation omitted). "An expert's opinion should be excluded only if that opinion is so fundamentally unsupported that it can offer no assistance to the jury." Synergetics, Inc. v. Hurst, 477 F.3d 949, 956 (8th Cir. 2007) (internal quotation marks and citation omitted). See also Minn. Supply Co. v. Raymond Corp., 472 F.3d 524, 544 (8th Cir. 2006) (quotation omitted).

**Patsy Duncan**

Patsy Duncan is a Certified Mold Remediator (CMR) and Certified Indoor Environmental Consultant (CIEC). (Duncan Report, Doc. No. 72 at 2) She owns Fungus-A-Mungus, a company that specializes in mold inspection and mold-related indoor environmental issues. (Id.) Ms. Duncan was retained by Simon to test the foam pad from his Select Comfort

mattress to determine if the discoloration on the pad was fungal growth. (Id. at 5) She took a single tape lift sample the size of one square centimeter from the foam pad on July 26, 2013, almost five months after Simon claimed to have found mold on his bed. She shipped the sample to EMLab P&K, an AIHA (American Industrial Hygiene Association) accredited laboratory in Marlton, New Jersey. EMLab provided a direct microscopic exam analysis and lab report to Ms. Duncan on July 30, 2013. According to Ms. Duncan, she then "interpreted the lab report and summarized [her] findings in a report titled 'Mold Investigation and Sampling Analysis,' dated August 1, 2013."[3] (Id. at 4, 11-21) At that time Ms. Duncan qualified those findings as follows:

> All samples taken during this project are limited to representing conditions at the time of sampling. The results do not imply or deny conditions that may have existed prior to our sampling or inspection.

(Id. at 17) On June 12, 2015, Ms. Duncan visually inspected the mattress stored at Simon's home and reviewed photographs of the foam pad taken after Simon discovered the alleged mold in March of 2013. (Id. at 4, 5)

According to her June 17, 2015 report, "EMLab conducted a direct microscopic examination of the tape sample lifted from the foam pad [sic] the lab report showed evidence of Cladosporium[4] mold growth with a 3+ density with a general impression stating mold growth." (Id. at 6) She opines that the Select Comfort model bed at issue could promote mold growth because "moisture created by the person sleeping in the bed by perspiration during sleep creates moisture and a humid environment over time on the untreated foam pad which sits directly on top of the rubberized air mattress creating a moisture barrier with no ventilation or ability for air

---

[3] Ms. Duncan's findings from this report are incorporated into her June 17, 2015 report. (Duncan Report at 7)

[4] Cladosporium is one of the most common forms of mold. "There are about 500 species of Cladosporium and it is the most frequently found genus of fungi in outdoor air in temperate climates." (Duncan Report at 15)

to move through the mattress to help evaporate the moisture." (Id. at 6) Although Ms. Duncan does not opine in her report that there was mold on the foam pad in March of 2013, she later testified on deposition that based on her review of the photographs Simon took of the mattress at that time, mold was in fact present on the pad in March of 2013. (Deposition of Patsy Duncan ("Duncan Depo."), Doc. No. 111-2 at 91:5-92:9; 94:23-95:7)

The Court finds Ms. Duncan's proposed testimony should be excluded first because she is not qualified to opine on the existence, type and quantity of mold allegedly found on Simon's bed. Ms. Duncan has a B.A. in Economics from the University of Missouri-Columbia; she is not a microbiologist, aerobiologist, physician, or engineer. (Id. at 12:12-21; 38:24-39:6) She admitted during her deposition that she is not qualified to analyze or interpret tape lift samples. (Id. at 35:14-17; 37:5-9) Based on her education and experience in mold remediation and indoor environmental consultation, Ms. Duncan is qualified only to conduct visual inspections of properties for mold-like substances and determine an appropriate sampling strategy. Based on independent lab reports and her own visual inspection, she then develops remediation plans for properties. (Id. at 34:5–35:2)

Second, Ms. Duncan's testimony should be excluded because it is not an independent opinion formed after examining facts or data. Her opinion regarding the existence, type and quantity of mold found on Simon's bed was based entirely on the microscopic exam analysis and report conducted by EMLab, not her own expert analysis:

> Q. You're not a microbiologist.
> A. No, I'm not.
> Q. So...
> A. That's why I rely on EMLab who is accredited. They're a microbiologist.
> Q. Right.
> A. I can rely on their information, because they are an accredited lab, and it's reliable information.

(Id. at 139:12-24) No one from EMLab was identified by Simon as a potential fact or expert witness in this case.

Federal Rule of Evidence 703 permits an expert to rely on data or facts collected by another expert and use that information to form an opinion. However, Rule 703 does not permit an expert to simply "parrot" the opinions of other experts. Hill v. Fikes Truck Line, LLC, 2012 WL 5258753, at *4 (E.D. Mo. Oct. 24, 2012) (collecting cases). "An expert's opinion must be based upon his or her own application of principles within his [or] her expertise to the facts of the case." Id. at *3 (citing Quiles v. Bradford–White Corp., 2012 WL 1355262, at *7 (N.D.N.Y. Apr. 18, 2012)). "To allow otherwise would deprive the opposing party of the opportunity to cross examine the expert on the basis for the nontestifying expert's opinion." Id. Here, Ms. Duncan did not merely use the EMLab report as data upon which an expert in her field would reasonably rely to form an opinion, but rather "adopted wholesale the opinion of another expert." Id. at *3. She cannot even testify that she independently agrees with the EMLab report because she admittedly is not qualified to analyze or interpret tape lift samples. Absent any independent analysis, the Court finds Ms. Duncan's opinion on this matter unreliable. Accordingly, Select Comfort's motion to exclude her report and testimony will be granted.

**Ernest P. Chiodo, M.D.**

Dr. Ernest P. Chiodo was retained to determine whether Simon suffered any injury or illness due to mold exposure. (Chiodo Report, Doc. No. 70 at 1, 5) Dr. Chiodo is board certified in the medical specialties of Internal Medicine, Occupational Medicine, and Public Health and General Preventive Medicine. He is also certified in the engineering and public health discipline of industrial hygiene by the American Board of Industrial Hygiene as a Certified Industrial

Hygienist (C.I.H.) in the comprehensive practice of industrial hygiene, i.e., the study of occupational and environmental hazards, including air toxins such as mold. (Id. at 1)

After examining Simon and reviewing his medical records, Dr. Chiodo opined that:

> "[Simon] has suffered from disease in the form of allergic rhinitis and chronic sinusitis due to exposure to mold from his contaminated mattress. However, in addition, due to his treatment with gentamycin he has suffered permanent hearing loss. His treatment with gentamycin occurred due to his treatment of symptoms believed to be arising out of an infectious disease but was instead due to his mold exposure due to the contaminated mattress in this matter. He also was treated with steroids in the form of prednisone. The treatment with prednisone caused him to develop cataracts. The cataracts are permanent and may require future surgical treatment. The treatment with prednisone was due to his symptoms arise [sic] from his exposure to the hidden contamination of his mattress due to mold."

(Id. at 5)

In support of their motion to exclude Dr. Chiodo's testimony and report, Select Comfort first argues Dr. Chiodo is not qualified to opine on the cause of Simon's symptomology because he has no specialized training or education in diagnosing or treating allergies. Next, Select Comfort argues Dr. Chiodo has failed to perform a scientific differential diagnosis. Lastly, Dr. Chiodo relies on an unsupported "temporal relationship" between Simon's alleged discovery of mold in March 2013 and the onset date of his symptoms, which varies from 2006 to "early 2009" to 2002.

Simon suggests that Dr. Chiodo will rely on the reports and testimony of Patsy Duncan as part of the factual basis for his own opinion that Simon was exposed to mold from his mattress. (See Chiodo Report at 5) As discussed above, the Court has determined that Ms. Duncan's proffered opinion testimony does not satisfy the Daubert standards for admission of expert testimony. As a result, there is no basis for Dr. Chiodo to "rule in" exposure to Cladosporium mold as a potential cause of Simon's symptoms because there is insufficient evidence that he

was in fact exposed to mold from his bed. Data regarding exposure is critical to a determination of causation. Bland v. Verizon Wireless, (VAW) L.L.C., 538 F.3d 893, 898 (8th Cir. 2008) (quoting Federal Judicial Center, The Reference Manual on Scientific Evidence 472 (2d ed. 2000)). Even if Ms. Duncan's testimony was not excluded, Dr. Chiodo failed to test or consider other potential allergens and did not "rule out" other potential sources of exposure to Cladosporium mold in Simon's environment.

The reliability of a specific causation opinion requires the proffered expert to consider and rule out other likely causes of the plaintiff's alleged ailments, i.e., to perform a proper differential diagnosis. See, e.g., Jenkins v. Slidella LLC, 2008 WL 2649510, *4 (E.D. La. June 27, 2008). "By failing to consider other causes, a differential diagnosis cannot, by definition, be reliable." Berg v. Johnson & Johnson, 940 F. Supp. 2d 983, 990 (D.S.D. 2013) (citing Bland, 538 F.3d at 897).

Simon's claim rests on injuries resulting from an alleged allergic reaction to Cladosporium mold. The results of skin testing conducted by Select Comfort's medical expert, Dr. H. James Wedner, indicated that in addition to Cladosporium, Simon is allergic to at least thirty-six different allergens. (Report of H. James Wedner, M.D., Doc. No. 83 at 6-7) Yet Dr. Chiodo did not conduct any allergy testing on Simon, asserting it was unnecessary. (Deposition of Dr. Ernest P. Chiodo ("Chiodo Depo."), Doc. No. 69 at 43:16) Instead, he ruled out symptoms caused by allergies to other substances based on "[t]he history from [Simon] and review of the records," and noted he did not see "any sign of a lack of truthfulness on [Simon's] part." (Id. at 41:18-42:11; 47:25-48:12) An expert physician cannot eliminate causes based simply on the patient's credibility as issues of credibility belong to the jury. Holloway v. Ameristar Casino St. Charles, Inc., 2009 WL 5169535, at *4 (E.D. Mo. Dec. 18, 2009) (citing Nichols v. Am. Nat'l

Ins. Co., 154 F.3d 875, 883 (8th Cir. 1998)). Simon relies on Heller v. Shaw Industries, Inc., 167 F.3d 146 (3rd Cir. 1999), for the proposition that a physician need not conduct every possible test and rule out all possible causes in order to apply a proper differential diagnosis. This is true so long as the physician "employed sufficient diagnostic techniques to have good grounds for his or her conclusion." Id. at 156. See also Holloway, 2009 WL 5169535, at *4 citing Turner v. Iowa Fire Equipment Co., 229 F.3d 1202, 1209 (8th Cir. 2000) (emphasis in original) (An expert must engage in a differential diagnosis that is reliably applied and "*scientifically* eliminate[s] the other potential causes of a plaintiff's condition.").

Without reliable evidence of exposure to mold or a reliable differential diagnosis, the only remaining basis for Dr. Chiodo's causation opinion is a temporal relationship between the onset of Simon's symptoms and the use of his Sleep Number® bed in 2002. According to Dr. Chiodo, "[Simon's] symptomatology matches his duration of sleeping on the moldy bed." (Chiodo Depo. at 51:21-23) He notes that Simon's records show no allergic manifestations in 1999 (id. at 48:20-49:12), but that in 2002, he presented with complaints of nasal stuffiness and shortness of breath at night (id. at 49:19-50:4). The issues "largely resolved" after he discovered the mold contamination of his bed and stopped sleeping on it. (Id. at 50:4-12) Dr. Chiodo concludes that because he is "not aware" of any other diet change or "any other exposure circumstance that matches the temporal sequence of this symptomatology," he has "ruled out" any other possible sources of Simon's allergy symptoms. (Id. at 50:10-51:7)

When asked what facts in the record he relied on to show there was mold in the bed in 2002, Dr. Chiodo replied:

> We have the fact that [Simon] bought the bed some period of time beforehand, I think 1999. That would have given ample time for mold to have developed in the bed due to the design defect of Select Comfort, that specifically the impermeable barrier that would lead to accumulation of … water and mold growth. And then we have the later discovery

of the mold, I think, sometime in 2012. So the deductive logic analysis is that there was mold contamination there during the relevant time period.

(Chiodo Depo. at 52:4-19) Yet Dr. Chiodo provides no basis, other than the alleged onset of Simon's symptoms, to conclude that mold formed in his bed in 2002.

It is well-established that a medical opinion on specific causation based primarily, if not solely, on the temporal proximity between the individual's exposure to a particular source and the onset of symptoms does not meet Daubert standards. See, e.g., Roche v. Lincoln Property Co., 278 F. Supp. 2d 744, 764-65 (E.D. Va. 2003) (collecting cases); Jenkins, 2008 WL 2649510 at *6. "Under some circumstances, a strong temporal connection is powerful evidence of causation." Bonner v. ISP Techs., 259 F.3d 924, 931 (8th Cir. 2001) (citation omitted). For example, "if a person were doused with chemical X and immediately thereafter developed symptom Y, the need for published literature showing a correlation between the two may be lessened." Id. (quoting Heller, 167 F.3d at 154. In the instant case, however, the purported temporal relationship is negated by the fact that Simon has offered three different onset dates spanning a seven year period. In both his original and amended complaints, Simon alleges he "began experiencing ailments" in "early 2009." (Doc. Nos. 5, 31) In a prior affidavit, Simon stated he experienced "sudden-onset symptoms" in 2006. (Simon Aff. at ¶ 3) During his deposition, Simon testified that beginning in 2002/2003, he began experiencing allergic reactions that he now associates with mold in his Sleep Number bed. (Simon Depo. at 44:7-22; 78:5-10)

Lastly, Dr. Chiodo has no specialized training or education in diagnosing or treating allergies or diagnosing cataracts or their causes[5] and is, therefore, unqualified to opine on the

---

[5] Dr. Chiodo acknowledged his unfamiliarity with the Lens Opacity Classification System (LOSC) (Deposition of Ernest P. Chiodo, M.D. ("Chiodo depo."), Doc. No. 69 at 86:10-12), the most commonly used standard system for determining cataract types and grading opacities (Sher Report, Doc. No. 81 at 2, 4-5; Doc. No. 153). In connection with their argument that Dr. Chiodo lacks sufficient qualifications to opine on the causation of Simon's cataracts, Select Comfort referred to an article titled "The Lens

cause of Simon's symptomology. Relying on Robinson v. GEICO General Insurance Co., 447 F.3d 1096 (8th Cir. 2006) and Isham v. Booneville Community Hospital, 2015 WL 3965701 (W.D. Ark. June 30, 2015), Simon argues that physicians with general knowledge are permitted to testify regarding medical issues that a specialist might treat in a clinical setting. (Doc. No. 118 at 4) Simon argues that Dr. Chiodo's certifications in internal medicine, occupational medicine and public health and general preventative medicine make him more qualified than most board certified allergists or ophthalmologists to testify regarding the medical issues in this case. (Id.)

It is true that a medical expert need not be a specialist in the area of his or her testimony. Hill, 2012 WL 5258753, at *2 (citing Robinson, 447 F.3d at 1100-01). However, Rule 702 does require that "the area of the witness's competence matches the subject matter of the witness's testimony." Id. Rule 702 requires that an expert "possess 'knowledge, skill, experience, training, or education' sufficient to 'assist' the trier of fact, which is 'satisfied where expert testimony advances the trier of fact's understanding to any degree.'" Id. (citing 29 Charles Alan Wright & Victor James Gold, Federal Practice & Procedure: Evidence § 6265 (1997)). Considering that Simon's very specific complaints are entirely allergen-based, Dr. Chiodo's lack of board certification as an allergist is problematic. See Roche v. Lincoln Property Co., 278 F. Supp. 2d 744 (E.D. Va. 2003); Jenkins v. Slidella L.L.C., 2008 WL 2649510, at *4 (E.D. La. June 27, 2008).

---

Opacities Classification System III," by Leo T. Chylack, Jr., MD et al., published June 1993 in the Archives of Ophthalmology, Volume 111, and marked as Defendants' Exhibit 44. (Doc. No. 153) Simon objects and moves to exclude Exhibit 44 for lack of foundation. He argues the article was not submitted with the reports of Select Comfort's experts and was not used in his cross-examination. (Doc. No. 158) Select Comfort responds that Exhibit 44 was not offered for any finding in the article itself but merely to demonstrate that the LOCS exists. Moreover, the article is self-authenticating and requires no extrinsic evidence of authenticity to be admitted. Federal Rule of Evidence 902(6). (Doc. No. 159) Accordingly, Simon's objection is overruled and his motion denied.

The Daubert test must be applied with due regard for the specialization of modern medicine. Dr. Chiodo is without question well-credentialed and has significant experience. He may not, however, be permitted to testify as to the cause of Simon's symptomology because he lacks qualifications in the field of allergy/immunology.

The Court finds Dr. Chiodo has failed to provide an adequate methodology for his conclusions on causation, and his primary reliance on temporal relationships is insufficient to satisfy the requirements of Daubert. Accordingly, Select Comfort's motion to exclude his report and testimony will be granted.

**Christopher A. Pastore, Ph.D.**

Dr. Pastore has a Ph.D. in Material Science and is currently Professor of Transdisciplinary Studies and Co-Director of the Engineering and Design Institute of Kanbar College of Design, Engineering, and Commerce at Philadelphia University. Dr. Pastore was retained to testify as a design expert regarding the alleged defect in Simon's Sleep Number® bed. It is his opinion that the bed was defective at the time of manufacture and that this defect was a direct cause of Simon's injury. According to Dr. Pastore:

> [t]he design of the bed system created a safety hazard for the user of the bed. The design of the bed promotes mold growth at the interface between the air chamber and the foam topper … where moisture can likely develop, there is negligible ventilation and no light. Select Comfort had knowledge of this problem prior to selling the product to [Simon]. Remedies were available to Select Comfort but not employed. The design of this bed is defective and unreasonably dangerous to consumers in normal use.

(Pastore Report, Doc. No. 80 at 12)

Dr. Pastore further opines that:

A manufacturer has the duty to warn of any danger from either intended or unintended by reasonably foreseeable use of its products. The product provided a danger to the user in the form of mold growth. This risk was known to Select Comfort from their own

customer support data[6] as well as industry knowledge, but no warnings or care instructions were presented to the consumer. A warning that identified the likelihood of mold growing at the interface of the foam topper and air chamber accompanied by care instructions suggesting the cleaning of the surfaces with a vacuum (preferable HEPA) and keeping the air chamber and foam topper exposed for a period of time every week would have prevented the problems that [Simon] experienced."

(Id. at 6, 12-13)

Select Comfort first argues that Dr. Pastore's mold and causation opinions should be excluded because, by his own admission, he is not a microbiologist, medical doctor or fungus expert and has no experience with mold. (Deposition of Christopher Pastore ("Pastore Depo."), Doc. No. 79 at 9:22-10:4; 12:19-13:2; 14:15-15:11; 29:12-13; 82:17-18; 89:18-22) Next, Select Comfort argues Dr. Pastore's testimony should be excluded because he has no training, education or experience in designing or consulting on mattress design and has failed to conduct a scientifically reliable methodology in his design analysis. Select Comfort also asserts that Dr. Pastore is not qualified to opine on the sufficiency of the warnings on Simon's Sleep Number bed. Lastly, Dr. Pastore's opinion regarding Select Comfort's awareness of mold growth on its mattresses based on customer complaints is unreliable given his lack of expertise with the Triumph data produced by Select Comfort.

Dr. Pastore's education and experience in the field of materials, textiles and design qualify him to testify regarding the properties of the materials that comprise Simon's mattress and opine that their configuration in the design of the mattress creates an environment which could allow mold to grow. An expert need not have experience with the particular product at issue to be qualified. Appropriate background and experience in a particular field can be

---

[6] Pastore refers to Select Comfort's customer support data (Triumph system data) showing over 1,800 complaints regarding mold or mildew for the model bed at issue here collected from 1995-1999. (Pastore Report at 4) The Court notes Select Comfort asserts these entries comprise only 0.4% of customers with Simon's model bed and does not necessarily reflect instances of mold growth or even claims of mold growth. (Doc. No. 55 at 11-12; Doc. No. 149 at 11)

sufficient to qualify an expert. Stone & Alter Real Estate Co. v. Hobart Corp., 2003 WL 25694932, at *3 (E.D. Mo. Mar. 18, 2003). See also Morton v. Homelite, Inc., 183 FRD 657, 660 (W.D. Mo. 1998) (mechanical engineer and experience with fuel containment and leak avoidance in aerospace industry qualified expert in design defect case involving multipurpose saw). Moreover, as both sides acknowledge, the mattress at issue is unique; it is not a standard innerspring or foam mattress. Instead, the mattress consists of several layers of porous materials (i.e., pillow top, foam topper) resting upon an air chamber, a vulcanized rubber membrane. (Pastore Report at 5-9) Select Comfort's disagreement with Dr. Pastore's assumptions and methodology goes to the weight, not admissibility, of his testimony. Synergetics, Inc. v. Hurst, 477 F.3d 949, 956 (8th Cir. 2006). Raising questions about, and exposing gaps in analyses and conclusions, is a task for Defendants to perform in front of a jury. Hanrahan v. Wyeth, Inc., 2012 WL 2395986, at *4 (E.D. Mo. June 25, 2012).

As for Dr. Pastore's proffered opinion on warnings, Select Comfort argues that Dr. Pastore's lack of expertise in drafting warning labels for mattresses or bedding systems, or experience regarding whether and when warnings are appropriate for potential mold growth, renders his testimony unreliable. Again, these arguments about gaps in an expert's qualifications or experience relate more to the weight to be given the expert's testimony than to its admissibility. Holbrook v. Lykes Bros. S.S.Co., Inc., 80 F.3d 777, 782 (3rd Cir. 1996). See also Robinson, 447 F.3d at 1100-01 (citations omitted).

The Court finds, however, that Dr. Pastore cannot provide the necessary causal link between the design of the mattress and mold growth and Simon's claimed injuries. He is not a microbiologist or medical doctor; he testified he was not opining as a medical expert that exposure to mold caused Simon's injury. (Pastore Depo. at 89:12-15; 14:15-15:19) In

formulating his opinions, Dr. Pastore relied on Ms. Duncan's report regarding the presence and type of mold (Pastore Depo. at 30:7-16; Pastore Report at 3), and the opinions of medical doctors who provided reports (id. at 89:15-17; 90:12-17). As discussed above, the Court has ruled that the opinions of both Ms. Duncan and Dr. Chiodo are unreliable and must be excluded. Without a reliable factual basis for his opinion, Dr. Pastore's testimony linking mold growth on the mattress to the "problems Simon experiences" approaches a "leap of faith" condemned by courts. See Roche, 278 F. Supp. at 761. For these reasons, Select Comfort's motion to exclude Dr. Pastore's report and testimony will be granted in part and denied in part.

**Motion for summary judgment**

The standards for summary judgment are well settled. In determining whether summary judgment should issue, the Court must view the facts and inferences from the facts in the light most favorable to the nonmoving party. The moving party has the burden to establish both the absence of a genuine issue of material fact, and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby Inc., 477 U.S. 242, 247 (1986); Celotex Corp. v. Carrett, 477 U.S. 317, 322 (1986). Once the moving party has met this burden, the nonmoving party may not rest on the allegations in the pleadings but must set forth by affidavit or other evidence specific facts showing that a genuine issue of material facts exists. Fed. R. Civ. P. 56(e). Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

Causation is an essential element of all of Simon's claims. In order to prevail, Simon must establish that his alleged injuries were caused by exposure to mold that grew in his Sleep

Number bed. "In a negligence claim, Missouri law requires a plaintiff to establish a causal connection between the defendant's conduct and the plaintiff's resulting injury." Chism v. W.R. Grace & Co., 158 F.3d 988, 991 (8th Cir. 1998) (citing Kraus v. Celotex Corp., 925 F. Supp. 646, 651 (E.D. Mo. 1996)). "A causal connection between the defendant and the injury-producing agent must also be established in strict liability claims." Id. To establish the necessary causal connection, the plaintiff must prove both causation in fact ("but for" causation) and proximate causation. Id. (citing Paull v. Shop 'N Save Warehouse Foods, Inc., 890 S.W.2d 401, 403 (Mo. Ct. App. 1995)). The Missouri Supreme Court has stressed that "but for causation" is an absolute minimum because it establishes causation in fact. Id. (citing Callahan v. Cardinal Glennon Hosp., 863 S.W.2d 852, 862 (Mo. 1993)).

Proof of causation related to mold claims requires scientific expertise. Brown for Estate of Kruse v. Seven Trails Investors, LLC, 456 S.W.3d 864, 870 (Mo. Ct. App. 2014). Simon attempts to establish causation through the expert testimony of Patsy Duncan and Dr. Chiodo. The Court has ruled herein that Ms. Duncan's and Dr. Chiodo's proffered opinion testimony does not satisfy the Daubert standards for admission of expert testimony. Thus, the Court will not consider their testimony on the element of causation in analyzing whether Select Comfort is entitled to summary judgment as a matter of law.

The Court finds that without expert testimony, Simon cannot raise a genuine issue of material fact concerning actual exposure to mold and whether exposure to mold caused his purported ailments, an essential element of his claims.[7] Thus, Select Comfort is entitled to summary judgment on all of Simon's claims. The Court need not address the remainder of Select Comfort's arguments.

---

[7] Indeed, at oral argument, Simon's counsel conceded that if the testimony and reports of Ms. Duncan and Dr. Chiodo were excluded, then summary judgment in favor of Select Comfort should be granted.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion to Exclude the Testimony of Dr. Ernest P. Chiodo [52] is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendants' Motion to Exclude the Testimony of Christopher A. Pastore, Ph.D. [54] is **GRANTED** in part and **DENIED** in part.

**IT IS FURTHER ORDERED** that Defendants' Motion to Exclude the Testimony of Patsy Duncan [56] is **GRANTED.**

**IT IS FURTHER ORDERED** that Defendants' Motion for Spoliation Sanctions [58] is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion to Exclude Defendants' Exhibit 44 [158] is **DENIED**.

**IT IS FINALLY ORDERED** that Defendants' Motion for Summary Judgment [60] is **GRANTED**.

A separate Judgment will accompany this Memorandum and Order.

Dated this 14th day of January, 2016.

                                              */s/ John A. Ross*
                                              **JOHN A. ROSS**
                                              **UNITED STATES DISTRICT JUDGE**